UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
GREENBELT DIVISION

SAQIB ALI

      Plaintiff,

  v.

LAWRENCE HOGAN, in his official
capacity as Governor of Maryland, and

BRIAN FROSH, in his official capacity
as Attorney General of Maryland,

      Defendants.

Case No. 1:19-CV-00078-BPG

**PLAINTIFF'S COMBINED
OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS**

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES .............................................................................. iii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

ARGUMENT ....................................................................................................... 4

I.   ALI HAS STANDING TO CHALLENGE THE EXECUTIVE  ORDER ............... 4

II.   DEFENDANTS ARE PROPER PARTIES UNDER EX PARTE YOUNG ........... 7

  A.   THE GOVERNOR IS A PROPER DEFENDANT UNDER *EX PARTE YOUNG* ................... 7

  B.   THE ATTORNEY GENERAL IS A PROPER PARTY UNDER *EX PARTE YOUNG* ............. 8

III.   THE ANTI-BDS EXECUTIVE ORDER VIOLATES ALI'S CONSTITUTIONAL RIGHT TO ENGAGE IN POLITICAL BOYCOTTS ................................................. 10

  A.   *CLAIBORNE* RESOLVES THIS DISPUTE ................................................. 10

    1)   *Claiborne* Prohibits the Anti-BDS Executive Order ..................................... 10

    2)   The Governor's Various Attempts to Distinguish *Claiborne* Fail ............... 11

  B.   *LONGSHOREMEN* AND *FAIR* DO NOT APPLY ........................................ 19

    1)   *Longshoremen* Does Not Apply Outside of the Labor Context or to Viewpoint-Based Suppression of Expressive Conduct ......................................... 20

    2)   *FAIR* Does Not Apply to Boycotts or to Viewpoint-Based Suppression of Expressive Conduct .................................................................................... 21

  C.   *ARKANSAS TIMES* IS WRONGLY DECIDED .......................................... 22

  D.   *JORDAHL* IS ON ALL FOURS WITH THIS CASE ....................................... 23

IV.   THE EXECUTIVE ORDER UNCONSTITUTIONALLY COMPELS SPEECH ............................................................................................................ 25

V.   THE EXECUTIVE ORDER IS VAGUE AND OVERBROAD ........................... 26

CONCLUSION ................................................................................................... 27

# TABLE OF AUTHORITIES

## CASES

*AFSCME Council 79 v. Scott,*
  278 F.R.D. 664 S.D. Fla. 2011).................................................................. 7

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
  570 U.S. 205 (2013) ................................................................................ 25

*Anglin v. Blue Shield of Virginia,*
  693 F.2d 315 (4th Cir. 1982) ................................................................. 24

*Arkansas Times LP v. Waldrip,*
  --- F. Supp. 3d ---, 2019 WL 580669 (E.D. Ark. Jan. 23, 2019) .............. 2, 11, 22, 23

*Arkansas Writers' Project, Inc. v. Ragland,*
  481 U.S. 221 (1987) ................................................................................ 17

*Bd. of Ancient Order of Hibernians v. Dinkins,*
  814 F. Supp. 358 (S.D.N.Y. 1993) ........................................................ 16

*Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr,*
  518 U.S. 668 (1996) ................................................................................ 18

*Boos v. Barry,*
  485 U.S. 312 (1988) ........................................................................... 15, 20

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ................................................................................ 19

*Bushey v. N. Assur. Co. of Am.,*
  362 Md. 626 (2001) ................................................................................... 5

*City of Bristol v. Earley,*
  145 F. Supp. 2d 741 (W.D. Va. 2001) ................................................... 10

*Coates v. Cincinnati,*
  402 U.S. 611 (1971) ................................................................................ 26

*Cole v. Richardson,*
  405 U.S. 676 (1972) ................................................................................ 25

*Connor B. ex rel. Vigurs v. Patrick,*
  771 F. Supp. 2d 142 (D. Mass. 2011) ..................................................... 7

*Coyne-Delany Co. v. Capital Dev. Bd. of State of Ill.*,
  616 F.2d 341 (7th Cir. 1980) ...................................................... 18

*D.G. Restaurant Corp. v. City of Myrtle Beach*,
  953 F.2d 140 (4th Cir. 1991) ...................................................... 17

*Does 1-5 v. Cooper*,
  40 F. Supp. 3d 657 (M.D.N.C. 2014) ....................................... 10

*Duke Energy Trading & Mktg., L.L.C. v. Davis*,
  267 F.3d 1042 (9th Cir. 2001) ...................................................... 7

*Ex Parte Young*
  209 U.S. 123 (1908) ................................................... 7, 8, 9, 10

*Farm Labor Org. Comm. v. Stein*,
  No. 17-CV-1037, 2018 WL 3999638 (M.D.N.C. Aug. 21, 2018) ............................ 10

*FTC v. Superior Court Trial Lawyers Association*,
  493 U.S. 411 (1990) ...................................................... 14, 22, 24

*Goldfarb v. Mayor & City Council of Baltimore*,
  791 F.3d 500 (4th Cir. 2015) ....................................................... 4

*Hall v. Virginia*,
  385 F.3d 421 (4th Cir. 2004) ....................................................... 4

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) ................................................................ 15

*Image Carrier Corp. v. Beame*,
  567 F.2d 1197, 1201 (2d Cir. 1977) .............................................. 6

*Int'l Bhd. of Elec. Workers, Local 501 v. N.L.R.B.*,
  181 F.2d 34 (2d Cir. 1950) ......................................................... 12

*Int'l Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*,
  456 U.S. 212 (1982) ...................................................... 12, 20, 21, 22

*Invisible Empire of the KKK v. Thurmont*,
  700 F. Supp. 281 (D. Md. 1988) .............................................. 16

*Jordahl v. Brnovich*,
  336 F. Supp. 3d 1016 (D. Ariz. 2018) ..................................... *passim*

*Koontz v. Watson*,
  F. Supp. 3d 1007 (D. Kan. 2018) ..................................... 2, 11, 22

*Leathers v. Medlock,*
    499 U.S. 439 (1991) ............................................................................ 17

*LeClerc v. Webb,*
    419 F.3d 405 (5th Cir. 2005) .............................................................. 6

*McBurney v. Cuccinelli,*
    616 F.3d 393 (4th Cir. 2010) .............................................................. 9

