**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

SAQIB ALI,

        *Plaintiff,*

    v.

LAWRENCE HOGAN, *et al.*,

        *Defendants.*

\*  No. 1:19-CV-00078-CCB

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

**GOVERNOR HOGAN'S REPLY**
**IN SUPPORT OF MOTION TO DISMISS**

BRIAN E. FROSH
Attorney General of Maryland

ADAM D. SNYDER
Assistant Attorney General
Bar No. 25723
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-6398
(410) 576-6955 (fax)
asnyder@oag.state.md.us

Attorneys for Defendant Lawrence Hogan,
Governor of Maryland

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................ 1

I.    MR. ALI LACKS STANDING TO CHALLENGE THE CONSTITUTIONALITY OF THE
      EXECUTIVE ORDER BECAUSE HE HAS NOT SUFFERED A CONCRETE INJURY
      THAT CAN BE REDRESSED BY THE RELIEF HE SEEKS............................................. 2

II.   THE GOVERNOR LACKS THE "SPECIAL RELATION" TO ENFORCEMENT OF THE
      EXECUTIVE ORDER REQUIRED FOR THIS COURT'S SUBJECT MATTER
      JURISDICTION UNDER *EX PARTE YOUNG*. ................................................................ 8

III.  THE EXECUTIVE ORDER DOES NOT VIOLATE THE FIRST AMENDMENT................. 10

CONCLUSION ............................................................................................................ 19

ii

# TABLE OF AUTHORITIES

Page

## Cases

*AFSCME Council 79 v. Scott*, 278 F.R.D. 664 (S.D. Fla. 2011)......................................... 9

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
   570 U.S. 203 (2013) .................................................................................. 18

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) ....................... 11

*American Muslims for Palestine v. Arizona State Univ.*, No. CV-18-00670
   -PHX-DWL, 2018 WL 6250474 (D. Ariz. Nov. 29, 2018) .......................................... 6

*Arkansas Times LP v. Waldrip*, No. 4:18-CV-00914 BSM,
   2019 WL 580669 (E.D. Ark., Jan. 23, 2019) ......................................................... 8, 11

*Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104 (4th Cir. 2006) ................................ 5

*Babbitt v. Farm Workers*, 442 U.S. 289 (1979) ................................................................. 6

*Baker v. Carr*, 369 U.S. 186 (1962) ................................................................................... 7

*Board of Ancient Order of Hibernians v. Dinkins*,
   814 F. Supp. 358 (S.D.N.Y. 1993).................................................................... 15

*Board of County Commissioners, Wabaunsee County, Kan. v. Umbehr*,
   518 U.S. 668 (1996)........................................................................................ 16, 17

*Burson v. Freeman*, 504 U.S. 191 (1992)......................................................................... 14

*Burt v. Gates*, 502 F.3d 183 (2d Cir. 2007) ..................................................................... 11

*Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142 (D. Mass. 2011)....................... 9

*D.G. Restaurant Corp. v. City of Myrtle Beach*, 953 F.2d 140 (4th Cir. 1991) ............... 15

*Duke Energy Trading & Marketing, L.L.C. v. Davis*,
   267 F.3d 1042 (9th Cir. 2001) .......................................................................... 9

*Equal Employment Opportunity Comm'n v. Baltimore County*,
   904 F.3d 330 (4th Cir. 2018) ............................................................................ 5

*Eriline Co. S.A. v. Johnson*, 440 F.3d 648 (4th Cir. 2006).............................................. 17

*Ex parte Young*, 209 U.S. 123 (1908) ........................................................................ passim

*Harp Advert. Illinois, Inc. v. Village of Chicago Ridge, Ill.*,
    9 F.3d 1290 (7th Cir. 1993) ...................................................................................... 3

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ........................................................... 16

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ................................................ 6

*Image Carrier Corp. v. Beane*, 567 F.2d 1197 (2d Cir. 1977) ......................................... 6

*Injured Workers' Ins. Fund v. Orient Exp. Delivery Serv., Inc.*,
    190 Md. App. 438 (2010) ........................................................................................... 4

*International Longshoremen Ass'n, AFL-CIO v. Allied Int'l, Inc.*,
    456 U.S. 212 (1982) ................................................................................................. 12

*Invisible Empire of the KKK v. Thurmont*, 700 F. Supp. 281 (D. Md. 1988) .................. 15

*Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*,
    968 F.2d 286 (2d Cir. 1992) .................................................................................... 12

*Jordahl v. Brnovich*, 336 F. Supp. 3d 1016 (D. Ariz. 2018) .................................... 7, 8, 11

*Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018) ........................................... 7, 11

*LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005) .............................................................. 6

*Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32 (1999) .............. 19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................... 3

*Madsen v. Boise State Univ.*, 976 F.2d 1219 (9th Cir. 1992) ........................................... 7

*McClintock v. Eichelberger*, 169 F.3d 812 (3d Cir. 1999) ............................................. 16

*McCullen v. Coakley*, 573 U.S. 464 (2014) ......................................................... 2, 13, 14

*Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974) ...................................... 18

*Mobil Oil Corp. v. Attorney Gen. of Com. of Virginia*,
    940 F.2d 73 (4th Cir. 1991) ..................................................................................... 10

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ............................... 10, 11, 12

*Norwood v. Harrison*, 413 U.S. 455 (1973) .................................................................. 12

iv

*Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1 (1986) ................... 18

*Papasan v. Allain*, 478 U.S. 265 (1986)............................................................. 10

*Pickering v. Board of Ed. of Township High School Dist. 205, Will County*,
      391 U.S. 563 (1968) ................................................................. 17

*Reeves v. Stake*, 447 U.S. 429 (1980).............................................................. 17

*Renne v. Geary*, 501 U.S. 312 (1991).............................................................. 3

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984)....................................... 1, 12, 16

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006) ................................................ 11, 12, 18

*Runyon v. McCrary*, 427 U.S. 160 (1976)...................................................... 16

*Trinity Outdoor, L.L.C. v. City of Rockville, Maryland*,
      No. CIV. JFM-03-2372, 2004 WL 78054 (D. Md. Jan. 15, 2004) .............................. 4

*Trinity Outdoor, L.L.C. v. City of Rockville, MD*,
      123 F. App'x 101 (4th Cir. 2005) ................................................. 4

*United States v. O'Brien*, 31 U.S. 367 (1968) ................................................ 15

*Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988)............................... 10

*Wachtler v. County of Herkimer*, 35 F.3d 77 (2d Cir. 1994).......................................... 17

*Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316 (4th Cir. 2001) .............. 8, 9

*West Va. Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943) .................................... 18

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993)...................................................... 16

*Wooley v. Maynard*, 430 U.S. 7057 (1977)...................................................... 18

*Wright v. North Carolina*, 787 F.3d 256 (4th Cir. 2015) .................................... 8

## Constitutional Provisions

U.S. Const. amend. I.................................................................................passim

