**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

SAQIB ALI,

v.

Civil No. CCB-19-0078

LAWRENCE HOGAN, *et al.*

\* \* \*

**Memorandum**

Saqib Ali brings this facial First Amendment challenge to Governor Lawrence Hogan's Executive Order 01.01.2017.25, entitled "Prohibiting Discriminatory Boycotts of Israel in State Procurement." ECF No. 9-1 at 43. Mr. Ali has sued Governor Lawrence Hogan and Attorney General Brian Frosh (the "defendants"), in their official capacities, requesting declaratory and injunctive relief. Specifically, Mr. Ali asks this court to declare Executive Order 01.01.2017.25 invalid and to enjoin its enforcement because, he contends, the "No Boycott of Israel" clause violates the First Amendment. The plain text of the Order appears to proscribe executive agencies from executing procurement contracts with business entities that boycott Israel. E.O. 01.01.2017.25(B). The defendants filed motions to dismiss, and oral argument was heard on August 1, 2019.

Unexpectedly, the Governor, interpreting his own executive order, asserted in his Reply and at oral argument, through counsel, that the Order prohibits only national-origin discrimination against Israelis in the formation of a bid for a state contract, leaving Mr. Ali and other potential state contractors free to boycott Israel and Israeli companies outside the bid formation process without compromising their eligibility to receive and maintain procurement contracts with the state. On this basis, the defendants argue that Mr. Ali lacks standing to bring

1

this lawsuit, because the boycott activities he describes in the complaint do not involve the bid formation process, because his proffered activities are carved out of the Order's definition of a boycott, and because he has not submitted a bid to test the contours of the Order's prohibition. Mr. Ali rightly notes that a potential contractor reading Section B of the Order would be led to believe that the Order's prohibitions were more expansive, and he asserts that the Governor's position is somewhat of a bait-and-switch used to duck this facial challenge. And yet, given the opaque language and structure of the Order, the parties' various interpretations of its meaning, and the Governor's express disavowal of its applicability to Mr. Ali's boycott of Israel as it is described in the complaint, the court is hesitant to reach the Order's constitutionality before there precipitates a more distilled dispute.

By way of background, and as Mr. Ali tells it, the Boycott, Divestment, Sanctions ("BDS") movement is an international effort "to impose economic pressure on Israel to substantially alter the country's practices and policies regarding Palestinians. . . . [and] seeks the peaceful end of Israeli discrimination against and maltreatment of Palestinians. The BDS movement specifically encourages economic divestment from institutions that are not in compliance with established international law related to the Israeli occupation of Palestine." ECF 1, Compl. ¶ 15. At least twenty-five states have implemented so-called "anti-BDS" requirements, some through legislation, and some, like Maryland, through executive order. While they range in specificity and the precise actions prohibited, these laws and regulations similarly purport to refuse state contracts to individuals and/or entities that boycott Israel. *See, e.g., Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717 (W.D. Tex. 2019) (Texas); *Arkansas Times LP v. Waldrip*, 362 F. Supp. 3d 617 (E.D. Ark. 2019) (Arkansas); *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016 (D. Ariz. 2018) (Arizona); *Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan.

2018) (Kansas). All but one (Arkansas's) have been held to constitute an unconstitutional restriction on the protected First Amendment right to engage in a political boycott under *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). *Id.* As explicated below, however, the Maryland Order's definition of a boycott appears to be more narrow than those promulgated in Kansas, Arkansas, Arizona, and Texas, chiefly because it comes with five carve-outs, the third of which appears to be a catch-all provision that allows a potential contractor to boycott an Israeli person or entity "because of the specific conduct of the person or entity." *Id.*; E.O. 01.01.2017.25(A)(1).

Several anti-BDS bills were introduced in the Maryland legislature between 2014 and 2017, but they failed to pass. Compl. ¶ 21. On October 23, 2017, Governor Hogan issued Executive Order 01.01.2017.25. He proclaimed: "The shameful BDS movement seeks to undercut those rights and freedoms, using economic discrimination and fear, by boycotting Israeli companies and prohibiting them from doing business in the United States. . . . The executive order further strengthens Maryland's opposition to the Boycott, Divestment, Sanctions (BDS) movement, a discriminatory campaign designed to undermine global trade with Israel." *Id.* ¶ 22.

