# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

SAQIB ALI,                                     *

        *Plaintiffs*,                            *

    v.                                       *     No. 1:19-cv-00078-CCB

LAWRENCE HOGAN, ET AL.,                        *

        *Defendants*.                            *


\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*


## MEMORANDUM IN SUPPORT OF
## GOVERNOR HOGAN'S MOTION TO DISMISS
## THE FIRST AMENDED COMPLAINT


Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

ADAM D. SNYDER
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
asnyder@oag.state.md.us
(410) 576-6398
(410) 576-6955 (facsimile)

November 26, 2019                    Attorneys for Defendant

# TABLE OF CONTENTS

Page

STATEMENT OF FACTS ............................................................... 2

    The Court's October 1, 2019 Memorandum Opinion ............................... 4

    The First Amended Complaint .................................................. 6

ARGUMENT ............................................................................. 7

I.      STANDARD OF REVIEW ............................................................ 7

II.    MR. ALI DOES NOT SATISFY THE RELAXED STANDING PRINCIPLES THAT
       APPLY TO CHALLENGES UNDER THE FIRST AMENDMENT ............................ 8

     A.    Mr. Ali Has Not Alleged a Credible Threat of Prosecution Sufficient
         to Establish Standing Under the First Amendment. ........................ 10

     B.    The Allegations of the First Amended Complaint Do Not Establish
         First Amendment Standing Under a "Chilling" Theory. .................... 17

III.   MR. ALI'S CLAIM AGAINST THE GOVERNOR IS BARRED BY THE ELEVENTH
       AMENDMENT TO THE UNITED STATES CONSTITUTION .......................... 22

IV.   THE EXECUTIVE ORDER DOES NOT VIOLATE THE FIRST AMENDMENT
       BECAUSE IT DOES NOT RESTRICT PROTECTED SPEECH. ...................... 23

V.    THE EXECUTIVE ORDER IS NOT UNCONSTITUTIONALLY VAGUE. ............... 25

CONCLUSION .......................................................................... 29

## Cases

*Adams v. Bain*, 697 F.2d 1213 (4th Cir. 1982).................................................................7

*Amawi v. Pflugerville Independent School District*,
 373 F. Supp. 3d 717 (W.D. Tex. 2019)...........................................................20, 21, 22

*American Muslims for Palestine v. Arizona State Univ.*,
 No. CV-18-00670-PHX-DWL, 2018 WL 6250474 (D. Ariz. Nov. 29, 2018)............17

*Arkansas Times LP v. Waldrip*, 362 F. Supp. 3d 617 (E.D. Ark. 2019) ..........................22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..............................................................................7

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)......................8, 10, 17

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)..............................................................7

*Benham v. City of Charlotte*, 635 F.3d 129 (4th Cir. 2011) ....................................9, 17, 18

*Blum v. Holder*, 744 F.3d 790 (1st Cir.) ....................................................................14, 15

*Borkowski v. Baltimore County, Maryland*, No. CV DKC 18-2809,
 2019 WL 4750296 (D. Md. Sept. 30, 2019) ................................................................7

*Broadrick v. Oklahoma,* 413 U.S. 601 (1973)............................................................26, 29

*Citizen Center v. Gessler*, 770 F.3d 900 (10th Cir. 2014)..........................................18, 20

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ......................................................14

*Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013)...............................................8, 9, 10, 16

*Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019) ..........................................................11

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ..................................................................20

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975)..................................................26

*Ex parte Young*, 209 U.S. 123 (1908) ............................................................................22

*Fernandes v. Limmer*, 663 F.2d 619 (5th Cir. 1981)......................................................20

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
 528 U.S. 167 (2000)...................................................................................................8

*Hamilton v. Verdow*, 287 Md. 544 (1980).....................................................................12

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ............................................... 24

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ................................... 17

*International Longshoremen's Association, AFL-CIO v. Allied International, Inc.*, 456 U.S. 212 (1982) .......................................................... 23

*Johnson v. District of Columbia*, 71 F. Supp. 3d 155 (D.D.C. 2014) ............... 15

*Jordahl v. Brnovich*, 336 F. Supp. 3d 1016 (D. Ariz. 2018) ............................. 22

*Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018) ................................................ 16

*Kolender v. Lawson*, 461 U.S. 352 (1983) ....................................................... 26

*Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018) ................................ 22

*Laird v. Tatum*, 408 U.S. 1 (1972) ....................................................... 9, 18, 19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................................... 8

*Martin v. Lloyd*, 700 F.3d 132 (4th Cir. 2012) ................................................. 26

*Master Printers of Am. v. Donovan*, 751 F.2d 700 (4th Cir. 1984) ................... 28

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ................................ 23

*Navegar, Inc. v. United States*, 103 F.3d 994 (D.C.Cir. 1997) ......................... 14

*Norwood v. Harrison*, 413 U.S. 455 (1973) ..................................................... 24

*People for the Ethical Treatment of Animals, Inc. v. Stein*, 737 F. App'x 122 (4th Cir. 2018) .............................................................. 16

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ............................................ 24, 25

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ....................................................................................... 23

*Sea-Land Serv., Inc. v. I.C.C.*, 738 F.2d 1311 (D.C. Cir. 1984) ...................... 12

*Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147 (1969) ..................... 20

*Sinai v. New England Telephone & Telegraph Co.*, 3 F.3d 471 (1st Cir. 1993) ............... 25

*Smith v. Frye*, 488 F.3d at 272 (4th Cir., 2007) ............................................... 18

iii

*Speech First, Inc. v. Schlissel*, 939 F.3d 764 (6th Cir., 2019) ........................................... 18

*United States v. Williams*, 553 U.S. 285 (2008) ............................................................. 26

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ...................................................................................... 26

*Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ............................... 26

*Wag More Dogs, LLC v. Cozart*, 680 F.3d 359 (4th Cir. 2012) ......................................... 7

*Warth v. Seldin*, 422 U.S. 490 (1975) ............................................................................ 18

*Washington State Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008) ...................................................................................... 29

## Constitutional Provisions

U.S. Const., amend. I ...................................................................................... passim

U.S. Const., amend. XI ...................................................................................... 4, 7, 22

U.S. Const., amend. XIV ...................................................................................... 26

## Statutes

50 U.S.C. § 4607 ............................................................................................... 3

Md. Code Ann., State Fin. & Proc. § 19-103 ...................................................... 21

## Rules

Fed. R. Civ. P. 12(b)(1) ...................................................................................... 7

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 8, 24

## Miscellaneous

Erica Newland, Executive Orders in Court, 124 Yale L.J. 2026 (2015) ........................... 12

iv

## MEMORANDUM IN SUPPORT
## OF GOVERNOR HOGAN'S MOTION TO DISMISS
## THE FIRST AMENDED COMPLAINT

This case involves a First Amendment challenge to a gubernatorial executive order prohibiting State agencies from contracting with a business entity that discriminates against Israeli subcontractors, vendors, or suppliers in the preparation of its bid for a State contract. After full briefing on the issues raised by plaintiff's initial complaint, the Court dismissed the complaint for lack of standing. *See* ECF No. 20. The Court concluded that Mr. Ali had not demonstrated the injury-in-fact required to establish Article III standing because he had not submitted a bid and because the Governor's "authoritative construction" of his own order suggested that Mr. Ali "may well get the state contract." *Id.* at 8, 9. The Court also concluded that Mr. Ali had not sufficiently alleged standing under the relaxed principles that apply in the First Amendment context. *Id.* at 9-10. The Court thus gave Mr. Ali a choice: either submit a bid or, if Mr. Ali "wishes to argue that First Amendment justiciability rules save his claims, he must file an amended complaint plausibly alleging that his First Amendment activities have been chilled or that despite the Governor's interpretation of the Order, 'it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Id.* at 10-11 (citation omitted).

In response, Mr. Ali filed an amended complaint in which he acknowledges that he "only boycotts Israel in his personal capacity," ECF 22 at 9 (¶38), but alleges that signing the ¶C certification that he has not discriminated against Israeli subcontractors, vendors, or suppliers—even though he could truthfully do so—"would be intimidating." *Id.* The

intimidation he alleges, however, is based entirely on the speculative possibility that the Governor or a reviewing court might someday interpret the certification such that "the 'other actions' clause"—i.e., that the vendor has not "taken other actions intended to limit commercial relations" on the basis of Israeli national origin—would be applied on its own. *Id.* at 8-9 (¶37).  That interpretation, however, cannot be squared with the text of the certification, which fixes the "'other actions' clause" within a larger list of discriminatory actions that a vendor may not take "in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier" *and* "[i]n preparing its bid."  *See* Executive Order 01.01.2017.25(C).  And such a contrived interpretation—even if subsequently adopted—could never form the grounds to prosecute Mr. Ali for submitting a bid with a certification that was truthful and legally sufficient at the time it was submitted.  Because the only "chilling" that Mr. Ali now alleges is wholly speculative and implausible, he has not established standing under even the relaxed principles applicable to First Amendment claims.