*McCutcheon v. Fed. Election Comm'n,*
    572 U.S. 185 (2014) ............................................................................ 19

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,*
    460 U.S. 575 (1983) ..................................................................... 16, 17

*Mobil Oil Corp. v. Attorney Gen. of Com. of Va.,*
    940 F.2d 73 (4th Cir. 1991) ........................................................ 8, 10

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982) ................................................................... *passim*

*Papasan v. Allain,*
    478 U.S. 265 (1986) ............................................................................ 8

*Paul v. Davis,*
    424 U.S. 693 (1976) .......................................................................... 19

*R.A.V. v. City of St. Paul, Minn.,*
    505 U.S. 377 (1992). ............................................................. 14, 15, 16

*Reeves, Inc. v. Stake,*
    447 U.S. 429 (1980) .......................................................................... 18

*Regan v. Taxation with Representation of Washington,*
    461 U.S. 540 (1983) .......................................................................... 18

*Richmond, Fredericksburg & Potomac R. Co. v. Bhd. of Maint. of Way Employees,*
    795 F.2d 1161 (4th Cir. 1986) .......................................................... 13

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ............................................................. 15, 16, 17

*Rumsfeld v. FAIR,*
    547 U.S. 47 (2006) ..................................................................... *passim*

*Rust v. Sullivan,*
    500 U.S. 173 (1991) .......................................................................... 18

*S.C. Wildlife Fed'n v. Limehouse,*
   549 F.3d 324 (4th Cir. 2008) .................................................................... 8, 9

*Times-Picayune Pub. Co. v. United States,*
   345 U.S. 594 (1953) ................................................................................ 24

*United States v. Albertini,*
   472 U.S. 675 (1985) ................................................................................ 21

*United States v. Am. Library Ass'n, Inc.,*
   539 U.S. 194 (2003) ................................................................................ 18

*United States v. O'Brien,*
   31 U.S. 367 (1968) ........................................................................... 17, 21

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.- Connecticut,*
   156 F.3d 535 (4th Cir. 1998) ................................................................... 13

*W. Va. State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ................................................................................ 25

*Waste Management Holdings, Inc. v. Gilmore,*
   252 F.3d 316 (4th Cir. 2001) .................................................................... 7

*Wisconsin v. Constantineau,*
   400 U.S. 433 (1971) ................................................................................ 19

## STATUTES

42 U.S.C. § 2000e-2 .................................................................................... 15

Md. Code, Gen. Prov. § 4-101(j)(1)(i) ............................................................ 4

Md. Code, Gen. Prov. § 8-102(b) ................................................................... 6

Md. Code, State Fin. & Proc. § 11-205.1(a) ................................................... 6

Md. Code, State Fin. & Proc. § 13-206(a)(1)(i) .............................................. 6

Md. Code, State Fin. & Proc. § 16-203(a)(12) ....................................... 6, 8, 9

Md. Code, State Gov't § 20-606 ................................................................... 15

Md. Code, State Gov't § 3-302 ...................................................................... 8

## OTHER AUTHORITIES

Executive Order 01.01.2017.25(B) ..................................................... *passim*

## INTRODUCTION

Having failed to pass his policy goals in the legislature, Governor Hogan's Executive Order punishes Saqib Ali and other potential government contractors for exercising their constitutional right to engage in a political boycott. The Governor is disciplining Ali for his activism by denying him the right to even bid on, much less enter into, government contracts unless he vows to not boycott Israel.

The Governor's Executive Order violates the First Amendment. Decades ago, in the midst of the Civil Rights Movement, government officials tried similar anti-boycott tactics to block activists who engaged in mass boycotts to combat racism.  The resulting unanimous Supreme Court decision *NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982), controls this case.  Ali has a First Amendment right to engage in political boycotts.

The Governor's Executive Order is part of a wave of state efforts to block pro-Palestinian advocacy. Whether through legislation, executive orders, or resolutions, at least 26 states have enacted Anti-Boycott, Divestment, and Sanctions ("BDS") movement measures. In response, two federal courts have already enjoined substantively similar state laws as facially unconstitutional under the First Amendment. In Arizona, a federal district court found that "the [Arizona] Act's history … suggests that the goal of the Act is to penalize the efforts of those engaged in political boycotts of Israel," then held that "such an interest is constitutionally impermissible." *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, 1049-50 (D. Ariz. 2018). In Kansas, another federal district court concluded that those who band together through boycotts to express solidarity with Palestinians "seek to amplify their voices

1

to influence change" and "are engaged in protected activity." *Koontz v. Watson*, F. Supp. 3d 1007, 1022 (D. Kan. 2018).  The court enjoined the Kansas law because "forcing plaintiff to disown her boycott is akin to forcing plaintiff to accommodate Kansas's message of support for Israel." *Id.* at 1024. A third court, *Arkansas Times LP v. Waldrip,* No. 4:18-CV-00914, --- F. Supp. 3d ---, 2019 WL 580669 (E.D. Ark. Jan. 23, 2019), disagreed with those decisions and approved of Arkansas's anti-BDS law, but that case was wrongly decided and is now on appeal to the Eighth Circuit.

The same First Amendment principles from *Jordahl* and *Koontz* dictate an identical outcome here. The Governor's "No Boycott of Israel" certification requirement violates the Constitution. The Governor's (Dkt. 9-1) and Attorney General Frosh's (Dkt. 10-1) Motions to Dismiss should be denied.

## BACKGROUND

Ali is a software engineer and former member of the Maryland House of Delegates. Complaint, Dkt. 1 ¶¶ 6, 29-32. He is also a supporter of Palestinian rights. *Id.* ¶¶ 33-34. Ali's activism on Palestinian rights have caused him to lead public demonstrations, write op-eds, lobby elected officials, and testify in public hearings. *Id.* ¶ 36. He has also organized in support of anti-Israel boycotts, known as the "Boycott, Divestment and Sanctions (BDS)" movement, including organizing his own coalition, "Freedom2Boycott in Maryland." *Id.* ¶¶ 15, 35-36.  Along with this activism, Ali personally boycotts Israel, including refusing to purchase Sabra hummus and SodaStream products. *Id.* ¶ 35.