**Statutes**

50 U.S.C. § 4842(a)(1) ................................................................................. 13

Md. Code Ann., State Fin. & Proc. § 19-101(a)................................................. 1

Md. Code Ann., State Fin. & Proc. § 19-103 .................................................... 2

Md. Code Ann., State Fin. & Proc. § 19-107(a)............................................... 10

## GOVERNOR HOGAN'S REPLY
## IN SUPPORT OF MOTION TO DISMISS

Antidiscrimination laws like Maryland's are constitutional, as courts have long held. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 615, 623 (1984) (upholding Minnesota law forbidding discrimination based on "race, color, creed, religion, disability, national origin or sex"); Md. Code Ann., State Fin. & Proc. § 19-101(a) (forbidding commercial discrimination "on the basis of race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, or on the basis of disability"). The Executive Order at issue here is but a specific application of that more general prohibition on national-origin discrimination, as the Governor explained in the memorandum accompanying his motion to dismiss. ECF 9-1 at 30. Mr. Ali concedes the point; he acknowledges that the Executive Order "prohibits one form of national-origin discrimination: discrimination against Israel." Plaintiff's Combined Opposition to Defendants' Motions to Dismiss, ECF 11 ("Opp.") at 15.

That concession requires dismissal of Mr. Ali's claims on all three grounds identified in the Governor's motion to dismiss. First, given that national-origin discrimination is already prohibited by Maryland's antidiscrimination law, Mr. Ali lacks standing because the relief he seeks—invalidation of the Executive Order—would not redress his purported injury, as he still would not be able to certify that he will not engage in national-origin discrimination, as the standard procurement forms require independently of the Order. Second, sovereign immunity bars this suit against the Governor because the Governor does not enforce the antidiscrimination laws—the Commission on Civil Rights

does—and thus does not have the "special relation" to enforcement that *Ex parte Young* requires.   Finally, the fact that the Executive Order focuses on only "one form of national-origin discrimination" does not render it content- or viewpoint-based.  "'States adopt laws to address the problems that confront them,'" and courts "cannot infer" a discriminatory purpose from a measure's "limited scope." *McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (citations omitted)).

## I.   MR. ALI LACKS STANDING TO CHALLENGE THE CONSTITUTIONALITY OF THE EXECUTIVE ORDER BECAUSE HE HAS NOT SUFFERED A CONCRETE INJURY THAT CAN BE REDRESSED BY THE RELIEF HE SEEKS.

First, given that national-origin discrimination is already prohibited by Maryland's antidiscrimination law, Mr. Ali lacks standing because the relief he seeks—invalidation of the Executive Order—would not redress his purported injury, as he still would not be able to certify that he will not engage in national-origin discrimination.

The standard procurement application form, which Mr. Ali refers to throughout his complaint, *see, e.g.*, Compl. ¶41, requires each bidder to certify that, "[i]n preparing its Bid/proposal on this project, the Bidder/Offeror has considered all Bid/proposals submitted from qualified, potential subcontractors and suppliers, and has not engaged in 'discrimination' as defined in § 19-103 of the State Finance and Procurement Article of the Annotated Code of Maryland." Bid/Proposal Affidavit at C-1, ¶B ("Certification Regarding Commercial Nondiscrimination") (attached hereto and available at https://procurement.maryland.gov/wp-content/uploads/sites/12/2018/04/AttachmentC-Bid_Proposal-Affidavit.pdf).  The Affidavit goes on to define the term "discrimination":

"Discrimination" means any disadvantage, difference, distinction, or preference in the solicitation, selection, hiring, or commercial treatment of a vendor, subcontractor, or commercial customer on the basis of race, color, religion, ancestry, or national origin, sex, age, marital status, sexual orientation, sexual identity, genetic information or an individual's refusal to submit to a genetic test or make available the results of a genetic test, disability, or any otherwise unlawful use of characteristics regarding the vendor's, supplier's, or commercial customer's employees or owners.

*Id.*

As Mr. Ali concedes, the discrimination against Israelis and Israeli companies that the Executive prohibits is but "one form of national-origin discrimination." Opp. at 15. If, as Mr. Ali contends, he would not be able to truthfully execute the certification required under the Executive Order, Compl. ¶42, he surely would not be able to truthfully execute the standard commercial nondiscrimination certification that accompanies all State requests for bids or proposals. Accordingly, even if he were to obtain the relief he seeks— "an injunction striking the 'No Boycott of Israel' certification from any bid proposal he submits to a Maryland agency governed by Executive Order 01.01.2017.25," Compl. at 12 (¶C)—he would still not be able to bid on State projects.

To establish standing here, Mr. Ali must demonstrate that the injury he alleges— inability to bid on State contracts—likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). An injury is not redressable if another restriction, not challenged in the litigation, would cause the same injury even if the plaintiff "achieved total victory." *Harp Advert. Illinois, Inc. v. Village of Chicago Ridge, Ill.*, 9 F.3d 1290, 1291 (7th Cir. 1993) (citing *Renne v. Geary*, 501 U.S. 312, 319 (1991); *see Trinity Outdoor, L.L.C. v. City of Rockville, Maryland*, No. CIV. JFM-03-2372, 2004 WL 78054,

at *2-3 (D. Md. Jan. 15, 2004), aff'd sub nom. *Trinity Outdoor, L.L.C. v. City of Rockville, MD*, 123 F. App'x 101 (4th Cir. 2005) (following *Harp*).  Because Mr. Ali would suffer the same injury regardless of whether the certification required by the Executive Order is in place, he lacks standing to pursue this challenge.

Nor do the other reasons that Mr. Ali offers for why he should be excused from having to adhere to standing principles support his claim here.  First, although a sole proprietorship is treated as identical to the individual who created it, the converse is not necessarily true.  Not every individual does business as a sole proprietor, and in many regulatory contexts the individual must actually establish himself as a sole proprietor to fall within a measure's reach.  *See, e.g.*, *Injured Workers' Ins. Fund v. Orient Exp. Delivery Serv., Inc.*, 190 Md. App. 438, 458 (2010) (stating, in the employment context, that "[w]hether an individual is a sole proprietor is a question depending on the specific circumstances of each case").  As discussed in the Governor's motion, the Executive Order is such a measure, as it was crafted specifically to exclude individuals from its reach.  ECF 9-1 at 7-10.  Although Mr. Ali now claims that he "intends to bid on contracts as a sole proprietor," Opp. at 4, his complaint contains no such allegation.[1]

Even if Mr. Ali were to amend his complaint to include such an allegation, doing so would not eliminate the need for him to submit a bid to have standing to challenge the Executive Order.  *See* ECF 9-1 at 10-11.  The Order's certification requirement does not,

---

[1] The portions of the complaint to which Mr. Ali cites in support of this assertion—¶¶ 39 and 40—contain no allegation that he "trades as" or "does business as" a sole proprietor.

as he argues, Opp. at 5, change that result.  Yes, the certification required under the Executive Order does not use the term "business entities" and thus, if taken out of context, could be read to encompass individual bidders as well as those who trade under the name of a sole proprietorship.[2]  But even if read that way, the certification does not require that bidders certify that they do not participate in a boycott of Israel in the way that Mr. Ali alleges that he participates in the BDS movement.  *See, e.g.*, Opp. at 2 (describing his refusal to purchase "Sabra hummus and SodaStream products"); Compl., ECF-1, ¶35 (same).  Instead, the certification requires bidders to certify that they have not discriminated against Israelis and Israeli companies in the formation of their bids:

> The undersigned bidder hereby certifies and agrees that the following information is correct: *In preparing its bid on this project*, the bidder has considered *all proposals submitted from qualified, potential subcontractors and suppliers*, and has not, *in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier,* refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories.