Mr. Ali is an experienced computer software engineer, a former Maryland state legislator, a resident of North Potomac, Maryland, and a United States citizen. *Id.* ¶¶ 29-32. Mr. Ali also is a political activist. He "has dedicated himself to education and advocacy regarding the plight of the Palestinian people . . . [and] works to enlist as many members of the public as possible in joining him in non-violent opposition to Israel's maltreatment of Palestinians." *Id.* ¶ 34. Mr. Ali also supports BDS. "Personally, Saqib Ali refuses to purchase Sabra hummus or SodaStream products, which have ties to Israel and its occupation of Palestine. He also advocates for others to

3

join the BDS movement, and monitors current events in order to identify and promote specific BDS actions." *Id.* ¶ 35. He has led public demonstrations and testified against proposed anti-BDS legislative efforts in Maryland. *Id.* ¶ 36. In 2014, he organized "Freedom2Boycott in Maryland," a grassroots effort to oppose the same proposed legislation. *Id.* ¶ 37.

As a professional software engineer, Mr. Ali seeks to submit bids for state contracts. *Id.* ¶ 39. He pleads that there are two specific projects for which Maryland has put out a call for bids and for which he generally has the requisite qualifications. *Id.* ¶ 40. The Maryland Office of the Chief Actuary has solicited bids for the creation of life insurance evaluation software (Bid Solicitation #MDD8031042042) and the Maryland Department of Aging has called for software support related to Medicaid (Bid Solicitation #MDD2631042358). *Id.* Under Mr. Ali's interpretation of Executive Order 01.01.2017.25, he is barred from submitting a bid for either state contract because he boycotts certain Israeli companies and he "cannot certify in good faith that he has not 'refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories.'" *Id.* ¶ 42 (quoting E.O. 01.01.2017.25(C)). Accordingly, he filed the present complaint.

The starting point here is the text. Executive Order 01.01.2017.25 dictates that:

> "Executive agencies may not execute a procurement contract with a business entity unless it certifies, in writing when the bid is submitted or the contract is renewed that:
>
> 1. it is not engaging in a boycott of Israel; and
> 2. it will, for the duration of its contractual obligation, refrain from a boycott of Israel."

E.O. 01.01.2017.25(B). "Boycott of Israel" has the following meaning within the Order: "the termination of or refusal to transact business activities, or other actions intended to limit

4

commercial relations, with a person or entity because of its Israeli national origin, or residence or incorporation in Israel and its territories." E.O. 01.01.2017.25(A)(1). But there are five carve-outs. "'Boycott of Israel' does not include actions taken: (i) that are not commercial in nature; (ii) for business or economic reasons; (iii) because of the specific conduct of the person or entity; (iv) against a public or governmental entity; or (v) that are forbidden by the United States pursuant to 50 U.S.C. § 4607." *Id*.[1]

Critically however, while it can be read as a separate required certification, any mandate contained within Section B is not contained within the Maryland Bid/Proposal Affidavit, which potential contractors are required to submit with their bids. Instead, potential contractors are required to sign a different, and seemingly narrower, certification—that contained within the Order's Section C.[2] While Section B appears to forbid potential contractors from boycotting Israel at the time of bidding for, or during, a state procurement contract, Section C says no such thing. Instead, it is written in the present perfect tense, requiring a bidder to certify that in the bid formation process she "has considered" all bids from subcontractors, suppliers and vendors, and "has not" discriminated on the basis of Israeli national origin, residence or incorporation. E.O. 01.01.2017.25(C). The certification, moreover, omits the phrase "Boycott of Israel," despite the Order's protracted definition of the term in Section (A)(1) and its use in Section B. In full, the Section C certification reads:

> *In preparing its bid on this project,* the bidder has considered all proposals submitted from qualified, potential subcontractors and suppliers, and has not, *in the solicitation, selection, or commercial*

---

[1] From the complaint, it is not clear whether Mr. Ali refuses to purchase Sabra hummus or SodaStream products because of any "specific conduct" on the companies' part.

[2] The certification language in Section C of the Executive Order mirrors what potential contractors must affirm in Provision M of the Bid/Proposal Affidavit, except that Provision M modifies the Section C language to apply to bids or proposals (*e.g.* "bid/proposal" instead of "bid," and "Bidder/Offeror" instead of "bidder"). *See* ECF 12 at 32.