## STATEMENT OF FACTS

The facts underlying the First Amended Complaint remain largely as they were described in the Governor's motion to dismiss the initial complaint.  *See* ECF 9-1.  The executive order at issue in this case—No. 01.01.2017.25, "Prohibiting Discriminatory Boycotts of Israel in State Procurement" ("Executive Order" or "E.O."), attached as Exhibit A hereto—provides that "Executive agencies may not execute a procurement contract with a business entity unless it certifies, in writing when the bid is submitted or the contract is renewed, that:  (1) it is not engaging in a boycott of Israel; and (2) it will, for the duration

2

of its contractual obligations, refrain from a boycott of Israel." E.O. at 3 (¶B). The term

"boycott of Israel" is defined as follows:

> "Boycott of Israel" means the termination of or refusal to transact business activities, or other actions intended to limit commercial relations, with a person or entity because of its Israeli national origin, or residence or incorporation in Israel and its territories. "Boycott of Israel" does not include actions taken:
>
> i.   that are not commercial in nature;
>
> ii.  for business or economic reasons;
>
> iii. because of the specific conduct of the person or entity;
>
> iv.  against a public or governmental entity; or
>
> v.   that are forbidden by the United States pursuant to 50 U.S.C. § 4607.

E.O. at 2 (¶A.1). The Executive Order goes on to specify the text of the certification that

"shall" appear in "[a]ll requests for bids and proposals":

> The undersigned bidder hereby certifies and agrees that the following information is correct: In preparing its bid on this project, the bidder has considered all proposals submitted from qualified, potential subcontractors and suppliers, and has not, in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier, refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories. The bidder also has not retaliated against any person or other entity for reporting such refusal, termination, or commercially limiting actions.

E.O. at 3 (¶C). The ¶C certification is included within the bid/proposal affidavit that all

bidders for State contracts are required to sign. *See* Bid/Proposal Affidavit at C-1, ¶M

(attached hereto as Exhibit B and available at https://procurement.maryland.gov/wp-

content/uploads/sites/12/2018/04/AttachmentC-Bid_Proposal-Affidavit.pdf).

The briefing and argument on the State's motions to dismiss Mr. Ali's initial

complaint crystalized several aspects of how the Executive Order has been interpreted and

3

implemented.  First, the parties agreed that the Order, on its face, only "prohibits one form of national-origin discrimination: discrimination against Israel."[1]  ECF 11 at 15 (Mr. Ali's opposition); *see also* ECF 9-1 at 30 (Governor's memorandum).  Second, the certification set forth in ¶C of the Executive Order is the only Israel-related certification that appears in the bid/proposal affidavits that vendors must complete and submit to be considered for a state contract.  ECF 20 at 5.

### The Court's October 1, 2019 Memorandum Opinion

On October 1, 2019, the Court granted the defendants' motions to dismiss on standing grounds, withholding judgment on the merits of the First and Eleventh Amendment issues addressed in the briefing.  In reaching its conclusion, the Court observed that ¶B of the Executive Order was broader than the certification set forth at ¶C, as it prohibits discrimination against Israeli subcontractors "at the time of bidding for, or during, a state procurement contract," while ¶C only prohibits such discrimination "in the bid formation process."  ECF 20 at 5.  The Court observed that the ¶C certification "largely mirrors the general prohibition against national-origin discrimination already contained in the required Maryland Bid/Proposal Affidavit," and that, "[s]tanding alone, it does not likely raise First Amendment concerns."  *Id.* at 6.

The Court noted Mr. Ali's concern that, "certifications aside," enforcement actions "could be taken against a contractor on the basis of Section B alone" and that, because ¶B

---

[1] It is a misnomer to say that the Executive Order addresses discrimination against *Israel*, as opposed to Israelis, when the order specifically excludes from its reach actions taken "against a public or governmental entity."  E.O. at 2 (¶A.1.iv).

4

"purports to bind state executive agencies, not just potential contractors," it "could expand the Order's effect and enforcement potential." *Id.* at 7. "At this stage, however," the Court concluded, "it is far from evident that Mr. Ali's bid application would be futile, as the Governor likely has the prerogative to issue the authoritative construction of his own executive order, the text of the Order is limited enough to be susceptible to an interpretation that does not prohibit Mr. Ali's proffered BDS activism . . . and counsel for the Governor and Attorney General has expressly disavowed enforcement of Section B against Mr. Ali." *Id.* at 8-9.

In light of the parties' positions, the Court concluded that "there is not a sufficient controversy to go forward on the basis of a direct injury incurred by Mr. Ali," *id.* at 8, "especially if there is a saving construction to be found in the Governor's interpretation of his own executive order," *id.* The Court dismissed the case without prejudice, leaving Mr. Ali two choices: "If Mr. Ali seeks to proceed on a direct injury theory, he should submit a bid. If he wishes to argue that First Amendment justiciability rules save his claims, he must file an amended complaint plausibly alleging that his First Amendment activities have been chilled or that despite the Governor's interpretation of the Order, 'it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights.'" *Id.* at 10-11 (citation omitted). The Court cautioned Mr. Ali, however, that, even if the certification described in ¶B were required, if he is "unwilling to sign the Section C certification" and if that certification "is constitutional, any harm from his failure to sign Section B may not be dispositive." *Id.* at 9 n.4.

### The First Amended Complaint

Rather than submit a bid and test the accuracy of the Court's statement that, under the Governor's "authoritative interpretation" of the order, Mr. Ali "may well get the state contract," *id.* at 9, Mr. Ali submitted an amended complaint seeking to establish standing on the theory that, despite the Governor's interpretation of it, the ¶C certification nevertheless "chills" his First Amendment rights. ECF 22 at 15 (¶75). Mr. Ali describes the chilling effect as follows: "Although Ali only boycotts Israel in his personal capacity, signing this certification would be intimidating," *id.* at 9 (¶38), because, if the Governor's interpretation is subsequently "changed, or found invalid," *id.* at 7 (¶31), and "the 'other actions' clause is not limited by the 'in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier' clause," *id.* at 9 (¶38), Mr. Ali might be subject to "damages, debarment, and even imprisonment," *id.* at 7 (¶32). Mr. Ali did not allege, however, that the existence of the Executive Order has caused him to curtail his boycotting activities: He has "not ceased boycotting Israel," ECF 22 at 9 (¶41), and he continues to "engage[] in and support[] boycotts of Israeli businesses and organizations that contribute to the oppression of Palestinians," *id.* at 2 (¶4).[2]

Mr. Ali alleges in the amended complaint that, since his initial complaint, there have been "four additional bid proposals" that he "would have liked to submit bids for" were it not for the Executive Order. *Id.* at 12 (¶57). He alleges that each of the proposals requires

---

[2] If Mr. Ali boycotts an Israeli company "because of [its] specific conduct," that practice too would lie beyond the scope of the Executive Order. E.O. at 2 (¶A.1.iii).

the ¶C certification that all "Maryland executive agencies' solicitation and invitation for bids documents" must include, *id.*, at 8 (¶34), 12 (¶58), and that the certification described in ¶B of the Executive Order "is not included in current government contract requests for bids," *id.* at 8 (¶36).

## ARGUMENT

### I.   STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim on which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although the Court is required to "take the facts in the light most favorable to the plaintiff," the Court "need not accept legal conclusions couched as facts." *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (internal quotation marks omitted).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

The standard of review applicable under Rule 12(b)(1)[3] is similar.  The plaintiff bears the burden of proof as to establishing jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).  Where a defendant contends that the complaint "fails to allege facts upon which subject matter jurisdiction can be based," all the facts alleged in the complaint

---

[3] Although the Fourth Circuit has not yet resolved whether Eleventh Amendment immunity is best asserted through Rule 12(b)(1) or 12(b)(6), this district "favor[s] analysis under Rule 12(b)(1)." *Borkowski v. Baltimore County, Maryland*, No. CV DKC 18-2809, 2019 WL 4750296, at *7 (D. Md. Sept. 30, 2019).

"are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Id.*

## II.   MR. ALI DOES NOT SATISFY THE RELAXED STANDING PRINCIPLES THAT APPLY TO CHALLENGES UNDER THE FIRST AMENDMENT.

To establish standing, Mr. Ali must be able to show that "(1) [he] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  These three elements make up the "irreducible constitutional minimum" that Mr. Ali "bears the burden of establishing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  As the Court observed, if Mr. Ali wishes to satisfy the traditional Article III requirement that he has suffered a direct injury, "he should submit a bid."  ECF 20 at 10.  His failure to do so forecloses a finding that he has standing under the three traditional *Lujan* criteria.