In 2017, after the Maryland Legislature declined to pass a statutory anti-BDS law, the Governor issued Executive Order 01.01.2017.25(B). *Id.* at ¶ 21. The

Executive Order specifically bars agencies from entering into procurement contracts with a "business entity" that boycotts Israel. Executive Order at § at B. The definition of "business entity" includes a "sole proprietorship … including … any developer, consultant, contractor, supplier, or vendor." Executive Order at § A(2). The Executive Order also requires all agencies to require bidders to certify they do not and will not boycott Israel, *see id.* at § B, whether or not the bidder is a "business entity," *see id.* at § C. The Governor's signing declaration and press release explicitly state that the purpose of the Executive Order was to "oppos[e]" the "shameful BDS movement." Complaint ¶ 22.

Ali seeks to bid on state contracts that match his qualifications as a software engineer. Complaint ¶ 39. Except for the prohibitions in the Executive Order, Ali was qualified to bid on two specific government contracts: one to create software to evaluate life insurance policies for the Chief Actuary, and one to support Medicaid services software for the Department of Aging. *Id.* at ¶ 40. Ali could not fill out the bid forms because of the "No Boycott of Israel" certification requirement added by Section C of the Executive Order.  *Id.* at ¶¶ 40-41.  Since the filing of this Complaint, the Maryland Department of Information Technology, Maryland Port Administration, and Maryland Stadium Authority have posted requests for bidding

3

on software services that Ali would also be qualified and interested in bidding on.[1]
He is likewise ineligible to bid on these contracts due to the Executive Order.

Due to this ongoing infringement on his Constitutional rights, Ali brought this
lawsuit against the Governor and Attorney General. The Complaint alleges a single
count, the violation of Ali's rights under the First Amendment of the Constitution.
The Governor and Attorney General have each moved to dismiss.  Both Motions
should be denied. Ali has standing, the Court has jurisdiction, the Attorney General
and Governor are both proper parties, and the Executive Order violates the First
Amendment.

## ARGUMENT

## I.   <u>ALI HAS STANDING TO CHALLENGE THE EXECUTIVE ORDER</u>

Ali is bound by the Executive Order as both a "business entity" and as a
prospective contractor. The Governor's arguments to the contrary (Gov. MTD at 7-10)
belie the plain language of his own edict.

The Executive Order's definition of "business entity" expressly includes a "sole
proprietorship … including … any developer, consultant, contractor, supplier, or
vendor." Executive Order at § A(2). Ali, an experienced software engineer, intends to
bid on contracts as a sole proprietor.  Complaint ¶¶ 39-40.  Maryland—like all

---

[1]  *See* Maryland Government Contracts MDF5031037782, MDF5031037112,
MDF5031036069,   MDJ0331043050,   and   MDD2831043080,   *available   at*
https://emaryland.buyspeed.com/bso/external/publicBids.sdo.   Government   contract
RFPs are public records, *see* Md. Code, Gen. Prov. § 4-101(j)(1)(i), and may be
considered in deciding a motion to dismiss, *Hall v. Virginia*, 385 F.3d 421, 424 n. 3
(4th Cir. 2004); *see also Goldfarb v. Mayor & City Council of Baltimore,* 791 F.3d 500,
506-07 (4th Cir. 2015).

states—makes no distinction between an individual and a sole proprietorship. Instead, "[t]he sole proprietorship form of business provides 'complete identity of the business entity with the proprietor himself.'" *Bushey v. N. Assur. Co. of Am.*, 362 Md. 626, 637 (2001) (citation omitted). Because Ali boycotts Israel, Ali's sole proprietorship also boycotts Israel. Ali's boycott bars his sole proprietorship from entering into any government contracts under Section B of the Executive Order.

The Executive Order also applies to all "bidders" for government contracts, regardless of their status as a "business entity." Section C of the Executive Order requires a certification from any "bidder" that they do not boycott Israel. Nowhere in Section C is that requirement limited to bidders who are also "business entities." For Ali to bid on any Maryland government contract, he would have to sign the certification required by Section C. This is true whether his sole proprietorship makes him a "business entity" or not. The Executive Order affects Ali regardless of the legal classification of his business entity.

The Governor claims that Ali lacks standing because Ali "appears not to have submitted a bid or proposal or had one rejected in a way that is traceable to the Order's provisions." Gov. MTD at 10. But Ali need not actually submit a bid in order to have standing to ask for the ability to submit bids. Ali was interested in bidding on two recent contracts which he was otherwise qualified to bid on. Complaint ¶¶ 40-41. Due to the Executive Order, Ali *cannot* bid on these contracts. To bid, Ali must "certify[y] and agree[] that the bidder … has not … taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national

origin, or residence or incorporation in Israel and its territories." Executive Order §
C. Ali cannot bid because he will not lie. Doing so would not only potentially subject
Ali to civil or criminal penalties for false statements, it is also contrary to Ali's
sincerely-held religious beliefs against lying. *See* Md. Code, State Fin. & Proc. § 11-
205.1(a); Md. Code, State Fin. & Proc. § 16-203(a)(12); and Md. Code, Gen. Prov. § 8-
102(b). The Governor's Executive Order prevents Ali from taking the very "bid" step
the Governor now claims is necessary before Ali can challenge the Governor's
unconstitutional actions.

Sure, Ali could physically submit a bid proposal while striking out the "No
Boycott of Israel" certification or leaving it blank.  But standing does not require Ali
to engage in futile bids. *Image Carrier Corp. v. Beame*, 567 F.2d 1197, 1201 (2d Cir.
1977) (no requirement to bid for standing if bidding would be futile). Under Section
B of the Executive Order, any bid-recipient agency would be required to reject Ali's
bid absent the mandatory "No Boycott of Israel" certification. A missing certification
would render Ali's bid incomplete and nonresponsive. Md. Code, State Fin. & Proc. §
13-206(a)(1)(i) ("A procurement officer shall reject a bid or proposal" that is
"nonresponsive").  Ali has standing because he cannot bid; he need not undertake the
time and expense to submit a technical bid he knows he is ineligible for due to the
challenged government policy. *LeClerc v. Webb*, 419 F.3d 405, 413 (5th Cir. 2005)
("strict adherence to the standing doctrine may be excused when a policy's flat
prohibition would render submission futile").

Ali has already been harmed by the State because the Governor has rendered him ineligible to bid for or receive government contracts.  Ali has standing to challenge the Anti-BDS Executive Order.