E.O. at 3 (¶C) (emphasis added).[3]  Mr. Ali has not alleged in any way that he intends to discriminate against Israelis and Israeli companies in the formation of his bid, and it seems unlikely that he would, given that the computer-programming contracts in which he alleges

---

[2] Read within the larger context of the Executive Order, the certification applies only to those "business entities" that are subject to the Order's more general prohibition. *See Equal Employment Opportunity Comm'n v. Baltimore County*, 904 F.3d 330, 333 (4th Cir. 2018) (stating that "[w]e do not . . . construe statutory phrases in isolation; we read statutes as a whole'" (quoting *Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104, 108 (4th Cir. 2006)).

[3] Mr. Ali omits the italicized language from his quotation of the certification that appears on pages 5-6 of his opposition.

an interest would not seem to require subcontractors or suppliers, let alone overseas subcontractors or suppliers.  It is thus not the case that Mr. Ali "*cannot* bid on these contracts," Opp. at 5, without having to lie.

Nor is this like those cases that allow pre-enforcement review of criminal laws on the grounds that a plaintiff "'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'"  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *see* Opp. at 6 (arguing that requiring Mr. Ali to submit a bid to ripen his claim here would "potentially subject [him] to civil or criminal penalties").  As one court put it in a related Israel boycott case, "[t]his isn't a case where Plaintiffs would be exposed to criminal prosecution or civil penalties if they were . . . presented . . . with a state contracting opportunity conditioned on their execution of a no-boycott clause and refused to execute it.  In that circumstance, if they were denied the contract, they could simply file another lawsuit." *American Muslims for Palestine v. Arizona State Univ*., No. CV-18-00670-PHX-DWL, 2018 WL 6250474, at *8 (D. Ariz. Nov. 29, 2018).

Finally, the futility exception to the Article III standing requirement does not apply here for several reasons.  First off, the cases that Mr. Ali cites for the proposition plainly do not describe his situation.  In *Image Carrier Corp. v. Beane*, it was "obvious" that the plaintiff non-union printing businesses were injured by the requirement that the municipality only contract with union businesses, 567 F.2d 1197, 1202 (2d Cir. 1977), and in *LeClerc v. Webb*, there was "no reason" to believe that any of the "nonimmigrant alien" plaintiffs would be admitted to the Louisiana bar when some had already been denied under

a provision prohibiting "nonimmigrant aliens" from bar admission, 419 F.3d 405, 414 (5th Cir. 2005).  In contrast to those cases, it is far from obvious that Mr. Ali would not be able to submit a bid here.  And requiring that he submit a bid would give the State agency to which he submitted it the opportunity to determine whether the Order's restrictions apply to his bid, which would itself depend on what his bid includes and the capacity in which he submits it.  *See Madsen v. Boise State Univ.*, 976 F.2d 1219, 1221 (9th Cir. 1992) (requiring a party "to have actually confronted the policy he now challenges in court" establishes a "well-defined controversy between the parties"); *Baker v. Carr*, 369 U.S. 186, 204 (1962) (observing that one objective of standing is to "sharpen[] the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions").

In requiring Mr. Ali to pursue a solicitation before bringing suit, the Court would not be asking Mr. Ali to do anything more than what the plaintiffs in the other Israel boycott cases he relies on have done.  *See Koontz v. Watson*, 283 F. Supp. 3d 1007, 1014 (D. Kan. 2018); *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, 1029 (D. Ariz. 2018).  And requiring that Mr. Ali submit a bid has the added advantage of identifying the State agency that would have the "special relation" to enforcement of the Executive Order to justify invoking the *Ex parte Young* exception to the bar of sovereign immunity, as occurred in all three other Israel boycott cases.  *See Koontz*, 283 F. Supp. 3d at 1014 n.3 (Kansas Commissioner of Education); *Jordahl*, 336 F. Supp. 3d at 1029 (local sheriff and "various members of the

Coconino County Jail District Board"); [4] *Arkansas Times LP v. Waldrip*, No. 4:18-CV-00914 BSM, 2019 WL 580669 (E.D. Ark., Jan. 23, 2019) (trustees of the University of Arkansas system).   Doing so is especially important here, where neither of the state officials Mr. Ali sues—the Governor and the Attorney General—has the requisite "special relation" to enforcement of the procurement rules that the Order relates to.

## II.   THE GOVERNOR LACKS THE "SPECIAL RELATION" TO ENFORCEMENT OF THE EXECUTIVE ORDER REQUIRED FOR THIS COURT'S SUBJECT MATTER JURISDICTION UNDER *EX PARTE YOUNG*.

As discussed in the Governor's motion to dismiss, the focus of the *Ex parte Young* analysis is on the state official's "special relation" to *enforcement* of the challenged act, not his relationship to its enactment.   That is why legislators and governors are not proper defendants in cases challenging the constitutionality of state laws, despite having passed and signed those laws, respectively.   *See, e.g.*, *Wright v. North Carolina*, 787 F.3d 256, 262 (4th Cir. 2015) (members of the North Carolina's General Assembly not proper defendants under *Ex parte Young* because the Legislature had "no ability to enforce any of the laws it passes"); *Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001) (dismissing Virginia Governor, despite his "general duty to enforce the laws of Virginia," as he "lacks a specific duty to enforce the challenged statutes").

Although two of the cases that Mr. Ali cites bear some resemblance to this one, neither is from the Fourth Circuit, and both are distinguishable in that they involve directly enforceable gubernatorial action that did not involve an intervening bidding or application

---

[4] As discussed in the Attorney General Frosh's Reply at 5, the plaintiffs in *Jordahl* also named the Arizona Attorney General as a defendant.

process.  *See AFSCME Council 79 v. Scott*, 278 F.R.D. 664 (S.D. Fla. 2011) (concluding that the Governor of Florida was an appropriate defendant in a challenge to executive order requiring mandatory drug-testing of all state employees); *Duke Energy Trading & Marketing, L.L.C. v. Davis*, 267 F.3d 1042 (9th Cir. 2001) (concluding that the Governor of California was an appropriate defendant in case challenging executive order "commandeering" electricity contracts).