*treatment of any subcontractor, vendor, or supplier*, refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories. The bidder also has not retaliated against any person or other entity for reporting such refusal, termination, or commercially limiting actions. Without limiting any other provision of the solicitation for bids for this project, it is understood and agreed that, if this certification is false, such false certification will constitute grounds for the State to reject the bid submitted by the bidder on this project, and terminate any contract awarded based on the bid. (emphasis added).

*Id.* Section C, unlike Section B, is limited to discrimination in the bid preparation process and largely mirrors the general prohibition against national-origin discrimination already contained in the required Maryland Bid/Proposal Affidavit. *See* Provision B of the Bid/Proposal Affidavit, ECF No. 12 at 27 (not to be confused with Section B of the Order). Standing alone, it does not likely raise First Amendment concerns.

The vagueness of what the Order actually prohibits, and the First Amendment territory in which it resides, have prompted the parties to take markedly different stances as to its effect. In the Governor's Reply and at oral argument, the defendants advanced the following interpretation: the "Whereas" clauses contained within the Order, the political circumstances of its passage, and the comparatively broad language of Section B notwithstanding, the only effect of the Order is to prohibit national origin discrimination in the bid formation process. Section B therefore should be read, not only as limited by the definitional section expressly incorporated, but by the Section C certification that neglects to even mention the term boycott. The Order then, in its effect, is but an Israel-specific reiteration of the general prohibition against national origin discrimination. Provision B of the Bid/Proposal Affidavit, ECF No. 12 at 27. As counsel

warranted during oral argument, the Order is merely aimed at a subset of national origin discrimination.

Mr. Ali balks at the defendants' interpretation, which he considers to be implausible, noting that, read this way, the Order would have no legal effect beyond that already effectuated by Provision B of the Bid/Proposal Affidavit. He points out that while Section C does not contain the term boycott, it does prohibit (albeit only in the bid formation context) "other actions intended to limit commercial relations," a phrase that is lifted directly from the definition of "Boycott of Israel" in Section (A)(1). Moreover, Section C is past oriented, while Section B prohibits present and future conduct. And the Order was issued after anti-BDS state legislation repeatedly failed to pass and with a clear intent on the part of Governor Hogan to oppose the BDS movement. Mr. Ali worries that, certifications aside, an enforcement action could be taken against a contractor on the basis of Section B alone, if he were to boycott Israel while holding a state contract. Mr. Ali notes, too, that Section B purports to bind state executive agencies, not just potential contractors, which could expand the Order's effect and enforcement potential. To now completely read out Section B and contend that the Order's effect is limited to Israeli national origin discrimination in the bid procurement process, as prohibited in Section C when read alone, Mr. Ali contends, strains credulity.

—

The degree of interpretative gymnastics performed by the parties to digest (and litigate) this executive order provokes certain justiciability concerns. While the Order at issue here may be narrower than those litigated in other states, a reading of the Order that limits prospective contractors' constitutionally protected rights to participate in a political boycott raises serious

7

constitutional concerns. *Claiborne Hardware Co.*, 458 U.S. at 907. At the same time, however, the court is hesitant to pass on the constitutionality of a moving target, especially if there is a saving construction to be found in the Governor's interpretation of his own executive order that the language of Section C is not broadened in any way by Section B or the transposition of any clause from the Boycott of Israel definition section into the certification text itself. Given the current allegations and the Governor's express disavowal of any prohibitive effect beyond national origin discrimination in the preparation of the bid, the court finds that there is not a sufficient controversy to go forward on the basis of a direct injury incurred by Mr. Ali.

As in any case, Mr. Ali must have suffered a sufficiently concrete injury in order to bring suit. *Lujan*'s tripartite framework governs. The plaintiffs must present (1) an injury-in-fact, (2) causation (the injury's connection to the actions of the defendant), and (3) the likelihood of redress in federal court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). The injury must also be ripe for adjudication and not be contingent on uncertain future events. *See Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013). The defendants argue that given their disavowal of the Order's applicability to Mr. Ali, he must submit a bid (and be rejected) before his case is justiciable. Mr. Ali contends that in order to submit a bid he must either lie and submit a false certification or submit an incomplete (and therefore futile) bid, one without the certification which must be, he says, denied as a matter of Maryland law for being unresponsive. Md. Code, State Fin. & Proc. 13-206(a)(1)(i).[3] In essence, Mr. Ali asserts that his injury here is not having his bid denied, but rather being rendered ineligible to submit a bid. *Id.* At this stage, however, it is far from evident that Mr. Ali's bid application would be futile, as the Governor likely has the prerogative to issue the authoritative construction of his own executive order, the text of the

---

[3] Counsel for Mr. Ali also noted at oral argument that the costs of preparing a technical bid are substantial.