Nor does Mr. Ali meet the "somewhat relaxed" standing requirements that apply in First Amendment cases.  *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013).  Those requirements allow plaintiffs to test the effect of state statutes on their First Amendment rights by alleging one of two types of injuries:  (1) "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution," *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); or (2) the plaintiff alleges

8

that he has engaged in "'self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression,'" *Cooksey*, 721 F.3d at 235 (citation omitted).  In both instances, "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt*, 442 U.S. at 298.  To qualify, "[a]ny chilling effect" that the plaintiff alleges "must be objectively reasonable." *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011). "Subjective or speculative accounts . . . are not sufficient," *id.*; plaintiffs must show "'specific present objective harm or a threat of specific future harm,'" *Cooksey*, 721 F.3d at 236 (citations omitted).  *See also Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.").

For two reasons, Mr. Ali has not satisfied even the relaxed standing requirements that apply in the First Amendment context.  First, the threat of prosecution that Mr. Ali alleges is not credible because it is based on the speculation that the Governor or a reviewing court, at some point in the future, might adopt an interpretation of the Executive Order that the Governor has already disavowed *and* that the Attorney General would prosecute him—retroactively—for having submitted a bid that was truthful when submitted.  Second, Mr. Ali has not alleged that the Order has actually "chilled" his speech, and the only thing he has forgone—bidding on state contracts—is not the result of a credible threat of enforcement.  Instead, it only reflects the fact that he values *this case* over any State contract, not that a "person of ordinary firmness," *Benham*, 635 F.3d at 135, would refuse to sign the certification.  As the Court observed, that certification, standing

9

alone, "does not likely raise First Amendment concerns," ECF 20 at 6, and, if Mr. Ali would only submit a bid, he "may well get the contract," *id.* at 9.

### A.     Mr. Ali Has Not Alleged a Credible Threat of Prosecution Sufficient to Establish Standing Under the First Amendment.

A plaintiff has standing to bring a pre-enforcement First Amendment challenge if he "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution." *Babbitt*, 442 U.S. at 298; *see also Cooksey*, 721 F.3d at 237 ("'When a plaintiff faces a credible threat of prosecution under a . . . statute he has standing to mount a pre-enforcement challenge to that statute.'" (citations omitted)).   Mr. Ali has not established either aspect of that test.

Mr. Ali alleges in the amended complaint that he "only boycotts Israel in his personal capacity," ECF 22 at 9 (¶38), and that the Executive Order, as implemented, prohibits "'only national-origin discrimination against Israelis in the formation of a bid for a state contract, leaving Mr. Ali and other potential state contractors free to boycott Israel and Israeli companies outside the bid formation process,'" *id.* at 6 (¶27) (quoting ECF 20 at 1).   Mr. Ali alleges that he disagrees with that interpretation, *id.* (¶29), and that because judicial estoppel would not prevent the Governor from reissuing the order at some later date, *id.* (¶28), he runs the risk that the Governor's interpretation might at some point in the future be "changed, or found invalid," *id.* at 7 (¶31).   But it is undisputed, from the allegations of the amended complaint, that the Executive Order, in its present form as

10

applied by the Governor, does not proscribe the conduct that Mr. Ali alleges an intention to continue.

Indeed, Mr. Ali freely acknowledges that the threat of prosecution he alleges would arise only if that were to change, namely, "[i]f the 'other actions' clause is not limited by the 'in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier' clause." *Id.* at 9 (¶38). For several reasons, however, that future possibility is "wholly speculative" and thus it cannot supply the "credible threat of prosecution" necessary to establish standing. *Davison v. Randall*, 912 F.3d 666, 678 (4th Cir. 2019).

*First*, the interpretation Mr. Ali fears cannot be squared with the plain language of ¶C of the Executive Order, which sets forth the only certification that the Executive Order requires to be included in every bid/proposal affidavit:

> The undersigned bidder hereby certifies and agrees that the following information is correct: *In preparing its bid on this project*, the bidder has considered all proposals submitted from qualified, potential subcontractors and suppliers, and has not, *in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier*, refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories. The bidder also has not retaliated against any person or other entity for reporting such refusal, termination, or commercially limiting actions.

E.O. at 3 (¶C) (emphasis added). The phrase "other actions intended to limit commercial relations" appears within a larger clause that is subject to two prefatory provisions—italicized above—which together limit the "other actions" phrase to the bid-preparation process and the bidder's treatment of subcontractors, vendors, and suppliers. The plain language of ¶C—standing alone—does not admit any other reasonable interpretation. And

11

Mr. Ali knows this, which is why he alleges that the "other actions" interpretation that he fears would come to pass *only if* the language of ¶C is "read in harmony" with ¶B—which does not appear in the bid/proposal affidavits, ECF 22 at 8 (¶36)—and thus is given "an expansive interpretation," ECF 22 at 8-9 (¶¶36, 37).

*Second*, the Governor has disavowed the expansive application of the Executive Order that Mr. Ali postulates as the precondition for the threat of prosecution that he alleges.  As the Court observed in its October 1 memorandum, the Governor's view of his own Executive Order limits its effect to "prohibit[ing] national origin discrimination in the bid formation process," and that, "in its effect," the order "is but an Israel-specific reiteration of the general prohibition against national origin discrimination."  ECF 20 at 6. Unlike the interpretation of statutes, which requires consideration of legislative history and the competing and often conflicting views of the legislators involved, the interpretation of an executive order requires only the views of the Executive.  *See Sea-Land Serv., Inc. v. I.C.C.*, 738 F.2d 1311, 1314 (D.C. Cir. 1984) ("The 'law' at issue in this instance is an Executive Order promulgated by the President, and it is to his intent that we must turn for guidance."); Erica Newland, Executive Orders in Court, 124 Yale L.J. 2026, 2069-70 (2015) (The courts' "guiding principle when interpreting executive orders . . . has generally been to give effect to presidential intent[.]"); *see also Hamilton v. Verdow*, 287 Md. 544, 556 (1980) (stating that "the Governor bears the same relation to this State as does the President to the United States").  Thus, as the Court acknowledged was likely the case, the Governor's construction of his own directives issued to the Executive Branch agencies that report to him is "authoritative," at least where, as here, "the text of the Order is limited

12

enough to be susceptible" to such an interpretation and the government has "expressly disavowed" the broader construction that Mr. Ali fears.  ECF 20 at 8-9.

*Third*, even if ¶B controlled, when the defined terms "Boycott of Israel" and "commercial relations" are inserted into it, the provision effectively encompasses only a bidder's "[termination of or refusal to transact business activities, or other actions intended to limit [[its conduct of business, and the terms and conditions by which business is transacted, with a vendor, supplier, subcontractor, or other business entity]], because of its Israeli national origin, or residence or incorporation in Israel and its territories]."  E.O. at 3 (¶B, incorporating ¶¶A(1), (3)).  Although, as the Court observed, "Section C is past oriented, while Section B prohibits present and future conduct," ECF 20 at 7, that temporal difference does not expand ¶B—let alone ¶C—to the purchasing decisions that Mr. Ali makes in his "personal capacity," or even in a commercial capacity, if those commercial decisions are made outside the period of time "when the bid is submitted" and through "the duration of" the contract being bid.[4]

Case law establishes that the Court is not obligated to accept Mr. Ali's postulated "expansive interpretation" of ¶C as the basis of his alleged fear of being prosecuted at some point in the future.  The First Circuit, for example, has rejected similar efforts to establish

---

[4] Although the Court noted that "a potential contractor reading Section B of the Order would be led to believe that the Order's prohibitions were more expansive," ECF 20 at 2, at least in terms of its temporal reach, *id*. at 5, executive orders direct Executive Branch agencies, not the public.  It is undisputed that potential contractors who seek to bid on State contractors will be faced only with the ¶C certification.  ECF 22 at 8 (¶36, Mr. Ali acknowledging that ¶B "is not included in the current government contract requests for bids").

standing through the threat of prosecution under a broad interpretation that the government

has disavowed.  In *Blum v. Holder*, animal rights activists challenged the Animal Enterprise

Terrorism Act on the grounds that three of its prohibitions could be read to encompass the

peaceful protests that they engaged in.  744 F.3d 790 (1st Cir.), *cert. denied*, 135 S. Ct. 477

(2014).  In each instance, the court rejected "their proffered interpretations of the provisions

of the statute" on the grounds that the plain text did not support them and the government

disavowed them:

> In sum, "[plaintiffs] in the present case present no concrete evidence to substantiate their fears, but instead rest on mere conjecture about possible governmental actions." In particular, plaintiffs' fear of prosecution under AETA is based on speculation that the Government will enforce the Act pursuant to interpretations it has never adopted and now explicitly rejects. Such unsubstantiated and speculative fear is not a basis for standing under Article III.

*Id.* at 803 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013), citation and

footnotes omitted).[5]

"Federal courts look to a variety of factors to determine whether the plaintiff's

decision to forego certain activity is truly motivated by a well-founded fear that engaging

in the activity will lead to prosecution under the challenged statute."  *Navegar, Inc. v.*

*United States*, 103 F.3d 994, 999 (D.C.Cir. 1997).  Those factors include "the history of

enforcement of the challenged statute to like facts" and "any threats of enforcement."