## II.   DEFENDANTS ARE PROPER PARTIES UNDER *EX PARTE YOUNG*

Both defendants incorrectly challenge jurisdiction under *Ex Parte Young,* 209 U.S. 123 (1908). Gov. MTD at 13-14; AG MTD *passim*.

### A.   The Governor Is a Proper Defendant under *Ex Parte Young*

Contrary to his assertions (Gov. MTD at 13-15), the Governor has a "special relationship" with his own Executive Order, making him a proper defendant. Courts consistently hold that the Governor is a proper party under *Ex Parte Young* when a plaintiff seeks to challenge an executive order. *See AFSCME Council 79 v. Scott*, 278 F.R.D. 664, 670-71 (S.D. Fla. 2011); *Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1053-54 (9th Cir. 2001); *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 159 (D. Mass. 2011).  The Governor issued, and may unilaterally revoke, the Anti-BDS Executive Order.  This alone makes him a proper party.

For this reason, the Governor's reliance (Gov. MTD at 14) on *Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001) is misplaced. That case holds that a Governor might not to be a proper party under *Ex Parte Young* when plaintiffs are challenging an unconstitutional *statute* passed by the *legislature*. It does not apply to Executive Orders such as the one here.

The Governor is separately a proper defendant because he directly oversees the affected acquisition policies and practices of the agencies. *Papasan v. Allain*, 478 U.S. 265, 282 n.14 (1986); *see also* Md. Code, State Gov't § 3-302.

7

The Governor has already acted by mandating the "No Boycott of Israel" certification requirement which prevents Ali from even bidding on a Maryland government contract. *See* Section I, above.  So the Governor's claims (Gov. MTD at 15) that he is not a proper party because he has not "acted or threatened to act" is simply wrong.   Even absent the certification requirement, the recency of his Executive Order constitutes sufficient likelihood of its enforcement for *Ex Parte Young* purposes.  *See Mobil Oil Corp. v. Attorney Gen. of Com. of Va.*, 940 F.2d 73, 76 (4th Cir. 1991) ("We see no reason to assume that the Virginia legislature enacted this statute without intending it to be enforced.") (citing *Va. v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)).

### B.   The Attorney General Is a Proper Party under *Ex Parte Young*

The Attorney General is also proper party, for a reason the Attorney General notes in his own Motion. As the Attorney General concedes, he "has the authority, for example, to seek debarment of vendors who violate Maryland's procurement laws." AG MTD at 5; *see also* Md. Code, State Fin. & Proc. § 16-203(a)(12). This specific authority makes him a proper party for purposes of *Ex Parte Young*.

This authority is all that is needed for a "special relation" under *Ex Parte Young*.  As the Fourth Circuit has explained, any "*proximity to* and *responsibility for* the challenged state action" gives rise to a special relationship. *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008) (emphasis original).  In *McBurney v. Cuccinelli*, 616 F.3d 393, 400 (4th Cir. 2010), relied on by the Attorney General and the Governor, the Fourth Circuit explained *Limehouse* as it applied to Attorneys General.  There an Attorney General was not a proper party because he did not have

specified authority to enforce the challenged law. Instead, it was the Commonwealth's Attorneys—a different set of government officials—who had enforcement authority. *Id.* Here, the Attorney General specifically concedes that he has specific authority to enforce the Executive Order under Md. Code, State Fin. & Proc. § 16-203(a)(12). *See* AG MTD at 5.

Indeed, the same jurisdictional arguments made by the Attorney General were also made by the Arizona Attorney General in *Jordahl*, 336 F. Supp. 3d at 1035-36. The *Jordahl* Court rejected these arguments based on the Arizona Attorney General's parallel statutory enforcement duty in that state. *Id.* at 1035. As explained by *Jordahl*, "the lack of direct enforcement authority does not necessarily mean that the Attorney General's authority is unconnected." *Id.* Instead, *Ex Parte Young* applies when "there is a sufficient connection between the official's responsibilities and the injury that Plaintiffs might suffer," *Id.* In *Jordahl*, the Court held that "a sufficient connection exists between the Attorney General's authority to prosecute persons illegally paying public contractors and Plaintiffs' injuries." *Id.* The same result is proper here given the Attorney General's role in disbarment and criminal prosecution for violation of the Executive Order and its "No Boycott of Israel" certification requirement.

Like the Governor, the Attorney General claims that even if a special relationship exists, he should be dismissed under *Ex Parte Young* because he has "not acted or threatened to act." AG MTD at 8-9. But the Fourth Circuit has held that when an attorney general otherwise has statutory authority to enforce a challenged

law (as he does here), the attorney general's obligation to enforce the threat constitutes a threat to act, at least when the Attorney General has not expressly "disclaimed any intention of exercising her enforcement authority," *Mobil Oil Corp.*, 940 F.2d at 76.[2] Since the Attorney General has not expressly disclaimed using his authority to enforce the Anti-BDS Executive Order, he is a proper defendant.

## III.   THE ANTI-BDS EXECUTIVE ORDER VIOLATES ALI'S CONSTITUTIONAL RIGHT TO ENGAGE IN POLITICAL BOYCOTTS

### A.   *Claiborne* Resolves this Dispute

#### 1)   *Claiborne* Prohibits the Anti-BDS Executive Order

Despite the Governor's protests to the contrary (*see* Gov. MTD at 16-17), *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) prohibits the Governor's Executive Order.

In *Claiborne*, a group of black activists in Mississippi voted to boycott white merchants in opposition to those businesses' racist practices. 458 U.S at 889, 907. The activists then monitored their community's patronage of the stores, picketing the storefronts and urging people to shop elsewhere. *Id.* at 894, 907. The Supreme Court's decision was not ambiguous: *Claiborne* unanimously held that each "elemen[t] of the boycott is a form of speech or conduct" entitled to protection under the First

---

[2] *See also Farm Labor Org. Comm. v. Stein*, No. 17-CV-1037, 2018 WL 3999638, at *13 (M.D.N.C. Aug. 21, 2018), *report and recommendation adopted*, 2018 WL 4518696 (M.D.N.C. Sept. 20, 2018) (Attorney General proper *Ex Parte Young* party under *Mobil Oil* despite lack of threat); *see also Does 1-5 v. Cooper*, 40 F. Supp. 3d 657, 674 (M.D.N.C. 2014) (Attorney General proper *Ex Parte Young* party under *Mobil Oil*, despite disclaiming authority to enforce the statute); *City of Bristol v. Earley*, 145 F. Supp. 2d 741, 746 (W.D. Va. 2001) (Attorney General proper *Ex Parte Young* party under *Mobil Oil*, despite no mention of any threat of prosecution).