The third case—*Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142 (D. Mass. 2011)—cannot be squared with the Fourth Circuit's pronouncements in this area, which warn against allowing federal suits against the Governor on the grounds that he has general supervisory authority over Executive Branch officials.  *See Gilmore*, 252 F.3d at 351-52 (dismissing Governor under *Ex parte* under *Ex parte Young* over dissent's objection that he had "direct authority" over other state officials involved); *compare Connor B.*, 771 F. Supp. 2d at 159 (Governor's "direct supervisory authority" over the defendant state officials who actually administered the challenged child welfare measures sufficient for *Ex parte Young* even though he had only a "detached, supervisory role").  Ultimately, the fact that the "Governor issued, and may unilaterally revoke" the Executive Order, Opp. at 7, says nothing about how the Order is *enforced*, which is what *Ex parte Young* requires.  *See, e.g.*, 209 U.S. 123, 155-56 (1908) (limiting rule to "officers of the state [who] are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings . . . to enforce").

Within the context of the procurement processes affected by the Executive Order, the State agencies that seek to procure goods and services are the ones to initially enforce

9

the Order's terms, not the Governor himself.  And because the discrimination that the Executive Order prohibits is but "one form of national-origin discrimination" that is also prohibited under Maryland's Commercial Nondiscrimination Policy, Opp. at 15, the Commission on Civil Rights, not the Governor, would be responsible for taking action against Mr. Ali if he falsely certified that he did not discriminate on the basis of national origin.  State Fin. & Proc. § 19-107(a).  Depending on how Mr. Ali proceeded with respect to the submission of his bids, one or more of these agencies might have a sufficiently "special" enforcement role to justify a suit against them under *Ex parte Young*.  The Governor, however, does not.[5]

## III.   THE EXECUTIVE ORDER DOES NOT VIOLATE THE FIRST AMENDMENT.

Mr. Ali continues to argue that *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), controls and that his decision not to purchase Sabra hummus, SodaStream products, or other goods produced in Israel is no different from the marching, protesting, and picketing involved in the civil-rights-era boycott at issue in that case.  The critical difference between the two, of course, is that the boycott targeted in *Claiborne* involved "pure speech," whereas the boycott at issue here does not.  Mr. Ali is free to march against Israeli policies, protest the choices made by Israeli companies, or speak out in criticism of Israelis for their role in their government's actions.

---

[5] *Papasan v. Allain*, 478 U.S. 265 (1986), is not to the contrary.  It did not involve the Governor of Mississippi, but a lower-level official who supervised and was responsible for the administration of the challenged distribution of public school funds.  *Id.* at 282 n.14.  The other two cases Mr. Ali cites—*Mobil Oil Corp. v. Attorney Gen. of Com. of Virginia*, 940 F.2d 73 (4th Cir. 1991), and *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988)—are standing cases do not apply *Ex parte Young* or even mention it.

That critical difference is why this case is instead controlled by *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), which unanimously held that—when stripped of its accompanying speech—the disassociative conduct that defines a boycott does not itself involve speech or expressive conduct.  That the Court in *FAIR* did not use the word "boycott" does not detract from its analytical force, and the fact that it did not feel the need to distinguish *Claiborne*, Opp. at 22, does not mean that it "overrule[d]" or "abrogate[d]" its earlier decision. *Claiborne* is principally and historically a civil rights case, not a case about discriminatory commercial boycotts, and not until *Koontz* and *Jordahl* had it been (erroneously) applied as such.  *See, e.g.*, *Burt v. Gates*, 502 F.3d 183, 192 (2d Cir. 2007) (concluding that *FAIR*, and not *Claiborne*, controlled application of Solomon Amendment to "boycott" of military recruiters, and rejecting First Amendment challenge when the law school was not required "to associate with the military" and remained "free to disassociate themselves from the recruiters by words and deeds"); *see also Arkansas Times*, 2019 WL 580669 *5-7 (following *FAIR* and distinguishing *Claiborne*); *Jordahl*, 336 F. Supp. 3d at 1042 (agreeing that "the decision not to buy a particular brand of printer to show support for a political position . . . may not be deserving of First Amendment protections on the grounds that such action is typically only expressive when explanatory speech accompanies it").

Nor does *Claiborne* "enshrine[] First Amendment protection for politically-motivated boycotts into law," as Mr. Ali claims.  Opp. at 13.  In fact, just six years after it decided the case, the Court declined to extend *Claiborne* to boycotts that involve "commercial activity with a political impact."  *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 507-08 (1988).  And in the very *same* year, the Court upheld the

prohibition of a boycott of Soviet goods, which the Court described as "not a labor dispute with a primary employer but a political dispute with a foreign nation." *International Longshoremen Ass'n, AFL-CIO v. Allied Int'l, Inc.*, 456 U.S. 212, 224 (1982).   Lower courts too have declined to extend *Claiborne* from its civil rights context.   In addition to the district court in *Arkansas Times*, the Second Circuit found *Claiborne* "readily distinguishable" from boycotts, like the one here, that seek "to achieve an objective prohibited by valid state and federal [anti-discrimination] statutes." *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 968 F.2d 286, 297 (2d Cir. 1992). That Mr. Ali believes his purchasing decisions have a political component does not take them out of the *FAIR* analytical framework or place them under *Claiborne*.

But even if *FAIR* did not control and the Executive Order did burden speech, the Order would still pass constitutional muster just as antidiscrimination measures everywhere do.   Mr. Ali concedes that "content-neutral antidiscrimination laws may incidentally regulate expressive conduct because they are narrowly tailored to serve a compelling state interest," Opp. at 15, namely, the state's interest in restraining "acts of invidious discrimination in the distribution of publicly available goods, services, and other advantages." *Jaycees*, 468 U.S. at 628.   Even though national-origin discrimination and other forms of invidious private discrimination "may be characterized"—as Mr. Ali does here—"as a form of exercising freedom of association protected by the First Amendment," *Norwood v. Harrison*, 413 U.S. 455, 470 (1973), the state may put in place measures to prevent them because they "cause unique evils that government has a compelling interest to prevent—wholly apart from the point of view such conduct may transmit." *Jaycees*, 468

12

U.S. at 628.  Mr. Ali does not dispute this.  According to Mr. Ali, what sets the Executive Order apart from more general antidiscrimination laws is its specific focus on preventing discrimination against Israel.[6]  That specific focus on discrimination against Israelis, he argues, renders the Order both content- and viewpoint-based.  Opp. at 15.