Order is limited enough to be susceptible to an interpretation that does not prohibit Mr. Ali's

proffered BDS activism (and Mr. Ali would thus not be ineligible to bid if the effect of the Order

was limited accordingly), and counsel for the Governor and Attorney General has expressly

disavowed enforcement of Section B against Mr. Ali, *c.f. Mobil Oil Corp. v. Attorney Gen. of

Va.*, 940 F.2d 73, 76 (4th Cir. 1991) (finding declaratory judgment appropriate when the

Attorney General did not "disclaim[] any intention of exercising her enforcement authority" of

the statute in question); *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)

(finding pre-enforcement injury in fact when the state "has not suggested that the newly enacted

law will not be enforced, and we see no reason to assume otherwise"). Given these

developments, Mr. Ali may well get the state contract.[4] To proceed on the basis of a direct

injury, Mr. Ali should submit a bid.

The doctrine of relaxed justiciability in First Amendment cases applies to both ripeness

and standing concerns. *Cooksey*, 721 F.3d at 235–36, 239–40. Considering a ripeness challenge,

the court adjudicating Texas's anti-BDS law noted, "[i]n the First Amendment context . . .

plaintiffs are neither required to formally submit a contract nor have a contract rejected to have

standing to bring a facial challenge to a law allegedly infringing the right to free expression."

*Amawi*, 373 F. Supp. 3d at 740–41 (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147,

151 (1969)); *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965). In the standing context, "the

injury-in-fact element [in First Amendment cases] is commonly satisfied by a sufficient showing

of self-censorship, which occurs when a claimant is chilled from exercising his right to free

---

[4] Similarly, if Mr. Ali seeks to challenge Section C on the basis of what he alleged to be a content-specific
restriction, he must allege an injury in order to have standing to sue. Here, the court notes another issue: if Mr. Ali
is unwilling to sign the Section C certification (Provision M in the Bid/Proposal Affidavit), and is therefore denied a
contract, and if Section C/Provision M is constitutional, any harm from his failure to sign Section B may not be
dispositive.

expression." *Cooksey*, 721 F.3d at 235 (internal quotations and alteration omitted). The Fourth Circuit has

> recognized that, to demonstrate injury in fact, it is sufficient to show that one's First Amendment activities have been chilled. Subjective or speculative accounts of such a chilling effect, however, are not sufficient. Any chilling effect must be objectively reasonable. Nevertheless, a claimant need not show [he] ceased those activities altogether to demonstrate an injury in fact. Government action will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights.

*Id.* at 235–36 (quoting *Benham v. City of Charlotte*, 635, F.3d 129, 135 (4th Cir. 2011)).

Mr. Ali does not clearly rely on a First Amendment-specific doctrine of justiciability. When asked by the court at oral argument, his counsel took the position that, while Mr. Ali contends he has incurred a direct injury by being excluded from the bidding process, he also should benefit from the relaxed standing requirements for facial First Amendment challenges. But the issue was alleged only briefly in his complaint ("Plaintiff will be chilled in his personal capacity to advocate for Palestinian rights . . ." Compl. ¶ 65), and it was not raised in his opposition nor discussed further in court. Therefore, this issue has not been sufficiently pled or briefed for the court to rule. Specifically, the interplay of the Governor's disavowal of the Order's effect beyond national origin discrimination in preparing the bid and the potential chilling effect of Section B remaining on the books in Maryland, is far from certain.

The most prudent course of action, the court finds, is to dismiss the present complaint without prejudice. If Mr. Ali seeks to proceed on a direct injury theory, he should submit a bid. If he wishes to argue that First Amendment justiciability rules save his claims, he must file an amended complaint plausibly alleging that his First Amendment activities have been chilled or

that despite the Governor's interpretation of the Order, "it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Cooksey*, 721 F.3d at 236.[5]

For the foregoing reasons, the defendants' motions to dismiss will be granted and the case will be dismissed without prejudice.[6]

A separate order follows.

_____10/1/19_____
Date

*CCB*
_____
Catherine C. Blake
United States District Judge

---

[5] Of course, the Governor also might choose to amend his Executive Order to clarify that it means what counsel says it does.

[6] Because the motions to dismiss are being granted for the reasons explained, the court does not need to reach the Attorney General's separate argument for dismissal.