---

[5] Although the federal statute at issue contained "rules of construction" that disavowed its application to the types of activities that the *Blum* plaintiffs wished to engage in, 744 F.3d at 801, the same is true here, where the text of the Executive Order expressly excludes from its reach actions—like the purchasing decisions that Mr. Ali makes in his "personal capacity"—"that are not commercial in nature."  E.O. at 2 (¶A.1.i).

*Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 160 (D.D.C. 2014).   And when considering those factors, "[p]articular weight must be given to the Government disavowal of any intention to prosecute on the basis of the Government's own interpretation of the statute and its rejection of plaintiffs' interpretation as unreasonable."   *Blum*, 744 F.3d at 798.  All of those factors weigh against Mr. Ali's standing here.

*Finally*, even if Mr. Ali's fears came to pass and, at some point in the future, the Governor or a reviewing court were to adopt a construction of ¶C that prohibits would-be vendors from speaking out against commercial relations with Israelis, that might provide standing then, but not now.  Such hypothetical future injuries never suffice to establish standing, for if they could, *any* plaintiff could challenge *any* law on the theory that it might be changed at some point in the future.  Nor is there any "credible threat" that Mr. Ali could submit a bid or be awarded a contract—in full compliance with the Governor's construction of the Executive Order—and later be "subject to damages, disbarment, and even imprisonment" if that construction subsequently changes.  ECF 22 at 7 (¶32).  The only potential liability that Mr. Ali could face from the Executive Order would arise if he submitted a *false* certification, which would not be the case under the scenario that Mr. Ali postulates as his "credible threat."

The speculative threat of prosecution that Mr. Ali alleges goes well beyond the circumstances in which the Fourth Circuit has found standing on that basis.  For example, in *Kenny v. Wilson*, students had standing to challenge South Carolina's laws against disorderly conduct in the public school system because they had been "prosecuted under the laws in the past" and the defendants had not "disavowed enforcement if plaintiffs

15

engage in similar conduct in the future." 885 F.3d 280, 289 (4th Cir. 2018). In *People for the Ethical Treatment of Animals, Inc. v. Stein*, plaintiff animal rights activists had standing to challenge the constitutionality of a North Carolina commercial espionage statute because the law "specifically targeted" organizations like it and because state enforcement officials had not "'disavowed enforcement' if Plaintiffs proceed[ed] with their plans." 737 F. App'x 122, 130-31 (4th Cir. 2018) (citation omitted). And in *Cooksey*, plaintiff had standing to challenge a North Carolina law barring the unlicensed practice of dietetics because the board charged with enforcing the law had threatened to sue him if he "did not bring his website in line with the Act's proscriptions." 721 F.3d at 236.

None of this describes Mr. Ali. There is nothing in the amended complaint to suggest that Mr. Ali has previously been charged with submitting a false certification. There is no allegation that any State official has ever threatened Mr. Ali with enforcement of the Executive Order or indicated that, if he were to submit a bid or proposal, it would be denied. Nor is there any allegation that a State official has ever suggested that Mr. Ali might—at some point in the future—be subject to "damages, disbarment, and even imprisonment" for submitting a certification that was truthful when made. *See* ECF 22 at 7 (¶32). *And* the Governor has disavowed the applicability of the Executive Order to people like Mr. Ali who choose to boycott Israeli goods and services as a personal matter outside the context of a State procurement. The absence of past enforcement and the disavowal of future enforcement underscores that Mr. Ali has in no way established the "credible threat" that might cause "[a] person of ordinary firmness" to "feel a chilling effect." *Cooksey*, 721 F.3d at 237.

16

Nor is this case like those that allow pre-enforcement review of criminal laws on the grounds that a plaintiff "'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) (quong *Babbitt*, 442 U.S. at 298).  As one court put it—in another Israel boycott case, no less—"[t]his isn't a case where Plaintiffs would be exposed to criminal prosecution or civil penalties if they were . . . presented . . . with a state contracting opportunity conditioned on their execution of a no-boycott clause and refused to execute it."  *American Muslims for Palestine v. Arizona State Univ*., No. CV-18-00670-PHX-DWL, 2018 WL 6250474, at *8 (D. Ariz. Nov. 29, 2018).  Instead, "if [Mr. Ali] were denied the contract, [he] could simply file another lawsuit" at that point.  *Id.*

**B.     The Allegations of the First Amended Complaint Do Not Establish First Amendment Standing Under a "Chilling" Theory.**

For many of the same reasons, neither do the allegations of the First Amended Complaint establish that Mr. Ali has engaged in "'self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression,'" *Cooksey*, 721 F.3d at 235 (citation omitted).  Although Mr. Ali need not establish that he has "ceased [his boycotting] activities altogether," *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011), he has to allege *some* objectively reasonable chilling of his First Amendment rights to demonstrate injury in fact.  Mr. Ali alleges precisely the opposite.  Not only has he "not ceased boycotting Israel," ECF 22 at 9 (¶41), he continues to "engage[] in and support[] boycotts" of Israeli businesses and organizations," *id*. at 2 (¶4), but he "only boycotts Israel in his personal capacity," *id.* at 9 (¶38).  In other words, Mr.

Ali alleges both that he *does not* boycott Israel in his commercial software business decisions—which is the only thing the Executive Order restricts—and that he *continues* to boycott Israel in his personal capacity.

Although the standing requirements are relaxed in the First Amendment context, they still require Mr. Ali to establish that the Executive Order has chilled *his* speech.  As the Supreme Court observed in *Laird*, "if respondents themselves are not chilled . . . [they] clearly lack that 'personal stake in the outcome of the controversy' essential to standing." 408 U.S. at 13-14 n.7 (citation omitted).  A plaintiff must show "h[is] right to free expression" has been chilled, *Benham*, 635 F.3d at 135; he "'cannot rest his claim to relief on the legal rights or interests of third parties.'"  *Smith v. Frye*, 488 F.3d at 272 (4th Cir., 2007) (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975); *see also Speech First v. Schlissel*, 939 F.3d 764 (6th Cir., 2019)  (stating that litigants have standing to challenge government action "only when it restricts their *own* constitutionally protected activities" (emphasis in original)).

It was for this reason that the Tenth Circuit found that the plaintiffs in *Citizen Center v. Gessler* had failed to allege "chilling" sufficient to challenge the constitutionality of an election agency's use of traceable ballots when they stated in their amended complaint that they intended to vote *despite* the possibility that their votes might be traceable:

> This [chilling] requirement is missing here because Citizen Center does not provide plausible allegations that members intend to refrain from voting because of the possibility that their ballots might be traced. Instead, the members indicate in the amended complaint that they *do* intend to vote despite the possibility of tracing. . . .  There Citizen Center alleges that its members include electors who "intend to freely vote their conscience in the

> 2012 primary and general, special district, municipal and coordinated elections, and elections held thereafter in their respective counties.

770 F.3d 900, 913 (10th Cir. 2014) (record citation omitted). Because the plaintiffs had not altered their protected behavior, their "alleged chill [wa]s too conjectural to establish an injury in fact" sufficient to establish standing to pursue their claim. *Id.* (citing *Laird*, 408 U.S. at 13-14 n.7). So it is here, where the First Amended Complaint does not allege that Mr. Ali has altered his boycotting activities in response to the Executive Order.

The only activity that Mr. Ali alleges that he *has* refrained from is bidding on contracts that he would have bid on were it not for the Executive Order. ECF 22 at 11-12 (¶¶ 53-58). But even assuming that submitting a bid involves sufficient expressive activity to make the decision not to do so "self-censorship," Mr. Ali does not allege that his decision to forgo those opportunities is the effect of the Executive Order, at least not as it is implemented by the Governor. And that makes sense; because Mr. Ali "only boycotts Israel in his personal capacity," *Id.* at 9 (¶38), he could truthfully execute the certification that appears in the bid/proposal affidavit, which only addresses his treatment of subcontractors, vendors, and suppliers in the bid-preparation process.[6] And, as the Court observed, that certification, standing alone, "does not likely raise First Amendment concerns." ECF 20 at 6.

---

[6] It also makes sense that Mr. Ali would not allege that he intends to discriminate against Israelis in the formation of his bid, given that the computer-programming contracts in which he alleges an interest would not seem to require subcontractors or suppliers, let alone overseas subcontractors or suppliers.

Instead, the "intimidat[ion]" that Mr. Ali alleges would arise only "*[i]f* the 'other actions' clause is not limited by the 'in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier' clause." ECF 22 at 9 (¶38, emphasis added). For the reasons discussed in Section A above, that potential—that the Governor might someday "change[]" his interpretation of the order or that a reviewing court might find it "invalid," ECF 22 at 7 (¶31) *and* that the Attorney General or some other official would prosecute him for having made a certification that was truthful at the time made—is far "too conjectural to establish an injury in fact." *Citizen Center*, 770 F.3d at 913.