Amendment. *Id.* at 907. "The black citizens … in this action banded together and collectively expressed their dissatisfaction with a social structure that had denied them rights to equal treatment and respect." *Id.*

Since last year, two different federal courts have relied on *Claiborne* to conclude that politically-motivated boycotts of Israel are fully protected expressive activity. "Collective boycotting activities undertaken to achieve social, political or economic ends is conduct that is protected by the First Amendment." *Jordahl*, 336 F. Supp. 3d at 1041 (enjoining Arizona anti-BDS law). Such protests seek to band individuals together "to express, collectively, their dissatisfaction with Israel and to influence governmental action…[They] and others participating in this boycott of Israel seek to amplify their voices to influence change, as did the boycotters in Claiborne." *Koontz*, 283 F. Supp. 3d at 1022 (enjoining Kansas anti-BDS law). The same result from in *Jordahl* and *Koontz* applies here.[3]

### 2) The Governor's Various Attempts to Distinguish *Claiborne* Fail

#### a. *Claiborne* Applies to Secondary Boycotts

The Governor first argues that *Claiborne* only applies to primary, not secondary boycotts. Gov. MTD at 22-23. A primary boycott is one where the entity being boycotted is the one whose conduct is directly at issue, while a secondary boycott is targeted at third parties to compel that third party to change its relationship with the primary target. *See Int'l Bhd. of Elec. Workers, Local 501 v.*

---

[3] A third district court case, *Arkansas Times,* 2019 WL 580669, upheld an Anti-BDS Act, but that law was wrongly decided for the reasons explained in Section C, below.

*N.L.R.B.*, 181 F.2d 34, 37 (2d Cir. 1950) (Hand, J.), *aff'd*, 341 U.S. 694 (1951). *Claiborne* itself involved secondary boycotts, which the Court found protected. 458 U.S. at 898-899. The protestors had agreed to boycott all white stores (not just stores with segregation policies) until 19 specific demands were met, including "desegregation of all public schools and public facilities, the hiring of black policemen, public improvements in black residential areas, selection of blacks for jury duty, integration of bus stations so that blacks could use all facilities, and an end to verbal abuse by law enforcement officers." *Id.* Later, the boycott of all white stores focused on forcing a federally-funded community action program to agree to purchase food from black stores. *Id.* at 900-01. And still later, the same boycott was reimposed until the Port Gibson Police Force adequately responded to the shooting of a black male. *Id.* at 902.

Because *Claiborne* involved secondary boycotts, the Mississippi Supreme Court decision reversed by *Claiborne* found that plaintiffs "suffered injury to their respective businesses as the direct and proximate result of the unlawful secondary boycott." *Id.* at 920 n.57. And it is why *Claiborne* distinguished *Int'l Longshoremen's Ass'n, AFL-CIO v. Allied Int'l, Inc.*, 456 U.S. 212 (1982), noting that although the government cannot prohibit political boycotts generally, "[s]econdary boycotts and picketing *by labor unions* may be prohibited, as part of Congress striking of the delicate balance" required for labor relations. 458 U.S. at 912 (emphasis added); *see also* Section B(1), below (discussing *Longshoremen*).

*Claiborne* enshrines First Amendment protection for politically-motivated boycotts into law. The Fourth Circuit has recognized it for that proposition. *See Virginia Vermiculite, Ltd. v. W.R. Grace & Co.- Connecticut,* 156 F.3d 535, 541 n.2 (4th Cir. 1998); *Richmond, Fredericksburg & Potomac R. Co. v. Bhd. of Maint. of Way Employees*, 795 F.2d 1161, 1163 (4th Cir. 1986). *Claiborne* protects Ali's participation in the Boycott, Divestment, and Sanctions movement.

> **b.**   *Claiborne* Applies to Laws Prohibiting Political Boycotts Regardless of whether they also Prohibit Speech

The Governor claims that for *Claiborne* to apply he must punish Ali's speech, and not just Ali's expressive boycott conduct. *See* MTD at 18. *Claiborne* rejected that proposition. *Claiborne* instead held that the Government could not punish the boycott alone, separate from speech, because they are inseparable. 458 U.S. at 9125 (the "boycott clearly involved constitutionally protected activity," and its speech elements, "though not identical, are inseparable").

In any event, the Governor's mandatory "No Boycott of Israel" certification requirement expressly requires boycotters to engage in speech, which may be punished based on its content. *See* Section IV, below; *Jordahl*, 336 F. Supp. 3d at 1042 (recognizing that a "promise to refrain from engaging in certain actions that are taken in response to larger calls to action that the state opposes" is "infringing on the very kind of expressive conduct at issue in *Claiborne*").

> **c.**   The Executive Order Does Not Merely Incidentally Impact Expressive Conduct

The Governor also attempts to distinguish *Claiborne* because, according to the Governor, the Executive Order only has an incidental impact on speech. Gov. MTD

at 26-31. This is untrue. The Executive Order's "Whereas" clauses show that it is designed to suppress disfavored expression. These clauses include the statement that "[b]oycotts of people or entities because of their Israeli national origin … undermin[e] the Declaration of Cooperation" and that "[i]t is the public policy of the United States, as enshrined in several federal laws, to oppose certain boycotts of Israel." Indeed, because the Executive Order only prohibits political boycotts of Israel (and Israel only), and excludes boycotts "for business or economics reason," the Executive Order applies only when identical conduct includes a disfavored expressive element. This is the exact opposite of what is permitted under *FTC v. Superior Court Trial Lawyers Association*, 493 U.S. 411, 415-16 (1990) (distinguishing between unprotected boycotts that seek "economic advantage" and protected boycotts that seek "to change a social order").

The Supreme Court has held that even when a government may proscribe speech based on a "noncontent element" it cannot proscribe the same speech based on a content element. *RAV v. St. Paul*, 505 U.S. 377, 386 (1992). As the Court explained: "The government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government." *Id.* (emphasis original). Such a content distinction triggers First Amendment strict scrutiny. "The only interest distinctively served by the content limitation is that of displaying the [government's] special hostility towards the particular biases thus singled out. That is precisely what the First Amendment forbids." *Id.* at 395–96.