The Supreme Court, however, has rejected the notion that a measure's focus on one aspect of a larger problem renders it content-based.  In *McCullen v. Coakley*, the Court upheld the constitutionality of a Massachusetts measure that created "buffer zones" around abortion clinics for the purpose of ensuring public safety and unobstructed passage along public sidewalks and roadways.  573 U.S. at 480.  The Court acknowledged that the measure had "the 'inevitable effect' of restricting abortion-related speech more than speech on other subjects," *id.*, but rejected the challengers' argument that, by choosing to pursue its legitimate interests "'only at abortion clinics,'" Massachusetts "'single[s] out for regulation speech about one particular topic: abortion,'" *id.* at 481 (citation omitted).

As the Court explained, courts "cannot infer" a content- or viewpoint-based purpose "from the Act's limited scope."  *Id.*  Although the "broad reach of a statute can help confirm

---

[6] In making this point, Mr. Ali states that he "remains free . . . to economically boycott" Palestine, Saudi Arabia, or Iraq.  Opp. at 15.  As explained in the Governor's motion—but consistently ignored by Mr. Ali—the Executive Order specifically excludes from its reach boycotts directed at "a public or governmental entity," E.O. at 2 (¶A.1.iv), so Mr. Ali is free to boycott Israel itself to the same degree that he could boycott Palestine, Saudi Arabia, Iraq, or any other government, so long as he does not run afoul of federal restrictions on such boycotts.  *See* 50 U.S.C. § 4842(a)(1) (prohibiting support for "any boycott fostered or imposed by any foreign country, against a [friendly] country").  But if Mr. Ali means to say that he is free to economically boycott Palestinians or Saudi Arabians, he is mistaken; Maryland law prohibits *all* forms of commercial national-origin discrimination.

that it was not enacted to burden a narrower category of disfavored speech," the converse is not true. *Id.* "'States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist.'" *Id.* (quoting *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion)). Just as the Massachusetts Legislature did not violate the First Amendment by acting "in response to a problem that was, in its experience, limited to abortion clinics," *id.* at 482, the Governor does not do so by acting in response to a particular form of national-origin discrimination that, through the efforts of the BDS movement, appears to have become a wider problem in recent years.

Nor does the fact that the Executive Order excludes from its reach boycotts "for business or economic reasons" render it content- or viewpoint-based, as Mr. Ali appears to argue. Opp. at 14.  That exclusion only demonstrates that the Governor tailored the Order's effect to boycotts entered into for discriminatory purposes, as opposed to for economic reasons or "because of the specific conduct" of the boycotted person or entity.  E.O. at 2 (¶A.1).  Even when a measure regulates speech—which the Order does not—that tailored approach is permissible.   "When selecting among various options for combating a particular problem, legislatures should be encouraged to choose the one that restricts less speech, not more." *McCullen*, 573 U.S. at 482.

Mr. Ali's arguments to the contrary—that the Executive Order is otherwise "not content neutral" and "distinguish[es] between prohibited and permitted activity on the basis of viewpoint," Opp. at 15, 16—are plainly not true.  The Order prohibits *all* boycotts of Israelis, regardless of the motivation or the message the boycotters might think they are

14

sending by declining purchase consumer goods produced in Israel.  It applies equally to people who believe that Israel ought to abandon its settlements in Palestine, as to people who believe that Israel ought to be *expanding* its settlements. The viewpoint of the boycotter does not matter; the Order targets only the discriminatory commercial effect of the boycott itself.[7]

For the same reason, the Executive Order, like antidiscrimination laws generally, also survives immediate scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968), for regulating expressive conduct.   The Order is neither "aimed at" nor "impinge[s] unnecessarily on" the conduct's "expressive element," *D.G. Restaurant Corp. v. City of Myrtle Beach*, 953 F.2d 140, 144 (4th Cir. 1991), because it exempts boycotts against Israel itself and boycotts against Israelis or Israeli companies because of their "specific conduct." E.O. at 2 (¶A.1).  The only boycotts it restricts are those that are imposed on Israelis and Israeli companies *simply because they are Israeli*, which is the type of national-origin discrimination that all antidiscrimination measures restrict.  If, as Mr. Ali seems to argue, national-origin discrimination "expresses a viewpoint" that the government cannot regulate, Opp. at 21, all those other antidiscrimination measures must fall as well, which is

---

[7] The two cases Mr. Ali cites to support his argument are fundamentally distinguishable, as both are "forced access" parade cases involving the application of antidiscrimination measures to *compel* a group to associate with people they find objectionable, and to do so in a way that affects the message their parades were meant to convey. *See* Opp. at 16 (citing *Invisible Empire of the KKK v. Thurmont*, 700 F. Supp. 281 (D. Md. 1988) (antidiscrimination measure could not be applied to force Ku Klux Klan to allow African Americans to march in parade), and *Board of Ancient Order of Hibernians v. Dinkins*, 814 F. Supp. 358 (S.D.N.Y. 1993) (same principle applied to conservative Catholic order and its right to exclude gay rights organization from its parade)).

a conclusion that cannot be squared with decades of Supreme Court precedents.  *See Jaycees*, 468 U.S. 609; *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (sex-based discrimination); *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) (race).  Those precedents establish that "federal and state antidiscrimination laws . . . [are] permissible content-neutral regulation[s] of conduct."  *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993).

In other respects, Mr. Ali's arguments do not substantively rebut the point, made in the Governor's opening memorandum, that the State is not obligated to subsidize Mr. Ali's discriminatory behavior and is free to pursue its own public policy goals through its procurement practices.  *See* ECF 9-1 at 32-35.  Although Mr. Ali is correct that the subsidies cases the Governor cited are (of course) not government contracting cases, the same principles of deference to governmental policies are at play in both contexts.  The case Mr. Ali relies on to the contrary—*Board of County Commissioners, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668 (1996), Opp. at 17—makes this point expressly.

*Umbehr* concluded that an independent government contractor who had a recurring contract with the county had a sufficient interest in that contract to support a suit alleging that he was denied the contract based on his criticism of County officials.[8]  In describing

---

[8] Although Mr. Ali does not exactly claim otherwise, the rule adopted in *Umbehr* would not benefit him, as the Court limited its holding to suits by independent contractors who have a "pre-existing commercial relationship" with the government, and not "suits by bidders or applicants for new government contracts who cannot rely on such a relationship."  *Umbehr*, 518 U.S. at 685.  Courts applying *Umbehr* have hewed closely to the limitations of its holding and have declined to extend First Amendment protections to bidders and applicants who lack an ongoing commercial relationship with the government.  *See, e.g.*, *McClintock v. Eichelberger*, 169 F.3d 812, 816 (3d Cir. 1999) (fact that plaintiff had "two prior contracts . . . for discrete services" not enough to form a "pre-existing commercial relationship with the government" under *Umbehr*).  Here, Mr. Ali does not

how lower courts must apply in the government contractor context the balancing test applicable to government employees under *Pickering v. Board of Ed. of Township High School Dist. 205, Will County*, 391 U.S. 563 (1968), the Court stated that "[d]eference is . . . due to the government's reasonable assessments of its interests *as contractor*," because when the government "exercise[s] contractual power," "its interests as a public service provider, including its interest in being free from intensive judicial supervision of its daily management functions, are potentially implicated." *Umbehr*, 518 U.S. at 678; *see also id.* at 676 (noting the government's "significant" interest "in achieving its goals as effectively and efficiently as possible"). The deference due the government in the procurement context reflects the fact that "States may fairly claim some measure of a sovereign interest in retaining freedom to decide how, with whom, and for whose benefit to deal." *Reeves, Inc. v. Stake*, 447 U.S. 429, 438 n.10 (1980).