*Amawi v. Pflugerville Independent School District*, properly understood, does not compel a different result. 373 F. Supp. 3d 717 (W.D. Tex. 2019), *appeal filed* (5th Cir., May 2, 2019). Although the Texas district court concluded that, "[i]n the First Amendment context . . . plaintiffs are neither required to formally submit a contract nor have a contract rejected to have standing to bring a facial challenge to a law allegedly infringing the right to free expression," *id*. at 740-41, *see* ECF 20 at 9, the cases it cited in support of that proposition involved facially invalid ordinances that conferred virtually limitless discretion on permitting and enforcement officials. *See Fernandes v. Limmer*, 663 F.2d 619, 625 (5th Cir. 1981) (plaintiff need not apply for permit to distribute literature in airport "because the very existence" of the permitting scheme's "broad grant of discretion" is "constitutionally unacceptable"); *Shuttlesworth v. City of Birmingham, Ala*., 394 U.S. 147, 150 (1969) (plaintiff need not apply for permit to hold a parade, procession, demonstration in public spaces when ordinance gives official "unbridled and absolute power to prohibit" it); *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965) (allowing pre-enforcement challenge

to penal statute under which officials threatened to prosecute plaintiffs as "subversive organization"). More importantly, in *Amawi*, "several state actors [had] already interpreted [the law at issue] to apply to Plaintiffs' boycott activities," 373 F. Supp. 3d at 738, the plaintiffs had been denied government work because of the challenge statute, *id.* at 731-35, and the certification they were required to sign applied to "*all* boycotting activity undertaken by companies during the contract period regardless of whether the boycotts are related to the content of the contract," *id.* at 738. None of that is the case here.

In the end, the only way in which the First Amended Complaint *might* establish standing would be if Mr. Ali's allegation that he "only boycotts Israel in his personal capacity," ECF 22-1 at 9 (¶38), were read to mean that he would boycott Israeli subcontractors, vendors, and suppliers in the preparation of his bids were it not for the Executive Order. Read that way, Mr. Ali would have alleged an injury from the Executive Order, which indisputably restricts *that* conduct. But even then, redressability would be an obstacle. As discussed in the Governor's earlier reply, ECF 12 at 2-8, the standard bid/proposal affidavit already requires each bidder to certify that, "[i]n preparing its Bid/proposal on this project, the Bidder/Offeror has considered all Bid/proposals submitted from qualified, potential subcontractors and suppliers, and has not engaged in 'discrimination' as defined in § 19-103 of the State Finance and Procurement Article of the Annotated Code of Maryland." Exhibit B at C-1 (¶B). Section 19-103, in turn, defines "discrimination" to include discrimination based on "race, color, religion, ancestry or national origin." If Mr. Ali cannot certify compliance with the Israel-specific application of this nondiscrimination clause, he surely cannot truthfully certify compliance with the

21

larger commercial nondiscrimination clause of which it is a subset. Accordingly, even if he were to obtain the relief he seeks—"an injunction striking the 'No Boycott of Israel' certification from any bid proposal he submits to a Maryland agency governed by Executive Order 01.01.2017.25," ECF 22 at 18 (¶C)—he would still not be able to bid on State projects.

This Court gave Mr. Ali a clear path to standing: "[S]ubmit a bid." ECF 20 at 10. Although, under the Governor's implementation of the order, he "may well get the state contract," ECF 20 at 9, if he did not, the denial would provide the "more distilled dispute," *id.* at 2, that Article III requires. In requiring Mr. Ali to pursue a solicitation before bringing suit, the Court would not be asking Mr. Ali to do anything more than what plaintiffs in the other Israel boycott cases have done. *See Koontz v. Watson*, 283 F. Supp. 3d 1007, 1014 (D. Kan. 2018); *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, 1029 (D. Ariz. 2018); *Arkansas Times LP v. Waldrip*, 362 F. Supp. 3d 617, 620 (E.D. Ark. 2019); *Amawi*, 373 F. Supp. 3d at 731-35.[7]

## III.   MR. ALI'S CLAIM AGAINST THE GOVERNOR IS BARRED BY THE ELEVENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

As discussed in the State's initial round of briefing, the Eleventh Amendment bars this suit against the Governor because it does not fit within the narrow exception recognized in *Ex parte Young*, 209 U.S. 123 (1908). *See* ECF 9-1, 12; *see also* ECF 10-1,

---

[7] Two of the plaintiffs in *Amawi* did not submit contract proposals, 373 F. Supp. 3d at 738 n.3, but both of them suffered concrete injuries, one from having had to decline an affirmative "offer" to work as a paid debate judge, *id.* at 733, and the other because he was "not paid" for work that he had already performed, *id.* at 734.

13 (Attorney General's treatment of immunity issue). This aspect of the Governor's memorandum and reply in support of his earlier motion to dismiss—which are incorporated by reference herein—has not been altered by the allegations of the First Amended Complaint.

## IV.   THE EXECUTIVE ORDER DOES NOT VIOLATE THE FIRST AMENDMENT BECAUSE IT DOES NOT RESTRICT PROTECTED SPEECH.

As for the merits of Mr. Ali's First Amendment theories, they fail to state a claim regardless of how the Executive Order is interpreted. Even if the Court were to ignore the undisputed fact that the ¶C certification is the only certification that would-be vendors must execute, the Executive Order would still withstand First Amendment scrutiny for the reasons set forth in the Governor's earlier briefing materials:

- *First*, the Executive Order does not restrict *speech*, only contracting and purchasing decisions that, under *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ("*FAIR*"), qualify as conduct, not speech. That case and *International Longshoremen's Association, AFL-CIO v. Allied International, Inc.*, 456 U.S. 212 (1982), control, and not *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), which involved an ordinance that restricted speech as well as commercial boycotting activities.

- *Second*, even if purchasing decisions involved expressive conduct, Mr. Ali's First Amendment claim would fail because economic regulations that impose only incidental burdens on expressive conduct do not violate the First Amendment.

- *Third*, the Executive Order advances multiple compelling state interests—e.g., prohibiting discrimination on the basis of ethnicity or national origin, regulating intra-state commerce—that justify any incidental effect the Order may have on any speech-related component of Mr. Ali's business decisions.

- *Finally*, the states are not constitutionally obligated to subsidize speech, and the First Amendment places no limits on the government's own speech.

23

These grounds for dismissal under Rule 12(b)(6) apply with equal force to the (mis)interpretation of the Executive Order that Mr. Ali postulates as the grounds for his allegation that having to sign the ¶C certification would be "intimidating," ECF 22 at 9 (¶38), and are incorporated herein.

As implemented, however, the constitutionality of the Executive Order is plainer still.  Because, as Mr. Ali puts it, the Executive Order prohibits only an Israel-specific "form of national-origin discrimination," ECF 11 at 15, it fits squarely within the many cases upholding the constitutionality of commercial nondiscrimination clauses.

The Supreme Court has repeatedly upheld the constitutionality of non-discrimination policies, like Maryland's, that prohibit commercial discrimination on the basis of race, national origin, and other immutable characteristics.  *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 615, 623 (1984) (upholding Minnesota law forbidding discrimination based on "race, color, creed, religion, disability, national origin or sex"). As the Court explained in *Jaycees*, "acts of invidious discrimination in the distribution of publicly available goods, services, and other advantages cause unique evils that government has a compelling interest to prevent—wholly apart from the point of view such conduct may transmit."  *Id.* at 628; *see also Norwood v. Harrison*, 413 U.S. 455, 470 (1973) ("Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections."); *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (same).

24

The Executive Order is a specific application of Maryland's more general commercial anti-discrimination policy. Like that more general policy, the Executive Order prohibits agencies from contracting with business entities that discriminate "on the basis of Israeli national origin." E.O. at 2 (¶A.1 (defining "Boycott of Israel"), ¶C (certification language)). And because the ¶C certification goes no further than the certification of compliance with Maryland's commercial nondiscrimination policy—the constitutionality of which Mr. Ali does not question—it falls comfortably within constitutional bounds.

The ¶C certification required by the Executive Order bars a would-be vendor from bidding on government contracts if, in the formation of its bid, it discriminated against a subcontractor, vendor, or supplier who just happens to reside in Israel or just happens to be incorporated there. To refuse to do business with someone based on their nationality is to discriminate based national origin. *See, e.g.*, *Sinai v. New England Telephone & Telegraph Co.*, 3 F.3d 471 (1st Cir. 1993) (affirming trial court in Title VII case finding discrimination based on Israeli national origin). The discrimination against Israelis and Israeli companies that the Executive Order prohibits is national-origin discrimination under any reasonable construction of that term, and it is precisely the type of discrimination that has long been prohibited under Maryland's commercial antidiscrimination policy. The State's interest in combatting that type of discrimination is "unrelated to the suppression of expression [and] plainly serves compelling state interests of the highest order." *Jaycees*, 468 U.S. at 624.