The Governor similarly seeks to compare the Executive Order to "more general commercial anti-discrimination policy." Gov. MTD at 30. But, unlike other antidiscrimination laws the Executive Order is not content neutral. *See e.g.,* 42 U.S.C. § 2000e-2; Md. Code, State Gov't § 20-606.   Instead, the Executive Order only prohibits one form of national-origin discrimination: discrimination against Israel. Executive Order at §§ A-C. Under the Executive Order, whether contractors may participate in political boycotts about the Middle East depends entirely upon whether their boycott is critical of Israel, as opposed to any other government, company, or cause. Ali remains free, for example, to economically boycott Palestine. He is also free to economically boycott Saudi Arabia and Iraq. He also remains free to boycott any domestic state, company, or cause. The Governor's Executive Order only targets anti-Israel boycotts. This makes the Executive Order impermissibly content-based. *See Boos v. Barry*, 485 U.S. 312, 319 (1988) ("Whether individuals may picket in front of a foreign embassy depends entirely upon whether their picket signs are critical of the foreign government or not.").

In general, content-neutral antidiscrimination laws may incidentally regulate expressive conduct because they are narrowly tailored to serve a compelling state interest. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623-24 (1984); *but see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (even neutral antidiscrimination law may not prohibit certain expressive conduct).   To be tailored to meet a compelling state interest, the antidiscrimination law must "not aim at the suppression of speech, [must] not distinguish between prohibited and

permitted activity on the basis of viewpoint, and [must] not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." *Jaycees*, 468 U.S. at 623.

Because the Governor's content-based Executive Order "distinguish[es] between prohibited and permitted activity on the basis of viewpoint," it fails muster under *Jaycees*. *See Invisible Empire of the KKK v. Thurmont*, 700 F. Supp. 281, 288 (D. Md. 1988) (anti-discrimination law was neither "content-neutral" nor narrowly-tailored); *Bd. of Ancient Order of Hibernians v. Dinkins*, 814 F. Supp. 358, 368 (S.D.N.Y. 1993) (similar); *see R.A.V.*, 505 U.S. at 395 (existence of content-neutral alternatives "undercuts significantly" the constitutional viability of a statute). The Anti-BDS Executive Order cannot be upheld against Ali's First Amendment challenge as an anti-discrimination law.

**d.**   *Claiborne* Applies to Laws Targeting Economic Regulation

The Government similarly claims—ignoring, among other cases, *Claiborne* itself—that the First Amendment is exempt from any "species of economic regulation." Gov. MTD at 31-32; *see Claiborne*, 458 U.S. at 912. The sole case the Governor cites for his proposition involved a sales tax on goods being applied to ink and paper. *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 578-70 (1983). *Minnesota Star* related to a viewpoint-neutral but content-based law, and stands (in dicta) for the irrelevant proposition that speakers are not entitled to special economic privileges. *Id.* at 581-85; *see also Leathers v. Medlock*, 499 U.S. 439, 447 (1991). Laws that are *not* content-neutral, like the Executive Order, are still inappropriate. *See Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228

16

(1987) (distinguishing the types of acceptable laws discussed in *Minnesota Star* when they are not content neutral and noting *Minnesota Star* law was content-based).

Further, the rule described in *Minnesota Star* only applies to incidental regulation of speakers, not regulation of speech itself. As explained above in subsection c and in *Claiborne*, even neutral laws regulating economic activity, such as antidiscrimination and antitrust laws, must meet at least the intermediate *O'Brien* test for regulating speech. *United States v. O'Brien*, 31 U.S. 367 (1968); *see also Jaycees*, 468 U.S. at 623.[4]

### e.   Government Contracts are not Subsidies

The Governor also attempts to avoid *Claiborne* by saying that the First Amendment does not apply to the Government "subsidizing" individuals when it acts as a proprietor rather than a regulator, where the Government has "significantly greater leeway" in contracting. Gov. MTD at 32-34. The Supreme Court rejected that argument in *Wabaunsee County v. Umbehr*, 518 U.S. 668 (1996). *Umbehr* held that the First Amendment applies in full to government contracting decisions, with the only distinction being that courts may consider the Government's particular proprietary "interests" in performing the relevant balancing test. *Id.* at 678-79; *see*

---

[4] The Governor claims that the *O'Brien* test does not have a tailoring requirement. Gov. MTD at 28. This argument is wrong. In *D.G. Restaurant Corp. v. City of Myrtle Beach*, 953 F.2d 140, 143-144 (4th Cir. 1991), the Fourth Circuit explained *O'Brien* as requiring a showing that "(1) the regulation is not aimed at the conduct's expressive element, and (2) the regulation is narrowly tailored so as not to impinge unnecessarily on the expressive element." This is indistinguishable from the *Jaycees* test. The Governor loses even under *O'Brien*.

*also Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968) (same for government employment).

None of the cases the Governor cites stands for his proposition. The three subsidy cases the Governor relies on are not government contracting cases, but simple government funding cases. *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 212 (2003) (funding of public library programs); *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 543 (1983) (501(c)(3) tax benefits); *Rust v. Sullivan*, 500 U.S. 173 (1991) (Title X funds). Likewise, the two government contract cases the Governor cites have no application to First Amendment claims. *Coyne-Delany Co. v. Capital Dev. Bd. of State of Ill.*, 616 F.2d 341, 342–43 (7th Cir. 1980) (no general due process right to challenge State Government's contracting decisions); *Reeves, Inc. v. Stake*, 447 U.S. 429, 447 n.10 (1980) (partial market participation limitation to dormant commerce clause).

Ali is not seeking to have his boycott activities funded by the State. Nor is he claiming an affirmative right to a government contract generally. He is simply seeking the ability to bid on state government contracts, and to have that bid considered on equal footing, regardless of his BDS activism.