Finally, Mr. Ali ends his opposition with two arguments that he claims prevents dismissal of his claims.[9] Opp. at 25-26. Neither merits much discussion. The certification requirement of the Executive Order no more "compels speech" than do the certification

---

allege that he has formed a "pre-existing commercial relationship" with the State sufficient to fall within the rule of *Umbehr*.

[9] That the Governor's motion to dismiss did not address Mr. Ali's compelled speech, vagueness, and overbreadth theories expressly is of no moment when the motion sought dismissal principally on the grounds that Mr. Ali's purchasing decisions do not implicate the First Amendment at all. But even if that were not the case, "'[t]he district court has the power to dismiss a complaint sua sponte for failure to state a claim,' so long as the plaintiff is given notice and 'an opportunity to be heard.'" *Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994) (citations omitted); *see also Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 655 n.10 (4th Cir. 2006) (citing *Wachtler*).

requirements used to ensure compliance with general nondiscrimination provisions, which

Mr. Ali presumably does not object to.   And the Supreme Court in *FAIR* upheld

requirements, like this one, that are "plainly incidental" to a measure's "regulation of

conduct."   547 U.S. at 62.   The submission of a certification to the government to

demonstrate eligibility for a government program no more compels speech than do

application materials more generally and is "a far cry from the compelled speech" that the

Supreme Court previously has found to be unconstitutional.   *Id.* (citing *West Va. Bd. of Ed.*

*v. Barnette*, 319 U.S. 624, 642 (1943) (striking down state law requiring schoolchildren to

recite the Pledge of Allegiance and to salute the flag), and *Wooley v. Maynard*, 430 U.S.

705, 717 (1977) (striking down requirement that New Hampshire motorists display the

state motto—"Live Free or Die"—on their license plates); *see also Pacific Gas & Elec.*

*Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 20-21 (1986) (state agency cannot require

a utility company to include a third-party newsletter in its billing envelope); *Miami Herald*

*Publishing Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (right-of-reply statute violates editors'

right to determine the content of their newspapers).   Nor is there any compulsion here at

all.   As the Supreme Court stated in a case relied on by Mr. Ali, "if a party objects to a

condition on the receipt of [government] funding, its recourse is to decline the funds.   This

remains true when the objection is that a condition may affect the recipient's exercise of

its First Amendment rights."   *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,

570 U.S. 203, 214 (2013).

Nor is the Order vague.   It is clearly applicable only to commercial conduct and

expressly excludes actions—like Mr. Ali's BDS advocacy—"that are not commercial in

nature."  E.O. at 2 (¶ A.1.i).  It chills only "one form of national-origin discrimination," Opp. at 15, not Mr. Ali's speech, expression, or association.  As for overbreadth, the Order *is* limited to "artificial" entities, and the certification requirement *is* limited to discrimination in the preparation of the bid itself, and thus does not encompass participation in boycotts more generally, as Mr. Ali claims.  Opp. at 26.  The "overbreadth doctrine is not casually employed," and its "limited" function "attenuates" as the target of the regulation—as here—"moves from 'pure speech' toward conduct." *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 39-40 (1999) (internal quotation marks omitted).  It has no application to the Executive Order, which, through its exclusions, focuses specifically on discriminatory conduct that is otherwise prohibited by law.

## CONCLUSION

Mr. Ali's complaint should be dismissed.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Adam D. Snyder

_____

ADAM D. SNYDER
Assistant Attorney General
Bar No. 25723
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
asnyder@oag.state.md.us
(410) 576-6398
(410) 576-6955 (facsimile)

Attorneys for Defendant Lawrence Hogan, Governor of Maryland

19

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2019, the foregoing document was filed with the Clerk of the Court and served on all counsel of record electronically through the Court's CM/ECF system.

__/s/ Adam D. Snyder____
Adam D. Snyder

| Attachment C.        Bid/Proposal Affidavit |
|---|

## A.     AUTHORITY

I hereby affirm that I, _____ (name of affiant) am the _____ (title) and duly authorized representative of _____ (name of business entity) and that I possess the legal authority to make this affidavit on behalf of the business for which I am acting.

## B.     CERTIFICATION REGARDING COMMERCIAL NONDISCRIMINATION

The undersigned Bidder/Offeror hereby certifies and agrees that the following information is correct: In preparing its Bid/proposal on this project, the Bidder/Offeror has considered all Bid/proposals submitted from qualified, potential subcontractors and suppliers, and has not engaged in "discrimination" as defined in § 19-103 of the State Finance and Procurement Article of the Annotated Code of Maryland. "Discrimination" means any disadvantage, difference, distinction, or preference in the solicitation, selection, hiring, or commercial treatment of a vendor, subcontractor, or commercial customer on the basis of race, color, religion, ancestry, or national origin, sex, age, marital status, sexual orientation, sexual identity, genetic information or an individual's refusal to submit to a genetic test or make available the results of a genetic test, disability, or any otherwise unlawful use of characteristics regarding the vendor's, supplier's, or commercial customer's employees or owners. "Discrimination" also includes retaliating against any person or other entity for reporting any incident of "discrimination". Without limiting any other provision of the solicitation on this project, it is understood that, if the certification is false, such false certification constitutes grounds for the State to reject the Bid/proposal submitted by the Bidder/Offeror on this project, and terminate any contract awarded based on the Bid/proposal. As part of its Bid/proposal, the Bidder/Offeror herewith submits a list of all instances within the past four (4) years where there has been a final adjudicated determination in a legal or administrative proceeding in the State of Maryland that the Bidder/Offeror discriminated against subcontractors, vendors, suppliers, or commercial customers, and a description of the status or resolution of that determination, including any remedial action taken. Bidder/Offeror agrees to comply in all respects with the State's Commercial Nondiscrimination Policy as described under Title 19 of the State Finance and Procurement Article of the Annotated Code of Maryland.

## B-1.     CERTIFICATION REGARDING MINORITY BUSINESS ENTERPRISES.

The undersigned Bidder/Offeror hereby certifies and agrees that it has fully complied with the State Minority Business Enterprise Law, State Finance and Procurement Article, § 14-308(a)(2), Annotated Code of Maryland, which provides that, except as otherwise provided by law, a contractor may not identify a certified minority business enterprise in a Bid/proposal and:

(1) Fail to request, receive, or otherwise obtain authorization from the certified minority business enterprise to identify the certified minority bid/proposal;

(2) Fail to notify the certified minority business enterprise before execution of the contract of its inclusion in the Bid/proposal;

(3) Fail to use the certified minority business enterprise in the performance of the contract; or

(4) Pay the certified minority business enterprise solely for the use of its name in the Bid/proposal.