## V.   THE EXECUTIVE ORDER IS NOT UNCONSTITUTIONALLY VAGUE.

In the First Amended Complaint, Mr. Ali retains a First Amendment "void for vagueness" claim and adds a new, second vagueness cause of action under the Fourteenth

Amendment.  *See* ECF 22 at 16-17 (¶¶84-90).  Under the Due Process Clause, a state enactment is unconstitutionally vague only if it "'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).   In determining whether an enactment is void for vagueness, "a court is not confined to the plain language of the contested statute."  *Id.* at 136 (citing *Kolender v. Lawson*, 461 U.S. 352, 355 (1983)).  Instead, it "must 'consider any limiting construction that a state court or enforcement agency has proffered.'"  *Id.* (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982)).

"It has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld."  *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) (citing *Erznoznik v. City of Jacksonville,* 422 U.S. 205 (1975); *Broadrick v. Oklahoma,* 413 U.S. 601 (1973)).  "The key to application of this principle is that the statute must be 'readily susceptible' to the limitation; [the Court] will not rewrite a state law to conform it to constitutional requirements."  *Id.*

Here, the Court has already found that "the text of the Order is limited enough to be susceptible to an interpretation that does not prohibit Mr. Ali's proffered BDS activism." ECF 20 at 8-9.  From that finding it follows from *Martin* that the Court "must 'consider any limiting construction that a state . . . enforcement agency has proffered,'" 700 F.3d at 136, and here, we have such a limiting construction.  The Governor, through counsel, has

clarified that ¶C is the operative provision of the Order and that it prohibits "only national-origin discrimination against Israelis in the formation of a bid for a state contract."  ECF 20 at 1.  That provision "leav[es] Mr. Ali and other potential state contractors free to boycott Israel and Israeli companies outside the bid formation process without compromising their eligibility to receive and maintain procurement contracts with the state."  *Id*.  And, the government "has expressly disavowed enforcement of Section B"— i.e., the provision that forms the basis for Mr. Ali's vagueness claim.  *Id.* at 9.  "[A]s the Governor likely has the prerogative to issue the authoritative construction of his own executive order," *id*. at 8, Mr. Ali's vagueness claim must be evaluated based on *that* construction, and not the construction that Mr. Ali worries might be adopted at some point in the future.

The certification contained in ¶C of the Executive Order—which is the only certification included in the bid/proposal affidavits that would-be state contractors must execute—is not vague.  As discussed in greater detail above, the only language in the operative certification that Mr. Ali finds offensive—that he may not take "other actions intended to limit commercial relations" with Israelis, ECF 22 at 8 (¶35)—is limited to the bid-preparation process in two different ways.  As the Court pointed out, the "other actions" language is limited by the phrase "in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier" *and* by the phrase "[i]n preparing its bid":

> The undersigned bidder hereby certifies and agrees that the following information is correct: *In preparing its bid on this project*, the bidder has considered all proposals submitted from qualified, potential subcontractors and suppliers, and has not, *in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier*, refused to transact or

terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories. The bidder also has not retaliated against any person or other entity for reporting such refusal, termination, or commercially limiting actions.

ECF 20 at 5-6 (emphasis supplied by Court).[8]  The plain language of the ¶C certification "largely mirrors" the general prohibition against national-origin discrimination that would-be vendors have always had to certify compliance with.  *Id.* at 6.  "Standing alone," the Court concluded, "it does not likely raise First Amendment concerns."  *Id.*

The only uncertainty about the Order's effect arises from the language of ¶B, which is not expressly limited to the bid-preparation process and thus could be read to prohibit commercial discrimination against Israelis during the time period bound by the submission of the bid and the end of the contract term.  ECF 20 at 5, 7.  But ¶B is not included in the bid/proposal affidavits that would-be vendors must execute.  Instead, vendors are only required to execute the ¶C certification, which the Governor, through the Attorney General's office, has identified as the order's operative provision.  That certification, which "largely mirrors" the general commercial nondiscrimination certification that has long appeared in state bid/proposal affidavits—and which Mr. Ali does not challenge—is sufficient to give bidders "a reasonable opportunity" to know what is expected of them.  *Master Printers of Am. v. Donovan*, 751 F.2d 700, 710 (4th Cir. 1984).[9]

---

[8] The "other actions" phrase also includes within it the term "commercial relations," which is itself limited by definition to relations with a "vendor, supplier, subcontractor, or other business entity."  E.O. at 3 (¶A.3).  It thus fits comfortably within the rest of ¶C, which is clearly limited to the bid-preparation process.

[9] To the extent that Mr. Ali asserts a facial overbreadth claim, *see* ECF 22 at 14 (¶73), that claim must be dismissed for similar reasons.  "Facial challenges are disfavored"

**CONCLUSION**

The First Amended Complaint should be dismissed.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Adam D. Snyder
ADAM D. SNYDER
Assistant Attorney General
Bar No. 25723
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
asnyder@oag.state.md.us
(410) 576-6398
(410) 576-6955 (facsimile)

Attorneys for Defendant Lawrence
Hogan, Governor of Maryland

---

to begin with, *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008), and "[f]acial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (citing cases).  The other claims that remain tacked on to the end of Mr. Ali's amended complaint—things like "compel[led] speech" (¶71) and "prior restraint" (¶72)—lack merit for the reasons set forth in the Governor's earlier reply (ECF 12).  The ¶C certification is not meaningfully different from those that implement the more general commercial nondiscrimination provisions, which are indisputably constitutional.

Exhibit A




### Executive Department

EXECUTIVE ORDER
01.01.2017.25

<u>Prohibiting Discriminatory Boycotts of Israel in State Procurement</u>

| | |
|---|---|
| WHEREAS, | The State of Maryland and Israel have executed a Declaration of Cooperation that has, for more than two decades, enabled the successful exchange of commerce, culture, technology, tourism, trade, economic development, scholarly inquiry, and academic research; |
| WHEREAS, | These accomplishments have helped generate millions of dollars of investment and substantial job creation in the State; |
| WHEREAS, | The cooperation between Israel and the State has produced notable achievements in medicine, healthcare, and biotechnology that have benefitted the State; |
| WHEREAS, | The collaboration between Israel and the State has produced important enhancements to the cyber, homeland, and national security of the State; |
| WHEREAS, | Boycotts of people or entities because of their Israeli national origin, or residence or incorporation in Israel and its territories, undermines the Declaration of Cooperation; |
| WHEREAS, | It is the public policy of the United States, as enshrined in several federal laws, to oppose certain boycotts of Israel; |
| WHEREAS, | The termination of or refusal to transact business activities with people or entities because of their Israeli national origin, or residence or incorporation in Israel and its territories, is not a commercial decision made for business or economic reasons; |
| WHEREAS, | Business entities that employ such unsound business practices therefore have impaired commercial viability and provide less job security to their employees; |

WHEREAS,         Such business entities pose undue risks as contracting partners and may not provide the best possible products or services to the State;

WHEREAS,         The State has a longstanding and broad policy to refrain from contracting with business entities that unlawfully discriminate in the solicitation, selection, hiring, or commercial treatment of vendors, supplies, subcontractors, or commercial customers;

WHEREAS,         Boycotts based on religion, national origin, ethnicity, or residence are discriminatory; and

WHEREAS,         Contracting with business entities that discriminate makes the State a passive participant in private-sector commercial discrimination;

NOW, THEREFORE,  I, LAWRENCE J. HOGAN, JR., GOVERNOR OF THE STATE OF MARYLAND, BY VIRTUE OF THE AUTHORITY VESTED IN ME BY THE CONSTITUTION AND LAWS OF MARYLAND, HEREBY PROCLAIM THE FOLLOWING EXECUTIVE ORDER, EFFECTIVE IMMEDIATELY:

A.   The following words have the meanings indicated:

1.   "Boycott of Israel" means the termination of or refusal to transact business activities, or other actions intended to limit commercial relations, with a person or entity because of its Israeli national origin, or residence or incorporation in Israel and its territories. "Boycott of Israel" does not include actions taken:

   i.   that are not commercial in nature;

   ii.  for business or economic reasons;

   iii. because of the specific conduct of the person or entity;

   iv.  against a public or governmental entity; or

   v.   that are forbidden by the United States pursuant to 50 U.S.C. § 4607.

2.   "Business entity" means any receiver, trustee, guardian, representative, fiduciary, partnership, firm, association, corporation, sole proprietorship, or company, including any bank, credit union, broker, developer, consultant, contractor, supplier, or vendor, individually or in any combination, that has submitted a

2

bid or proposal for, has been selected to engage in, or is engaged in providing goods or services to the State.

3. "Commercial relations" means a business entity's conduct of business, and the terms and conditions by which business is transacted, with a vendor, supplier, subcontractor, or other business entity.

4. "Contract" means an agreement by or on behalf of the State for a business entity to sell or lease supplies or goods, or to provide services, to the State in return for a fee, or any other form of compensation to be paid or provided by the State.

5. "Executive agency" means a State department, agency, authority, board, or instrumentality that is controlled by the Governor.

6. "Services" includes construction, real-estate development, financial management, insurance, and professional support.

B.    Executive agencies may not execute a procurement contract with a business entity unless it certifies, in writing when the bid is submitted or the contract is renewed, that:

1. it is not engaging in a boycott of Israel; and

2. it will, for the duration of its contractual obligations, refrain from a boycott of Israel.