### f.  States Do Not Have a First Amendment Right to Punish Expressive Conduct

Finally, the Governor claims that *Claiborne* does not apply because the State has a constitutional right to punish expressive conduct through the State's own boycotts. Gov. MTD at 34-35. The Governor's argument relies on government speech cases, which permit governments to express their own views. But the government

18

speech cases do not hold that governments have their own affirmative rights protected by the First Amendment, or that they may violate the First Amendment rights of others under the guise of government speech or expressive conduct. *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 206 (2014) ("First Amendment does not protect the government, even when the government purports to act through legislation reflecting 'collective speech'") (citations omitted). Thus, although individuals may have a First Amendment right to discriminate in hiring on the basis of immutable characteristics in certain instances, *Boy Scouts of Am. v. Dale,* 530 U.S. 640, 656 (2000), governments do not. Likewise, even pure speech by a government can violate the constitutional rights of others if it stigmatizes or creates an independent legal change in an individual's rights or status. *See Paul v. Davis,* 424 U.S. 693, 708–09 (1976) (discussing *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) ("where the State attaches 'a badge of infamy' to the citizen, due process comes into play") (citation omitted)). Unlike Ali, governments are not protected by the First Amendment, do not have the right to engage in political boycotts, and cannot retaliate against private parties for expressive conduct.

### B.     *Longshoremen* and *FAIR* Do Not Apply

The Governor claims that *Longshoremen* and *Rumsfeld v. FAIR,* 547 U.S. 47 (2006), apply here, and require the Court to uphold the Executive Order. Gov. MTD at 16-17.  The Governor is wrong.

1)   ***Longshoremen* Does Not Apply Outside of the Labor Context or to Viewpoint-Based Suppression of Expressive Conduct**

*Longshoremen* is limited to the labor context and the effect of forced boycotts on non-consenting third parties. *Longshoremen* did not hold that a political boycott was entirely unprotected speech or expressive conduct under the First Amendment. *Longshoremen* recognized that boycotting can be compared to "picketing," which is unquestionably expressive. 456 U.S. at 226; *see also Boos v. Barry*, 485 U.S. 312, 318 (1988) (picketing is "classically political speech"). Instead, *Longshoremen* held that the admittedly expressive nature of a labor-union boycott was overridden by the general, viewpoint-neutral labor law prohibition against secondary boycotts, due to those laws' interests in protecting dissenting third parties from coerced involvement in the boycott.  *Id.* at 225-26.   As *Claiborne* itself explained, the result in *Longshoremen* was not because of a lack of First Amendment "protected activity," but because a labor regulation having only an "incidental" effect on protected activity may be "justified in certain narrowly defined instances." 458 U.S. at 912 (citations omitted). "Secondary boycotts and picketing by labor unions may be prohibited, as part of Congress striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife." *Id.* (citation omitted).

In other words, labor-specific issues permit certain bans on labor boycotts as narrowly tailored to meet a compelling government interest.   The Governor's Executive Order is not a labor union regulation and the Governor lacks the same interest here. *Longshoremen* is inapplicable.

### 2)   *FAIR* Does Not Apply to Boycotts or to Viewpoint-Based Suppression of Expressive Conduct

*FAIR* also does not apply. Crucial to the *FAIR* decision was narrowly-defined conduct: law schools must provide physical access for military recruiters. *See FAIR,* 547 U.S. at 58. Once law schools supplied that access, "[t]he Solomon Amendment neither limits what law schools may say nor requires them to say anything." *Id.* at 60. The Supreme Court specifically acknowledged that law schools remained free to engage in other protest activities, including distribute dissenting bulletins, or picketing outside the military recruiters' doors. *See id.* By limiting the issue to a binary yes-or-no regarding physical access, the Supreme Court averted any legal dissection of the schools' speech or viewpoints on LGBT discrimination in the military.

*FAIR*, as limited to narrow conduct, involved an "incidental" burden on speech, which triggers at most intermediate scrutiny. 547 U.S. at 67 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)). Under the test relied on by *FAIR*, an incidental burden on speech will be upheld if "the governmental interest is unrelated to the suppression of free expression," *see O'Brien,* 391 U.S. 367; *FAIR,* 547 U.S. at 65-67.

The Executive Order creates a different situation. The Executive Order, by its terms, requires the state to scrutinize "ordinary" versus "anti-Israel" economic transactions. The Governor objects to conduct only when it expresses a viewpoint with which he disagrees. *See Koontz*, 283 F. Supp. 3d at 1023 ("conduct the Kansas Law aims to regulate is inherently expressive" under *Claiborne*); *see also* Section A(2)(c), above. The purpose of the Executive Order is to sanction BDS expression and support

21

Israel – therefore the Governor's interest is directly aimed at the suppression of free expression.

Further, *FAIR* conspicuously does not refer to the law schools' actions as a boycott. Instead, the Supreme Court states that the conduct involved was simply "treating military recruiters differently from other recruiters." 547 U.S. at 66. *FAIR* does not mention *Claiborne*, *SCTLA*, or *Longshoremen* at all. When the Supreme Court overrules, abrogates, or distinguishes prior decisions, it does so expressly. The Supreme Court's unanimous, narrow decision in *FAIR* should not be read to have upset decades of prior boycott caselaw covertly and without dissent. *See Koontz*, 283 F. Supp. 3d at 1023-24 (distinguishing *FAIR*, in part by noting that "boycotts—like parades—have an expressive quality") (citing *Claiborne*); *Jordahl*, 336 F. Supp. 3d at 1042-43 (distinguishing *FAIR*).

## C.  *Arkansas Times* Is Wrongly Decided

*Arkansas Times*, relied on by the Governor (Gov. MTD at 19 and 24) is wrongly decided for the same reasons the Governor's  *Longshoremen* and *FAIR* arguments should be rejected as described above. *Arkansas Times* reaches its primary holding that an anti-Israel-boycott prohibition does not regulate expressive conduct by distinguishing speech in support of a boycott (which *Arkansas Times* claims is protected) from the act of boycotting itself (which *Arkansas Times* claims is not). 2019 WL 580669 at *6. But as noted above in Section A(2)(b), *Claiborne* specifically rejected that distinction. Along the same lines, *Arkansas Times* also relies on *FAIR*, arguing that "[i]t is highly unlikely that, absent any explanatory speech, an external observer would ever notice that a contractor is engaging in a primary or secondary boycott of

Israel." 2019 WL 580669 at *5. But in Maryland, the "explanatory speech" is compelled by the Executive Order itself and embodied in the "No Boycott of Israel" certification requirement. *See Jordahl*, 336 F. Supp. 3d at 1042 (requiring a "promise to refrain from engaging in certain actions that are taken in response to larger calls to action that the state opposes" is "infringing on the very kind of expressive conduct at issue in *Claiborne*"); *see Section* IV, below.