Without limiting any other provision of the solicitation on this project, it is understood that if the certification is false, such false certification constitutes grounds for the State to reject the

Bid/proposal submitted by the Bidder/Offeror on this project, and terminate any contract awarded based on the Bid/proposal.

**B-2.   CERTIFICATION   REGARDING   VETERAN-OWNED   SMALL   BUSINESS ENTERPRISES.**

The undersigned Bidder/Offeror hereby certifies and agrees that it has fully complied with the State veteran-owned small business enterprise law, State Finance and Procurement Article, § 14-605, Annotated Code of Maryland, which provides that a person may not:

(1)   Knowingly and with intent to defraud, fraudulently obtain, attempt to obtain, or aid another person in fraudulently obtaining or attempting to obtain public money, procurement contracts, or funds expended under a procurement contract to which the person is not entitled under this title;

(2)   Knowingly and with intent to defraud, fraudulently represent participation of a veteran-owned small business enterprise in order to obtain or retain a Bid/proposal preference or a procurement contract;

(3)   Willfully and knowingly make or subscribe to any statement, declaration, or other document that is fraudulent or false as to any material matter, whether or not that falsity or fraud is committed with the knowledge or consent of the person authorized or required to present the declaration, statement, or document;

(4)   Willfully and knowingly aid, assist in, procure, counsel, or advise the preparation or presentation of a declaration, statement, or other document that is fraudulent or false as to any material matter, regardless of whether that falsity or fraud is committed with the knowledge or consent of the person authorized or required to present the declaration, statement, or document;

(5)   Willfully and knowingly fail to file any declaration or notice with the unit that is required by COMAR 21.11.13; or

(6)   Establish, knowingly aid in the establishment of, or exercise control over a business found to have violated a provision of § B-2(1) -(5) of this regulation.

**C.   AFFIRMATION REGARDING BRIBERY CONVICTIONS**

I FURTHER AFFIRM THAT:

Neither I, nor to the best of my knowledge, information, and belief, the above business (as is defined in Section 16-101(b) of the State Finance and Procurement Article of the Annotated Code of Maryland), or any of its officers, directors, partners, controlling stockholders, or any of its employees directly involved in the business's contracting activities including obtaining or performing contracts with public bodies has been convicted of, or has had probation before judgment imposed pursuant to Criminal Procedure Article, § 6-220, Annotated Code of Maryland, or has pleaded nolo contendere to a charge of, bribery, attempted bribery, or conspiracy to bribe in violation of Maryland law, or of the law of any other state or federal law, except as follows (indicate the reasons why the affirmation cannot be given and list any conviction, plea, or imposition of probation before judgment with the date, court, official or administrative body, the sentence or disposition, the name(s) of person(s) involved, and their current positions and responsibilities with the business):

_____

_____

**D.     AFFIRMATION REGARDING OTHER CONVICTIONS**

I FURTHER AFFIRM THAT:

Neither I, nor to the best of my knowledge, information, and belief, the above business, or any of its officers, directors, partners, controlling stockholders, or any of its employees directly involved in the business's contracting activities including obtaining or performing contracts with public bodies, has:

(1)    Been convicted under state or federal statute of:

    (a)    A criminal offense incident to obtaining, attempting to obtain, or performing a public or private contract; or

    (b)    Fraud, embezzlement, theft, forgery, falsification or destruction of records or receiving stolen property;

(2)    Been convicted of any criminal violation of a state or federal antitrust statute;

(3)    Been convicted under the provisions of Title 18 of the United States Code for violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 et seq., or the Mail Fraud Act, 18 U.S.C. § 1341 et seq., for acts in connection with the submission of Bids/Proposals for a public or private contract;

(4)    Been convicted of a violation of the State Minority Business Enterprise Law, § 14-308 of the State Finance and Procurement Article of the Annotated Code of Maryland;

(5)    Been convicted of a violation of § 11-205.1 of the State Finance and Procurement Article of the Annotated Code of Maryland;

(6)    Been convicted of conspiracy to commit any act or omission that would constitute grounds for conviction or liability under any law or statute described in subsections (1)— (5) above;

(7)    Been found civilly liable under a state or federal antitrust statute for acts or omissions in connection with the submission of Bids/Proposals for a public or private contract;

(8)    Been found in a final adjudicated decision to have violated the Commercial Nondiscrimination Policy under Title 19 of the State Finance and Procurement Article of the Annotated Code of Maryland with regard to a public or private contract;

(9)    Been convicted of a violation of one or more of the following provisions of the Internal Revenue Code:

    (a)    §7201, Attempt to Evade or Defeat Tax;

    (b)    §7203, Willful Failure to File Return, Supply Information, or Pay Tax,

    (c)    §7205, Fraudulent Withholding Exemption Certificate or Failure to Supply Information;

    (d)    §7206, Fraud and False Statements, or

    (e)    §7207 Fraudulent Returns, Statements, or Other Documents;

(10)   Been convicted of a violation of 18 U.S.C. §286 Conspiracy to Defraud the Government with Respect to Claims, 18 U.S.C. §287, False, Fictitious, or Fraudulent Claims, or 18 U.S.C. §371, Conspiracy to Defraud the United States;

(11)   Been convicted of a violation of the Tax-General Article, Title 13, Subtitle 7 or Subtitle 10, Annotated Code of Maryland;

(12)   Been found to have willfully or knowingly violated State Prevailing Wage Laws as provided in the State Finance and Procurement Article, Title 17, Subtitle 2, Annotated Code of Maryland, if:

    (a)   A court:

        (i)  Made the finding; and

        (ii)  Decision became final; or

    (b)   The finding was:

        (i)  Made in a contested case under the Maryland Administrative Procedure act; and

        (ii)  Not overturned on judicial review;

(13)  Been found to have willfully or knowingly violated State Living Wage Laws as provided in the State Finance and Procurement Article, Title 18, Annotated Code of Maryland, if:

    (a)   A court:

        (i)  Made the finding; and

        (ii)  Decision became final; or

    (b)   The finding was:

        (i)  Made in a contested case under the Maryland Administrative Procedure act; and

        (ii)  Not overturned on judicial review;

(14)  Been found to have willfully or knowingly violated the Labor and Employment Article, Title 3, Subtitles 3, 4, or 5, or Title 5, Annotated Code of Maryland, if:

    (a)   A court:

        (i)  Made the finding; and

        (ii)  Decision became final; or

    (b)   The finding was:

        (i)  Made in a contested case under the Maryland Administrative Procedure act; and