C.    All requests for bids or proposals issued for contracts with Executive agencies shall include the text of the following certification to be completed by the bidder: "The undersigned bidder hereby certifies and agrees that the following information is correct: In preparing its bid on this project, the bidder has considered all proposals submitted from qualified, potential subcontractors and suppliers, and has not, in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier, refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories. The bidder also has not retaliated against any person or other entity for reporting such refusal, termination, or commercially limiting actions. Without limiting any other provision of the solicitation for bids for this project, it is understood and agreed that, if this certification is false, such false certification will

3

constitute grounds for the State to reject the bid submitted by the bidder on this project, and terminate any contract awarded based on the bid."

D.     All Executive agencies shall implement this Executive Order in a manner consistent with the important public policy favoring advancement of women- and minority-owned businesses as set forth in Title 14, Subtitle 3, of the State Finance & Procurement Article of the Code of Maryland and related regulations.

E.     All Executive agencies shall implement this Executive Order in a manner that is consistent with all applicable statutes and regulations. Nothing in this Executive Order shall operate to contravene any State or federal law or to affect the State's receipt of federal funding.

F.     If any provision of this Executive Order or its application to any person, entity, or circumstance is held invalid by any court of competent jurisdiction, all other provisions or applications of the Executive Order shall remain in effect to the extent possible without the invalid provision or application. To achieve this purpose, the provisions of this Executive Order are severable.

GIVEN Under My Hand and the Great Seal of the State of Maryland, in the City of Annapolis, this 23rd Day of October 2017.

Lawrence J. Hogan, Jr.
Governor

ATTEST:

John C. Wobensmith
Secretary of State

4

Exhibit B

| Attachment C.        Bid/Proposal Affidavit |
|---|

## A.    AUTHORITY

I hereby affirm that I, _____ (name of affiant) am the _____ (title) and duly authorized representative of _____ (name of business entity) and that I possess the legal authority to make this affidavit on behalf of the business for which I am acting.

## B.    CERTIFICATION REGARDING COMMERCIAL NONDISCRIMINATION

The undersigned Bidder/Offeror hereby certifies and agrees that the following information is correct: In preparing its Bid/proposal on this project, the Bidder/Offeror has considered all Bid/proposals submitted from qualified, potential subcontractors and suppliers, and has not engaged in "discrimination" as defined in § 19-103 of the State Finance and Procurement Article of the Annotated Code of Maryland. "Discrimination" means any disadvantage, difference, distinction, or preference in the solicitation, selection, hiring, or commercial treatment of a vendor, subcontractor, or commercial customer on the basis of race, color, religion, ancestry, or national origin, sex, age, marital status, sexual orientation, sexual identity, genetic information or an individual's refusal to submit to a genetic test or make available the results of a genetic test, disability, or any otherwise unlawful use of characteristics regarding the vendor's, supplier's, or commercial customer's employees or owners. "Discrimination" also includes retaliating against any person or other entity for reporting any incident of "discrimination". Without limiting any other provision of the solicitation on this project, it is understood that, if the certification is false, such false certification constitutes grounds for the State to reject the Bid/proposal submitted by the Bidder/Offeror on this project, and terminate any contract awarded based on the Bid/proposal. As part of its Bid/proposal, the Bidder/Offeror herewith submits a list of all instances within the past four (4) years where there has been a final adjudicated determination in a legal or administrative proceeding in the State of Maryland that the Bidder/Offeror discriminated against subcontractors, vendors, suppliers, or commercial customers, and a description of the status or resolution of that determination, including any remedial action taken. Bidder/Offeror agrees to comply in all respects with the State's Commercial Nondiscrimination Policy as described under Title 19 of the State Finance and Procurement Article of the Annotated Code of Maryland.

## B-1.    CERTIFICATION REGARDING MINORITY BUSINESS ENTERPRISES.

The undersigned Bidder/Offeror hereby certifies and agrees that it has fully complied with the State Minority Business Enterprise Law, State Finance and Procurement Article, § 14-308(a)(2), Annotated Code of Maryland, which provides that, except as otherwise provided by law, a contractor may not identify a certified minority business enterprise in a Bid/proposal and:

(1) Fail to request, receive, or otherwise obtain authorization from the certified minority business enterprise to identify the certified minority bid/proposal;

(2) Fail to notify the certified minority business enterprise before execution of the contract of its inclusion in the Bid/proposal;

(3) Fail to use the certified minority business enterprise in the performance of the contract; or

(4) Pay the certified minority business enterprise solely for the use of its name in the Bid/proposal.

Without limiting any other provision of the solicitation on this project, it is understood that if the certification is false, such false certification constitutes grounds for the State to reject the

Bid/proposal submitted by the Bidder/Offeror on this project, and terminate any contract awarded based on the Bid/proposal.

**B-2.   CERTIFICATION   REGARDING   VETERAN-OWNED   SMALL   BUSINESS ENTERPRISES.**

The undersigned Bidder/Offeror hereby certifies and agrees that it has fully complied with the State veteran-owned small business enterprise law, State Finance and Procurement Article, § 14-605, Annotated Code of Maryland, which provides that a person may not:

(1)   Knowingly and with intent to defraud, fraudulently obtain, attempt to obtain, or aid another person in fraudulently obtaining or attempting to obtain public money, procurement contracts, or funds expended under a procurement contract to which the person is not entitled under this title;

(2)   Knowingly and with intent to defraud, fraudulently represent participation of a veteran-owned small business enterprise in order to obtain or retain a Bid/proposal preference or a procurement contract;

(3)   Willfully and knowingly make or subscribe to any statement, declaration, or other document that is fraudulent or false as to any material matter, whether or not that falsity or fraud is committed with the knowledge or consent of the person authorized or required to present the declaration, statement, or document;

(4)   Willfully and knowingly aid, assist in, procure, counsel, or advise the preparation or presentation of a declaration, statement, or other document that is fraudulent or false as to any material matter, regardless of whether that falsity or fraud is committed with the knowledge or consent of the person authorized or required to present the declaration, statement, or document;

(5)   Willfully and knowingly fail to file any declaration or notice with the unit that is required by COMAR 21.11.13; or

(6)   Establish, knowingly aid in the establishment of, or exercise control over a business found to have violated a provision of § B-2(1) -(5) of this regulation.

**C.   AFFIRMATION REGARDING BRIBERY CONVICTIONS**

I FURTHER AFFIRM THAT:

Neither I, nor to the best of my knowledge, information, and belief, the above business (as is defined in Section 16-101(b) of the State Finance and Procurement Article of the Annotated Code of Maryland), or any of its officers, directors, partners, controlling stockholders, or any of its employees directly involved in the business's contracting activities including obtaining or performing contracts with public bodies has been convicted of, or has had probation before judgment imposed pursuant to Criminal Procedure Article, § 6-220, Annotated Code of Maryland, or has pleaded nolo contendere to a charge of, bribery, attempted bribery, or conspiracy to bribe in violation of Maryland law, or of the law of any other state or federal law, except as follows (indicate the reasons why the affirmation cannot be given and list any conviction, plea, or imposition of probation before judgment with the date, court, official or administrative body, the sentence or disposition, the name(s) of person(s) involved, and their current positions and responsibilities with the business):

_____

_____

**D.      AFFIRMATION REGARDING OTHER CONVICTIONS**

I FURTHER AFFIRM THAT:

Neither I, nor to the best of my knowledge, information, and belief, the above business, or any of its officers, directors, partners, controlling stockholders, or any of its employees directly involved in the business's contracting activities including obtaining or performing contracts with public bodies, has:

(1)   Been convicted under state or federal statute of:

   (a)   A criminal offense incident to obtaining, attempting to obtain, or performing a public or private contract; or

   (b)   Fraud, embezzlement, theft, forgery, falsification or destruction of records or receiving stolen property;

(2)   Been convicted of any criminal violation of a state or federal antitrust statute;

(3)   Been convicted under the provisions of Title 18 of the United States Code for violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 et seq., or the Mail Fraud Act, 18 U.S.C. § 1341 et seq., for acts in connection with the submission of Bids/Proposals for a public or private contract;

(4)   Been convicted of a violation of the State Minority Business Enterprise Law, § 14-308 of the State Finance and Procurement Article of the Annotated Code of Maryland;

(5)   Been convicted of a violation of § 11-205.1 of the State Finance and Procurement Article of the Annotated Code of Maryland;

(6)   Been convicted of conspiracy to commit any act or omission that would constitute grounds for conviction or liability under any law or statute described in subsections (1)— (5) above;

(7)   Been found civilly liable under a state or federal antitrust statute for acts or omissions in connection with the submission of Bids/Proposals for a public or private contract;

(8)   Been found in a final adjudicated decision to have violated the Commercial Nondiscrimination Policy under Title 19 of the State Finance and Procurement Article of the Annotated Code of Maryland with regard to a public or private contract;