### D.   *Jordahl* Is on All Fours with this Case

*Jordahl* vindicates Ali's claims. "*Claiborne* stands for the proposition that collective boycotting activities undertaken to achieve social, political or economic ends is conduct that is protected by the First Amendment." *Jordahl*, 336 F. Supp. 3d. at 1041. BDS laws like both the Arizona statute and the Maryland Governor's Executive Order only prohibit boycotts when "taken 'in compliance with or adherence to calls for a boycott of Israel.'" *Id.* at 1042; *see also* Executive Order at § B(1) (penalizing individuals "engaging in a boycott of Israel"). "Indeed, the collective element of the actions that are prohibited, together with the potential reach of what activities constitute 'other actions,' is what distinguishes this Act from those statutes that lawfully prohibit conduct that is not inherently expressive." *Jordahl*, 336 F. Supp. 3d. at 1042 (citing *FAIR*); *see also* Executive Order at §§ A(1) and (C) (penalizing "other actions intended to limit commercial relations" with Israel).

The Governor claims that *Jordahl* supports upholding the Executive Order. Gov. MTD at 20 and 26. According to the Governor, *Jordahl* only struck down the Arizona law because that anti-BDS act expressly prohibited boycotts against Israel that "are taken as part of a larger calls to action." *Id.* at 26. Not so. Rather, *Jordahl*—

paralleling the language of the statute—explained that boycotts of Israel are *always* taken as part of larger calls to action. 336 F. Supp. 3d at 1033 and 1048. That is inherent in the very concept of boycotts. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 625 (1953) ("group boycotts, or *concerted* refusals to deal") (emphasis added); *Anglin v. Blue Shield of Va.*, 693 F.2d 315, 322 (4th Cir. 1982) ("an individual refusal to deal" is not a boycott). Excluding the magic words "larger calls to action" from the Arizona statute would not have changed *Jordahl*'s result.

Nor does *Jordahl's* result turn on the inherent collective nature of boycotts. Instead, *Jordahl* turns on the fact that a boycott of Israel is politically motivated and therefore expressive conduct. 336 F. Supp. 3d at 1047; *see also SCTLA*, 493 U.S. at 415-16. Because BDS boycotts are politically motivated and therefore expressive, and because Arizona's anti-BDS Act was not narrowly-tailored to meet a compelling government interest, it was unconstitutional. *Id.* at 1049. *Jordahl* also found the Arizona anti-BDS law unconstitutional because, like here, it put an unconstitutional condition on government employment, *id.* at 1045-46, and because, like here, it unconstitutionally compelled speech, *id.* at 1042 ("when a statute requires a company, in exchange for a government contract, to promise to refrain from engaging in certain actions that are taken in response to larger calls to action that the state opposes, the state is infringing on the very kind of expressive conduct at issue in *Claiborne*"); *see also* Section IV, below.

*Jordahl* is not distinguishable. Applying it here renders the Executive Order unconstitutional and requires denial of the Governor's Motion to Dismiss.

## IV.  THE EXECUTIVE ORDER UNCONSTITUTIONALLY COMPELS SPEECH

The Maryland Executive Order unconstitutionally compels contractors and bidders to certify that they will not boycott Israel. This loyalty oath to Israel specifically violates what the Supreme Court has called a "fixed star in our constitutional constellation." *W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943). It does so by "prescrib[ing] what shall be orthodox in politics" and forcing Ali to sign a loyalty oath compelling him "to confess by word or act [his] faith" in that pro-Israel orthodoxy. *See id.*

The government is constitutionally prohibited from requiring contractors to pledge allegiance to its preferred policies. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,* 570 U.S. 205, 220–21 (2013). State governments cannot condition employment "on an oath that one has not engaged, or will not engage, in protected speech activities." *Cole v. Richardson*, 405 U.S. 676, 680 (1972) (collecting cases). Even if *FAIR* could otherwise justify the Executive Order because it prohibits conduct that lacks a speech component, *see* Section III(B)(2) above, the Executive Order separately requires that speech component from Ali and others. The result compels the very speech that reveals the Governor's viewpoint-based ban on expressive conduct and makes the Executive Order unconstitutional.

The Governor's Motion to Dismiss does not address this separate unconstitutional provision of the Executive Order. His Motion must be denied on those grounds alone.

## V.     THE EXECUTIVE ORDER IS VAGUE AND OVERBROAD

Laws are unconstitutionally vague where "men of common intelligence must necessarily guess at [their] meaning." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971) (internal citation omitted). It is by no means clear what exact activities the Governor intends to prohibit through the Executive Order. The Governor's definition of "Boycott of Israel" encompasses more than just economic conduct, i.e., "the termination of or refusal to transact business activities" with Israel. *See* Executive Order § A(1).  The definition also contains a catch-all against "other actions intended to limit commercial relations." *Id.* Such other actions "intended to limit commercial relations" easily encompass pure political speech about Israel's maltreatment of Palestinians, if done with the intent to persuade others to economically boycott Israel. They readily extend to *any* activity done in response to the Boycott, Divestment, and Sanctions movement.  The vagueness of the Executive Order and its "Boycott of Israel" definition operates to chills free speech, expression, and association.

Likewise, the Governor does not even seem to realize who the law regulates. The Governor issued the Executive Order apparently believing it does not regulate individuals like Ali.  But he failed to limit the term "business entity" to artificial single-purpose entities, including sole proprietorships.  And he failed to limit the reach of the Executive Order to "business entit[ies]," in any event; Section C requires a "No Boycott of Israel" certification from all bidders, including Ali.

The Governor's Motion also fails to address this separate constitutional deficiency. The Motion must thus be denied for these grounds alone.

26

## CONCLUSION

The Court should deny the Governor's and Attorney General's Motions to Dismiss.

March 25, 2019                        CAIR LEGAL DEFENSE FUND

                                      BY:   */s/ Lena F. Masri*
                                      LENA F. MASRI (20251) ‡
                                      GADEIR I. ABBAS (20257) ‡ *
                                      CAROLYN M. HOMER (20409) ‡
                                      453 New Jersey Ave, SE
                                      Washington, DC 20003
                                      Phone: (202) 488-8787

                                      *Attorneys for Plaintiff Saqib Ali*

                                      ‡ Admitted to practice in this Court

                                      *Mr. Abbas is licensed in VA, not in D.C.
                                      Practice limited to federal matters.

27