        (ii)  Not overturned on judicial review; or

(15)  Admitted in writing or under oath, during the course of an official investigation or other proceedings, acts or omissions that would constitute grounds for conviction or liability under any law or statute described in §§ B and C and subsections D(1)—(14) above, except as follows (indicate reasons why the affirmations cannot be given, and list any conviction, plea, or imposition of probation before judgment with the date, court, official or administrative body, the sentence or disposition, the name(s) of the person(s) involved and their current positions and responsibilities with the business, and the status of any debarment):

_____

_____

**E.**      **AFFIRMATION REGARDING DEBARMENT**

I FURTHER AFFIRM THAT:

Neither I, nor to the best of my knowledge, information, and belief, the above business, or any of its officers, directors, partners, controlling stockholders, or any of its employees directly involved in the business's contracting activities, including obtaining or performing contracts with public bodies, has ever been suspended or debarred (including being issued a limited denial of participation) by any public entity, except as follows (list each debarment or suspension providing the dates of the suspension or debarment, the name of the public entity and the status of the proceedings, the

name(s) of the person(s) involved and their current positions and responsibilities with the business, the grounds of the debarment or suspension, and the details of each person's involvement in any activity that formed the grounds of the debarment or suspension).

_____

_____

**F.      AFFIRMATION REGARDING DEBARMENT OF RELATED ENTITIES**

I FURTHER AFFIRM THAT:

(1)   The business was not established and does not operate in a manner designed to evade the application of or defeat the purpose of debarment pursuant to Sections 16-101, et seq., of the State Finance and Procurement Article of the Annotated Code of Maryland; and

(2)   The business is not a successor, assignee, subsidiary, or affiliate of a suspended or debarred business, except as follows (you must indicate the reasons why the affirmations cannot be given without qualification):

_____

_____

**G.      SUBCONTRACT AFFIRMATION**

I FURTHER AFFIRM THAT:

Neither I, nor to the best of my knowledge, information, and belief, the above business, has knowingly entered into a contract with a public body under which a person debarred or suspended under Title 16 of the State Finance and Procurement Article of the Annotated Code of Maryland will provide, directly or indirectly, supplies, services, architectural services, construction related services, leases of real property, or construction.

**H.      AFFIRMATION REGARDING COLLUSION**

I FURTHER AFFIRM THAT:

Neither I, nor to the best of my knowledge, information, and belief, the above business has:

(1)   Agreed, conspired, connived, or colluded to produce a deceptive show of competition in the compilation of the accompanying Bid/proposal that is being submitted; or

(2)   In any manner, directly or indirectly, entered into any agreement of any kind to fix the Bid/proposal price of the Bidder/Offeror or of any competitor, or otherwise taken any action in restraint of free competitive bidding in connection with the contract for which the accompanying Bid/proposal is submitted.

**I.      CERTIFICATION OF TAX PAYMENT**

I FURTHER AFFIRM THAT:

Except as validly contested, the business has paid, or has arranged for payment of, all taxes due the State of Maryland and has filed all required returns and reports with the Comptroller of the Treasury, State Department of Assessments and Taxation, and Department of Labor, Licensing, and Regulation, as applicable, and will have paid all withholding taxes due the State of Maryland prior to final settlement.

**J.      CONTINGENT FEES**

I FURTHER AFFIRM THAT:

The business has not employed or retained any person, partnership, corporation, or other entity, other than a bona fide employee, bona fide agent, bona fide salesperson, or commercial selling agency working for the business, to solicit or secure the Contract, and that the business has not paid or agreed to pay any person, partnership, corporation, or other entity, other than a bona fide employee, bona fide agent, bona fide salesperson, or commercial selling agency, any fee or any other consideration contingent on the making of the Contract.

**K.   CERTIFICATION REGARDING INVESTMENTS IN IRAN**

(1)   The undersigned certifies that, in accordance with State Finance and Procurement Article, §17-705, Annotated Code of Maryland:

(a)   It is not identified on the list created by the Board of Public Works as a person engaging in investment activities in Iran as described in State Finance and Procurement Article, §17-702, Annotated Code of Maryland; and

(b)   It is not engaging in investment activities in Iran as described in State Finance and Procurement Article, §17-702, Annotated Code of Maryland.

(2)   The undersigned is unable to make the above certification regarding its investment activities in Iran due to the following activities:

_____

_____

**L.   CONFLICT MINERALS ORIGINATED IN THE DEMOCRATIC REPUBLIC OF CONGO (FOR SUPPLIES AND SERVICES CONTRACTS)**

I FURTHER AFFIRM THAT:

The business has complied with the provisions of State Finance and Procurement Article, §14-413, Annotated Code of Maryland governing proper disclosure of certain information regarding conflict minerals originating in the Democratic Republic of Congo or its neighboring countries as required by federal law.

**M.   PROHIBITING DISCRIMINATORY BOYCOTTS OF ISRAEL**

I FURTHER AFFIRM THAT:

In preparing its bid/proposal on this project, the Bidder/Offeror has considered all bid/proposals submitted from qualified, potential subcontractors and suppliers, and has not, in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier, refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories. The Bidder/Offeror also has not retaliated against any person or other entity for reporting such refusal, termination, or commercially limiting actions. Without limiting any other provision of the solicitation for bid/proposals for this project, it is understood and agreed that, if this certification is false, such false certification will constitute grounds for the State to reject the bid/proposal submitted by the Bidder/Offeror on this project, and terminate any contract awarded based on the bid/proposal.

**N.   I FURTHER AFFIRM THAT:**

Any claims of environmental attributes made relating to a product or service included in the bid or bid/proposal are consistent with the Federal Trade Commission's Guides for the Use of Environmental Marketing Claims as provided in 16 C.F.R. §260, that apply to claims about the environmental attributes of a product, package or service in connection with the marketing, offering for sale, or sale of such item or service.

**O.     ACKNOWLEDGEMENT**

I ACKNOWLEDGE THAT this Affidavit is to be furnished to the Procurement Officer and may be distributed to units of: (1) the State of Maryland; (2) counties or other subdivisions of the State of Maryland; (3) other states; and (4) the federal government. I further acknowledge that this Affidavit is subject to applicable laws of the United States and the State of Maryland, both criminal and civil, and that nothing in this Affidavit or any contract resulting from the submission of this Bid/proposal shall be construed to supersede, amend, modify or waive, on behalf of the State of Maryland, or any unit of the State of Maryland having jurisdiction, the exercise of any statutory right or remedy conferred by the Constitution and the laws of Maryland with respect to any misrepresentation made or any violation of the obligations, terms and covenants undertaken by the above business with respect to (1) this Affidavit, (2) the contract, and (3) other Affidavits comprising part of the contract.

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE CONTENTS OF THIS AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

By: _____

*Signature of Authorized Representative and Affiant*

Printed Name: _____

*Printed Name of Authorized Representative and Affiant*

Title: _____

*Title*

Date: _____

*Date*

_____