(9)   Been convicted of a violation of one or more of the following provisions of the Internal Revenue Code:

   (a)   §7201, Attempt to Evade or Defeat Tax;

   (b)   §7203, Willful Failure to File Return, Supply Information, or Pay Tax,

   (c)   §7205, Fraudulent Withholding Exemption Certificate or Failure to Supply Information;

   (d)   §7206, Fraud and False Statements, or

   (e)   §7207 Fraudulent Returns, Statements, or Other Documents;

(10)   Been convicted of a violation of 18 U.S.C. §286 Conspiracy to Defraud the Government with Respect to Claims, 18 U.S.C. §287, False, Fictitious, or Fraudulent Claims, or 18 U.S.C. §371, Conspiracy to Defraud the United States;

(11)   Been convicted of a violation of the Tax-General Article, Title 13, Subtitle 7 or Subtitle 10, Annotated Code of Maryland;

(12)   Been found to have willfully or knowingly violated State Prevailing Wage Laws as provided in the State Finance and Procurement Article, Title 17, Subtitle 2, Annotated Code of Maryland, if:

(a)  A court:

    (i)  Made the finding; and

    (ii)  Decision became final; or

(b)  The finding was:

    (i)  Made in a contested case under the Maryland Administrative Procedure act; and

    (ii)  Not overturned on judicial review;

(13)  Been found to have willfully or knowingly violated State Living Wage Laws as provided in the State Finance and Procurement Article, Title 18, Annotated Code of Maryland, if:

(a)  A court:

    (i)  Made the finding; and

    (ii)  Decision became final; or

(b)  The finding was:

    (i)  Made in a contested case under the Maryland Administrative Procedure act; and

    (ii)  Not overturned on judicial review;

(14)  Been found to have willfully or knowingly violated the Labor and Employment Article, Title 3, Subtitles 3, 4, or 5, or Title 5, Annotated Code of Maryland, if:

(a)  A court:

    (i)  Made the finding; and

    (ii)  Decision became final; or

(b)  The finding was:

    (i)  Made in a contested case under the Maryland Administrative Procedure act; and

    (ii)  Not overturned on judicial review; or

(15)  Admitted in writing or under oath, during the course of an official investigation or other proceedings, acts or omissions that would constitute grounds for conviction or liability under any law or statute described in §§ B and C and subsections D(1)—(14) above, except as follows (indicate reasons why the affirmations cannot be given, and list any conviction, plea, or imposition of probation before judgment with the date, court, official or administrative body, the sentence or disposition, the name(s) of the person(s) involved and their current positions and responsibilities with the business, and the status of any debarment):

_____

_____

### E.    AFFIRMATION REGARDING DEBARMENT

I FURTHER AFFIRM THAT:

Neither I, nor to the best of my knowledge, information, and belief, the above business, or any of its officers, directors, partners, controlling stockholders, or any of its employees directly involved in the business's contracting activities, including obtaining or performing contracts with public bodies, has ever been suspended or debarred (including being issued a limited denial of participation) by any public entity, except as follows (list each debarment or suspension providing the dates of the suspension or debarment, the name of the public entity and the status of the proceedings, the

name(s) of the person(s) involved and their current positions and responsibilities with the business, the grounds of the debarment or suspension, and the details of each person's involvement in any activity that formed the grounds of the debarment or suspension).

_____

_____

**F.     AFFIRMATION REGARDING DEBARMENT OF RELATED ENTITIES**

I FURTHER AFFIRM THAT:

(1)   The business was not established and does not operate in a manner designed to evade the application of or defeat the purpose of debarment pursuant to Sections 16-101, et seq., of the State Finance and Procurement Article of the Annotated Code of Maryland; and

(2)   The business is not a successor, assignee, subsidiary, or affiliate of a suspended or debarred business, except as follows (you must indicate the reasons why the affirmations cannot be given without qualification):

_____

_____

**G.     SUBCONTRACT AFFIRMATION**

I FURTHER AFFIRM THAT:

Neither I, nor to the best of my knowledge, information, and belief, the above business, has knowingly entered into a contract with a public body under which a person debarred or suspended under Title 16 of the State Finance and Procurement Article of the Annotated Code of Maryland will provide, directly or indirectly, supplies, services, architectural services, construction related services, leases of real property, or construction.

**H.     AFFIRMATION REGARDING COLLUSION**

I FURTHER AFFIRM THAT:

Neither I, nor to the best of my knowledge, information, and belief, the above business has:

(1)   Agreed, conspired, connived, or colluded to produce a deceptive show of competition in the compilation of the accompanying Bid/proposal that is being submitted; or

(2)   In any manner, directly or indirectly, entered into any agreement of any kind to fix the Bid/proposal price of the Bidder/Offeror or of any competitor, or otherwise taken any action in restraint of free competitive bidding in connection with the contract for which the accompanying Bid/proposal is submitted.

**I.     CERTIFICATION OF TAX PAYMENT**

I FURTHER AFFIRM THAT:

Except as validly contested, the business has paid, or has arranged for payment of, all taxes due the State of Maryland and has filed all required returns and reports with the Comptroller of the Treasury, State Department of Assessments and Taxation, and Department of Labor, Licensing, and Regulation, as applicable, and will have paid all withholding taxes due the State of Maryland prior to final settlement.

**J.     CONTINGENT FEES**

I FURTHER AFFIRM THAT:

The business has not employed or retained any person, partnership, corporation, or other entity, other than a bona fide employee, bona fide agent, bona fide salesperson, or commercial selling agency working for the business, to solicit or secure the Contract, and that the business has not paid or agreed to pay any person, partnership, corporation, or other entity, other than a bona fide employee, bona fide agent, bona fide salesperson, or commercial selling agency, any fee or any other consideration contingent on the making of the Contract.

**K.   CERTIFICATION REGARDING INVESTMENTS IN IRAN**

(1)   The undersigned certifies that, in accordance with State Finance and Procurement Article, §17-705, Annotated Code of Maryland:

(a)   It is not identified on the list created by the Board of Public Works as a person engaging in investment activities in Iran as described in State Finance and Procurement Article, §17-702, Annotated Code of Maryland; and

(b)   It is not engaging in investment activities in Iran as described in State Finance and Procurement Article, §17-702, Annotated Code of Maryland.

(2)   The undersigned is unable to make the above certification regarding its investment activities in Iran due to the following activities:

_____

_____

**L.   CONFLICT MINERALS ORIGINATED IN THE DEMOCRATIC REPUBLIC OF CONGO (FOR SUPPLIES AND SERVICES CONTRACTS)**

I FURTHER AFFIRM THAT:

The business has complied with the provisions of State Finance and Procurement Article, §14-413, Annotated Code of Maryland governing proper disclosure of certain information regarding conflict minerals originating in the Democratic Republic of Congo or its neighboring countries as required by federal law.

**M.   PROHIBITING DISCRIMINATORY BOYCOTTS OF ISRAEL**

I FURTHER AFFIRM THAT:

In preparing its bid/proposal on this project, the Bidder/Offeror has considered all bid/proposals submitted from qualified, potential subcontractors and suppliers, and has not, in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier, refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories. The Bidder/Offeror also has not retaliated against any person or other entity for reporting such refusal, termination, or commercially limiting actions. Without limiting any other provision of the solicitation for bid/proposals for this project, it is understood and agreed that, if this certification is false, such false certification will constitute grounds for the State to reject the bid/proposal submitted by the Bidder/Offeror on this project, and terminate any contract awarded based on the bid/proposal.

**N.   I FURTHER AFFIRM THAT:**

Any claims of environmental attributes made relating to a product or service included in the bid or bid/proposal are consistent with the Federal Trade Commission's Guides for the Use of Environmental Marketing Claims as provided in 16 C.F.R. §260, that apply to claims about the environmental attributes of a product, package or service in connection with the marketing, offering for sale, or sale of such item or service.

**O.     ACKNOWLEDGEMENT**

I ACKNOWLEDGE THAT this Affidavit is to be furnished to the Procurement Officer and may be distributed to units of: (1) the State of Maryland; (2) counties or other subdivisions of the State of Maryland; (3) other states; and (4) the federal government. I further acknowledge that this Affidavit is subject to applicable laws of the United States and the State of Maryland, both criminal and civil, and that nothing in this Affidavit or any contract resulting from the submission of this Bid/proposal shall be construed to supersede, amend, modify or waive, on behalf of the State of Maryland, or any unit of the State of Maryland having jurisdiction, the exercise of any statutory right or remedy conferred by the Constitution and the laws of Maryland with respect to any misrepresentation made or any violation of the obligations, terms and covenants undertaken by the above business with respect to (1) this Affidavit, (2) the contract, and (3) other Affidavits comprising part of the contract.

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE CONTENTS OF THIS AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

By: _____
*Signature of Authorized Representative and Affiant*

Printed Name: _____
*Printed Name of Authorized Representative and Affiant*

Title: _____
*Title*

Date: _____
*Date*

_____