**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

| | |
|---|---|
| **SAQIB ALI** <br> Montgomery County, Maryland, <br><br>          Plaintiff, <br><br>    v. <br><br> **LAWRENCE HOGAN**, in his official <br> capacity as Governor of Maryland, <br> 100 State Circle <br> Annapolis, MD 21401, and <br><br> **BRIAN FROSH**, in his official capacity as <br> Attorney General of Maryland, <br> 200 St. Paul Place <br> Baltimore, MD 21202, <br><br>          Defendants. | Case No. 1:19-CV-00078-BPG |

**SAQIB ALI'S COMBINED OPPOSITION TO**
**GOVERNOR'S AND ATTORNEY GENERAL'S MOTIONS TO DISMISS**

## TABLE OF CONTENTS

*TABLE OF AUTHORITIES* ................................................................................................. *iii*

*INTRODUCTION* ........................................................................................................ *1*

*BACKGROUND* .......................................................................................................... *1*

*ARGUMENT* ............................................................................................................... *4*

I.      **Ali Does not Need to, and in Fact cannot, Submit a Bid** ............................ **4**

    A.   Ali Is Already Punished by the Executive Order .................................... 4

    B.   Ali Has Been Burdened by the Executive Order under Chilled-Speech Theory ...... 7

    C.   The Governor's Claim that Other Challengers to Anti-BDS Laws Had to "Pursue" a Solicitation is False ............................................................................................. 8

II.     **The Governor Cannot Interpret Away Section B** ....................................... **9**

    A.   The Governor's Interpretation of Section B Is Wrong ........................... 9

    B.   The Governor's Interpretation Is not Binding ..................................... 10

    C.   Voluntary Cessation Does not Moot this Case ..................................... 11

III.    **Section C Is Independently Unconstitutional** .......................................... **14**

    A.   Section C Prohibits Conduct not Otherwise Prohibited against Israel Only ......... 14

    B.   Section C Applies to a Different Range of Conduct than Otherwise Prohibited ... 16

    C.   Section C's Politically Oriented Oath is Unconstitutional ................... 16

IV.     **The Executive Order Is Unconstitutionally Void for Vagueness Even under the Governor's Interpretation** ................................................................................. **17**

    A.   Even if Section B is Ultimately Given no Meaning, the Executive Order is Unconstitutionally Vague ................................................................................. 17

    B.   Section C is Independently Unconstitutionally Vague ......................... 20

    C.   Neither Provision Is "Readily Susceptible" to a Constitutionally-Appropriate Limiting ............................................................................................................. 22

V.      **Ali's Claim Is Not Barred by the 11th Amendment to the Constitution** .......... **24**

VI.     **Section B Violates the First Amendment** ................................................. **24**

VII.    **Section B is Void for Vagueness** .............................................................. **25**

VIII.   **The Attorney General Is a Proper Defendant** ........................................... **26**

*CONCLUSION* .......................................................................................................... *26*

## TABLE OF AUTHORITIES

*Cases*

*Accord Invisible Empire of the KKK v. Thurmont*, 700 F. Supp. 281 (D. Md. 1988)_____ 15

*AFSCME Council 79 v. Scott*, 278 F.R.D. 664 (S.D. Fla. 2011)_____ 13

*Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717 (W.D. Tex. 2019) _____passim

*Arkansas Times LP v. Waldrip*, 362 F. Supp. 3d 617 (E.D. Ark. 2019)_____ 8

*Auer v. Robbins,* 519 U.S. 452 (1997) _____ 10

*Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289 (1979) _____ 20

*Baird v. State Bar of Ariz.,* 401 U.S. 1 (1971) _____ 8, 17

*Baltimore & Ohio R. Co. v. Kuchta*, 76 Md. App. 1, 543 A.2d 371 (1988)_____ 19

*Bd. of Ancient Order of Hibernians v. Dinkins*, 814 F. Supp. 358 (S.D.N.Y. 1993)_____ 15

*Benham v. City of Charlotte, N.C.*, 635 F.3d 129 (4th Cir. 2011) _____ 7

*Brown v. Ent't Merchants Ass'n*, 564 U.S. 786 (2011) _____ 18

*Citizen Center v. Gessler*, 770 F.3d 900 (10th Cir. 2014) _____ 12

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982) _____ 11

*Cole v. Richardson*, 405 U.S. 676 (1972) _____ 8, 17

*Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142 (D. Mass. 2011) _____ 13

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474 (4th Cir. 2005) _____ 7

*Cooksey v. Futrell*, 721 F.3d 226 (4th Cir. 2013) _____ 7

*Cramp v. Bd. of Pub. Instruction of Orange Cty., Fla.*, 368 U.S. 278 (1961) _____ 22

*Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042 (9th Cir. 2001) _____ 13

*Ex Parte Young, 209 U.S. 123 (1908)* _____ 24

*Friends of the Earth v. Laidlaw Environmental Servs.*, 528 U.S. 167 (2000)_____ 12

*Hamilton v. Verdow*, 287 Md. 544 (1980) _____ 11

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) _____ 15

*Image Carrier Corp. v. Beame*, 567 F.2d 1197 (2d Cir. 1977) _____ 5

*Int'l Longshoremen's Association, AFL-CIO v. Allied International, Inc.*, 456 U.S. 212 (1982)__ 24

*Johnson v. United States*, 135 S. Ct. 2551 (2015) _____ 18

*Jordahl v. Brnovich*, 336 F. Supp. 3d 1016 (D. Ariz. 2018) _____ 1, 2, 8, 24

*Konigsberg v. State Bar of Cal.,* 366 U.S. 36 (1961) _____ 17

*Koontz v. Watson*, F. Supp. 3d 1007 (D. Kan. 2018) _____ 1, 8, 24

*LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005) _____ 6

*Mid-Atl. Power Supply Ass'n v. Pub. Serv. Comm'n*, 760 A.2d 1087 (2000) _____ 10

*Mobil Oil Corp. v. Attorney Gen. of Com. of Va.*, 940 F.2d 73 (4th Cir. 1991)_____ 12, 13

*NAACP v. Button*, 371 U.S. 415 (1963)_____ 18

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) _____ 24

*New Hampshire v. Maine*, 532 U.S. 742 (2001) _____ 10

*Papasan v. Allain*, 478 U.S. 265 (1986) _____ 13

*Para v. 1691 Ltd. P'ship*, 211 Md. App. 335, 65 A.3d 221 (2013) _____ 10

*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015) _____ 10

*Porter v. Clarke*, 852 F.3d 358 (4th Cir. 2017)_____ 12

*PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) _____ 23

*R.A.V. v. City of St. Paul,* 505 U.S. 377 (1992) _____ 15

*Reno v. ACLU*, 521 U.S. 844 (1997) _____ 23

*Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096 (10th Cir. 2010) _____ 12

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) _____ 15

*Rumsfeld v. FAIR*, 547 U.S. 47 (2006)_____ 24

*Sea-Land Serv., Inc. v. I.C.C.*, 738 F.2d 1311 (D.C. Cir. 1984) _____ 11

*Stone v. Mississippi*, 101 U.S. 814 (1880)_____ 19

*Town of Nags Head v. Toloczko*, 728 F.3d 391 (4th Cir. 2013) _____ 11

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) _____ 19

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) _____ 12, 23

*Wall v. Wade*, 741 F.3d 492 (4th Cir. 2014)_____ 11

*Ward v. Rock Against Racism,* 491 U.S. 781 (1989) _____ 18

**Statutes**

50 U.S.C. § 4607 _____ 11

Md. Code, Fin. & Proc. § 11-205.1(a) _____ 5

Md. Code, Gen. Prov. § 8-102(b)_____ 6

Md. Code, State Fin. & Proc. § 13-206(a)(1)(i)_____ 6

Md. Code, State Fin. & Proc. § 19-103(j) _____ 17, 18, 19, 29

Md. Code, State Fin. & Proc. § 19-115 _____ 17

Md. Code, State Gov't § 3-302_____ 17

State Fin. & Proc. § 16-203(a)(12) _____ 6

**Other Authorities**

Erica Newland, *Executive Orders in Court*, 124 YALE L.J. 2026, 2069 (2015) _____ 13

Executive Order 01.01.2017.25 _____ 3, 8

Executive Order 01.01.2017.25(A) _____passim

Executive Order 01.01.2017.25(A)(1) _____ 11

Executive Order 01.01.2017.25(B)_____ 3, 6, 7, 10

Executive Order 01.01.2017.25(C)_____passim

**INTRODUCTION**

The Governor's Executive Order is part of a wave of state efforts to undermine the constitutional right of Americans to boycott a particular foreign country. It is an often-exercised First Amendment right, and a hallowed American tradition, to boycott.  Boycotts—against other foreign countries, states, businesses, cities, news stations, to name a few—permeate our public discourse not by coincidence but rather because the First Amendment and the federal courts have offered this robust protection.

Nevertheless, through legislation and executive orders, at least 25 states have enacted legal measures against one boycott in particular: the Boycott, Divestment, and Sanctions ("BDS") movement, which, as its name implies, uses boycotts to advocate for the rights of Palestinians. In response, three out of the four federal courts that have reviewed anti-BDS laws have found them facially unconstitutional under the First Amendment.

In Arizona, a federal district court found that "the [Arizona] Act's history … suggests that the goal of the Act is to penalize the efforts of those engaged in political boycotts of Israel," then held that "such an interest is constitutionally impermissible." *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, 1048-50 (D. Ariz. 2018). In Kansas, another federal district court concluded that "the Supreme Court has held that the First Amendment protects the right to participate in a boycott like the one punished by the Kansas law." *Koontz v. Watson*, F. Supp. 3d 1007, 1012 (D. Kan. 2018). In invalidating the law, the court in *Koontz* noted that the law's "goal is to undermine the message of those participating in a boycott of Israel." *Id.* at 1022.

And in Texas, yet another federal district court struck down another Anti-BDS law as an unlawful infringement of speech. *Amawi v. Pflugerville Indep. Sch. Dist.*, 373 F. Supp. 3d 717 (W.D. Tex. 2019). In the course of explaining its result, *Amawi* concluded without hesitation

that the law's anti-boycott aim, "to prevent expressive conduct critical of the nation of Israel, was clear." 373 F. Supp. 3d at 749 (emphasis omitted). "Texas has taken sides in the robust public debate on Israeli-Palestinian relations." *Id.* at 750-51.

The purpose of the Executive Order here is just as obvious as the laws at issue in *Koontz, Jordahl, and Amawi*. The WHEREAS clauses announce that "[i]t is the public policy of the United States … to oppose certain boycotts of Israel," and that such boycotts are "discriminatory."  And the Governor's press release upon issuing the Executive Order removes any doubt: "The executive order further strengthens Maryland's opposition to the Boycott, Divestment, and Sanctions (BDS) movement, a discriminatory campaign designed to undermine global trade with Israel." Dkt. 22 at ¶ 22.

Yet, in the face of *Jordahl*, *Koontz*, and *Amawi*, the Governor  declines to defend the plain terms of his Executive Order. The Governor's assertion to this Court is that his Executive Order—with terms he tried but failed to get passed by the Maryland legislature— is a nullity. He claims it simply prohibits certain conduct that was already entirely prohibited by already-existing general antidiscrimination law.

But the Governor has neither amended nor withdrawn his Executive Order.  His attempt to rewrite the Executive Order into oblivion should fail. The Executive Order's vagueness, as well as the loyalty oath to a foreign nation it imposes, remain unconstitutional.

In its October Order, the Court queries whether the State's proffered new interpretation might eliminate Ali's standing unless Ali actually goes out and bids on a contract in violation of the Executive Order. It does not. Ali has standing because he has already been punished by the State. Ali cannot submit a bid with the fidelity oath signed, because doing so would not only be an illegal false certification but would also violate his

personal religious beliefs against lying. This is true regardless of whether the Court accepts the Governor's interpretation of the Executive Order. And Ali cannot submit a bid without signing the oath, because doing so would render the bid incomplete and futile. His necessary foregoing of government contracts is all the punishment or burden necessary for Ali to have standing.

If the Governor wants the Executive Order to mean nothing, he can accomplish that in the most obvious way: by repealing it. Otherwise, this Court should hold the Executive Order unconstitutional, whether under its actual and plain meaning, or even under the Governor's new, fabricated one.

## BACKGROUND[1]

In 2017, after the Maryland Legislature declined to pass a statutory anti-BDS law, the Governor issued Executive Order 01.01.2017.25. *Id.* at ¶¶ 21-22. The Executive Order contains two separate sections describing certification, Section B and Section C.

Section B states, in full:

Executive agencies may not execute a procurement contract with a business entity unless it certifies, in writing when the bid is submitted or the contract is renewed, that

1. it is not engaging in a boycott of Israel; and

2. it will, for the duration of its contractual obligations, refrain from a boycott of Israel.

Executive Order 01.01.2017.25(B). "Boycott of Israel" is a defined term. Executive Order 01.01.2017.25(A). That term covers Ali, who boycotts Israel in his personal capacity. Dkt. 22 at ¶¶ 4 and 38.

---

[1] The Background is described in Ali's prior Opposition. Dkt. 11 at 2-4. Ali thus merely provides important highlights relevant to the issues raised by the Court's Order (Dkt. 20), and otherwise incorporates the prior Background.

Section C states, in full:

> All requests for bids or proposals issued for contracts with
> Executive agencies shall include the text of the following
> certification be completed by the bidder: "In preparing its
> bid/proposal on this project, the Bidder/Offeror has considered all
> bid/proposals submitted from qualified, potential subcontractors
> and suppliers, and has not, in the solicitation, selection, or
> commercial treatment of any subcontractor, vendor, or supplier,
> refused to transact or terminated business activities, or taken other
> actions intended to limit commercial relations, with a person or
> entity on the basis of Israeli national origin, or residence or
> incorporation in Israel and its territories. The Bidder/Offeror also
> has not retaliated against any person or other entity for reporting
> such refusal, termination, or commercially limiting actions.
> Without limiting any other provision of the solicitation for
> bid/proposals for this project, it is understood and agreed that, if
> this certification is false, such false certification will constitute
> grounds for the State to reject the bid/proposal submitted by the
> Bidder/Offeror on this project, and terminate any contract
> awarded based on the bid/proposal.

Executive Order 01.01.2017.25(C). Section C does not contain the phrase "boycott of Israel."

## ARGUMENT

### I.      Ali Does not Need to, and in Fact cannot, Submit a Bid

#### A.  Ali Is Already Punished by the Executive Order

Although the Court suggests it is possible that Ali might not be prohibited from submitting a bid, signing Section C, and perhaps being awarded that bid, Dkt. 20 at 9, Ali need not do so in order to challenge the Executive Order.

As explained below, even if Section B was read out of the Executive Order entirely, Section C would still be unconstitutional for three reasons. *First*, Section C both prohibits only certain kinds of Israel-regarding conduct only when that conduct regards one particular foreign country and is perceived as hostile to that foreign country only against Israel and no other country, *see* § III(A), *below*, This makes Section C viewpoint-based, rather than

4

viewpoint-neutral, and thus facially unconstitutional. **Second**, even if the Government could prohibit the conduct covered by Section C, Section C would still constitute an illegal oath requirement based on political viewpoint. *See* § III(C), below. **Third**, Section C is unconstitutionally vague. *See* § IV, *below*.

Because the Certification in Section C is separately unconstitutional, the Governor cannot legally require Ali to sign the Section C certification. Indeed, because Ali will continue to refuse to do business with, for instance, American citizens who operate in the West Bank, *see* § III(A), *below*, he **cannot** sign the Certification. Doing so would subject Ali to civil or criminal penalties for false statements, and is contrary to Ali's sincerely-held religious beliefs against lying. *See* Md. Code, Fin. & Proc. § 11-205.1(a); Md. Code Ann., State Fin. & Proc. § 16-203(a)(12); and Md. Code, Gen. Prov. § 8-102(b); *see also* Dkt. 22 at ¶¶ 38-39. So Ali cannot submit a bid by signing the Section C certification.

Falsely completing Section C, in the manner the Governor prescribes, gives "grounds for the State to reject the bid ... and terminate any contract awarded based on the bid." Executive Order 01.01.2017.25(C). And standing doctrine does not require Ali to submit futile bids. *Image Carrier Corp. v. Beame*, 567 F.2d 1197, 1201 (2d Cir. 1977) (no requirement to bid for standing if bidding would be futile). Even under the Governor's "harmon[ized]" interpretation of Section B, refusal to sign the Section C certification would be futile. A missing certification would render Ali's bid incomplete and nonresponsive. Md. Code, State Fin. & Proc. § 13-206(a)(1)(i) ("A procurement officer shall reject a bid or proposal" that is "nonresponsive"). And the Governor has not disavowed the requirement to sign the Section C Certification in any way. Ali need not undertake the time and expense to submit a defective bid which, by order of the Governor, must be rejected.  Dkt. 22 at ¶ 31; *LeClerc v. Webb*, 419

F.3d 405, 413 (5th Cir. 2005) ("strict adherence to the standing doctrine may be excused when a policy's flat prohibition would render submission futile").

Even if the Certification was not separately unconstitutional, to the extent Section B is given any meaning, Ali's submitting a bid by signing the Section C certification (which, again, he cannot do) would be futile. Surely, any Maryland executive agency would know that Ali, of any potential bidder, boycotts Israel as defined in Section A of the Executive Order. So, consistent with Section B's requirements, any agency would be prohibited from allowing him to enter into any government contract with that agency. To the extent Section B has any meaning at all—which, as explained in Section II, *below*, it does—then Ali submitting a bid even while signing a Section C certification would be futile.

And, as noted in the Court's Order, that futile action would come at substantial cost to Ali. Order at 8 n.2; *see also* Dkt. 22 at ¶ 31.

Ali does not argue that he has a First Amendment right to speak by applying for government bids.  Rather, he makes a more modest point: that, Ali has a First Amendment right to boycott Israel.  The Governor, seeks to deter Ali and others from exercising that right by making all those who boycott Israel ineligible for government contracts. Ali is among those who boycott Israel, and because of his First Amendment activity, has been ***punished*** by an executive order that declares him ineligible for government contracts. So Ali has standing based on this direct harm even without reaching the more abstract questions of chilled speech[2] and standing.

---

[2] Chilled-speech theory is merely an exception to the general rule that one has standing to challenge the government punishing someone for engaging in protected conduct.

The general rule is enough here. Any other result—which would allow the government to punish individuals who speak so long as they do speak, because they have not actually been "chilled" by the suppression—would leave the First Amendment diminished.

### B.   Ali Has Been Burdened by the Executive Order under Chilled-Speech Theory

Chilled-speech doctrine only further establishes that Ali has standing. As explained above, Ali's inability to bid on state government contracts is a "burden" on Ali's free speech rights. *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 139 n.7 (4th Cir. 2011). Other than a "burden," all Ali needs to show is that the Executive Order "is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* at 135; *see also Cooksey v. Futrell*, 721 F.3d 226, 236 (4th Cir. 2013). And the Executive Order does this, for anyone looking to bid on Maryland contracts. After all, that is the express purpose of the Executive Order. *See* Executive Order 01.01.2017.25 at Fifth-Ninth & Eleventh WHEREAS Clauses.

The Governor responds that Ali cannot meet the *Cooksley* test because Ali has not stopped boycotting Israel, Dkt. 25-1 at 9. But the Fourth Circuit has made clear that chilled-speech standing does not require  plaintiffs who can show they dampened their own speech. *Benham*, 635 F.3d 139 n.7. *Benham*, 635 F.3d 139 n.7. If it did, "such a subjective standard would expose public officials to liability in some cases, but not in others, for the very same conduct, depending upon the plaintiff's will to fight." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005). And the Governor admits that Ali has been burdened in that "he has forgone … bidding on state contracts." Dkt. 25-1 at 9.

The Governor further claims—without evidence—that Ali's burden "is not the result of a credible threat of enforcement." Dkt. 25-1 at 9. But this is neither true (for reasons explained in this opposition), nor relevant. Ali has been burdened by his refusal to lie on the

Certification alone; this is enough to provide standing. After all, none of the oath cases discussed in *Cole v. Richardson*, 405 U.S. 676 (1972), or *Baird v. State Bar of Ariz.,* 401 U.S. (1971), required that the individuals take the challenged oath and be prosecuted for violating it to have standing.

So whether Section B has any meaning or not, Ali cannot and need not bid to sustain his claims.

### C. The Governor's Claim that Other Challengers to Anti-BDS Laws Had to "Pursue" a Solicitation is False

The Governor first hinted at its Section-B-has-no-meaning defense in his reply brief to the initial Motion to Dismiss. Dkt. 12 at 6-8. This is false. None of the other cases involved solicitations, or states that any individuals had bid for any contract at all. Instead, in each case the certification was contained in a contract. Much like Ali here, Jordahl, Koontz, Arkansas Times, and all but one of the *Amawi* plaintiffs refused to sign the contracts because they included an oath. *Jordahl*, 336 F. Supp. 3d at 1029; *Koontz*, 283 F. Supp. 3d 1014, *Amawi*, 373 F. Supp.3d at 731-734; *Arkansas Times LP v. Waldrip*, 362 F. Supp. 3d 617, 620 (E.D. Ark. 2019).[3] In fact, Arkansas Times had standing because it refused to sign the oath even though it did not boycott Israel. 362 F. Supp. 3d at 622 ("The Times … has ***already*** sustained an injury …. because it refused to comply with Act 710's certification provision") (emphasis original). And the final *Amawi* plaintiff, George Hale, signed the oath, nothing happened to him, and yet still had standing to challenge the anti-BDS law. 373 F. Supp. 3d at 734-35.

---

[3] In *Jordahl*, the plaintiff continued providing services under a prior contract, but was not paid for that contract due to refusal to sign the updated contract with the certification. 336 F. Supp. 3d at 1029.

II.     **The Governor Cannot Interpret Away Section B**

   A.  **The Governor's Interpretation of Section B Is Wrong**

The Governor alleges that Section B does not apply at all, because it "does not appear in the bid/proposal affidavits." Dkt. 25-1 at 12; *see also* Order (Dkt. 20) at 6-7. The Governor suggests that Section B must be "read in harmony" with Section C. Dkt. 25-1 at 12. But the two clauses are plainly distinct and separate requirements.

*First*, Section B specifically binds "executive agencies" that are dealing with a defined entity, i.e., a "business entity." Executive Order 01.01.2017.25(B) ("Executive Agencies may not execute a procurement contract with a business entity unless it certifies, in writing…); *see id.* at § (A)(2) (defining "business entity"). Section C, in contrast, applies to all "bidder[s]."

*Second*, Section B's certification requirement expressly not only requires that the "business entity" not be "engaging in a boycott of Israel," present tense, but that … "it will, for the duration of its contractual obligations, refrain from a boycott of Israel." Yet Section C's certification requirement is solely past tense. Executive Order 01.01.2017.25(C) ("has considered …. Has not … refused … has not retaliated ….").

*Third*, while Section B includes the defined term "boycott of Israel" (in a manner which covers Ali's actions, *see* Dkt. 20 at 5 ("Section B appears to forbid potential contractors from boycotting Israel"); Dkt. 22 at ¶¶ 4 and 38. Section C does not. Ignoring Section B eliminates the definition of the Boycott of Israel, Executive Order 01.01.2017.25(A)(1), from the Executive Order entirely. Reading Section B out of the Executive Order also reads out the exceptions to the definition of a boycott of Israel contained in Section A(1). So it no longer is the case that one is not in violation of the Order if one's actions are "not commercial in nature," "for business or economic reasons," "because of the specific conduct of the person

or entity," "against a public or governmental entity" or even "forbidden by the United States" under 50 U.S.C. § 4607. *Id.* Yet in defending the statute's constitutionality, the Governor specifically relied on these exceptions, even though they are not incorporated anywhere into Section C. *See* Dkt. 9-1 at 32. And the Governor incorporates these arguments into his current defense of the statute. Dkt. 12-1 at 24.

Section B and Section C are different certifications, but both are required to enter into a contract with the State. If Section B and Section C were meant to refer to the same certification, then the Executive Order would have said so. Section B would have said something like "the certification in Section C" below, rather than describing an incongruent certification. Section C would have only applied to "business entities" instead of to all "bidder[s]." And the language of Section C would have tracked the language of Section B. The Executive Order did not do so. So the canon against surplusage applies. *Mid-Atl. Power Supply Ass'n v. Pub. Serv. Comm'n*, 760 A.2d 1087, 1091 (2000).

### B. The Governor's Interpretation Is not Binding

The Governor first hinted at its proposed its Section-B-has-no-meaning position in his reply brief to the initial Motion to Dismiss. Dkt. 12 at 6-8. The position was raised in full for the first time at oral argument. This litigation argument is not binding. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1207 (2015); *see also Para v. 1691 Ltd. P'ship*, 211 Md. App. 335, 389, 65 A.3d 221, 253 (2013) (adopting *Auer* deference). Nor can Ali rely on judicial estoppel to prevent the Governor from returning to his prior interpretation. *New Hampshire v. Maine*, 532 U.S. 742, 755 (2001). At most, the Governor's assertion of his new "narrow" interpretation of Section B is simply voluntary cessation.

The Governor suggests his new interpretation is entitled to conclusive weight. Dkt.25-1 at 12. But the only case he cites, *Sea-Land Serv., Inc. v. I.C.C.*, 738 F.2d 1311, 1314 (D.C. Cir. 1984), does not stand for the proposition that the current Governor's litigation position in this case is entitled to any weight. Instead, *Sea-Land* stands for the proposition that the meaning of an executive order is determined by the intent of the President at the time the executive order is promulgated. *Id.* There, the intent was discerned from the plain language of the executive order. *Id.* So too here. Erica Newland's article, *Executive Orders in Court*, 124 Yale L.J. 2026, 2069 (2015), and the cases cited in it, *see id.* at n.181, say only the same as *Sea-Land* does. *Hamilton v. Verdow*, 287 Md. 544 (1980), in contrast, is not about interpreting executive orders at all, but rather about executive privilege.

### C. Voluntary Cessation Does not Moot this Case

To the extent that the Governor's new interpretation constitutes voluntary cessation of enforcement of Section B, the case is not moot. Voluntary cessation may only moot a case when it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.10 (1982) (citations omitted); *see generally Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014). So "when a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claims should not be dismissed as moot." *Wall*, 741 F.3d at 497 (citations omitted). And "courts have been particularly unwilling to find that a defendant has met its heavy burden to establish that its allegedly wrongful conduct will not recur when the defendant expressly states that, notwithstanding its abandonment of a challenged policy, it could return to the contested policy in the future, *see Town of Nags Head v. Toloczko*, 728 F.3d 391, 394 n.3 (4th Cir. 2013), or when the defendant's 'reluctant' decision to change a policy reflects 'a desire to return to

11

the old ways,' *Citizen Center v. Gessler*, 770 F.3d 900, 908 (10th Cir. 2014) (internal quotation marks omitted) (quoting *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1117 (10th Cir. 2010))." *Porter v. Clarke*, 852 F.3d 358, 365 (4th Cir. 2017).

Here, the Governor only adopted the non-interpretation of Section B in response to the Motion to Dismiss in this litigation. This can be seen from the fact that he did not raise this defense in his initial Motion to Dismiss and instead relied (in part) on the now-supposedly-irrelevant meaning of "Boycott of Israel." *See* Dkt. 9-1 at 30. The Governor also expressly continues to assert the authority to impose the requirements of Section B. Dkt. 25-1 at 23-25. And the Governor has not even taken the simple step of repealing Section B.

So the case is not moot. And, importantly, mootness is not "standing set in a time frame," *Friends of the Earth v. Laidlaw Environmental Servs.*, 528 U.S. 167, 190 (2000). At the time Ali brought this Complaint, he had no reason to believe Section B was meaningless. So, at the time he brought this case, Ali had standing. Even if Section B has no meaning, it would still be void for vagueness, as explained in Section IV, below, and Ali—at minimum—had the right to challenge that vagueness when he brought this case.

*Mobil Oil Corp. v. Attorney Gen. of Com. of Va.*, 940 F.2d 73 (4th Cir. 1991), and *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 391 (1988), are consistent with Ali's case not being moot.

*Mobil*, a standing case, explained at the outright that the plaintiff had standing to bring the case: "Public policy should encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution."

12

Article III of the Constitution limits the federal courts' jurisdiction to "cases and controversies." *Id.* at 75. The issue in *Mobil* was thus not whether the plaintiff had standing to bring the case, but whether the Attorney General was a proper party. *Id.* at 76. Relying on *American Booksellers*, the court concluded the Attorney General was a proper party there because there was "no reason to assume that the Virginia legislature enacted this statute without intending it to be enforced," and so there was "'an actual and well-founded fear' that the law will be enforced, and has in fact 'self-censored' itself by complying with the statute, incurring harm all the while." *Id.*

Based on *Mobil* and *American Booksellers*, the Attorney General is a proper party because—both at the time of the Complaint, when standing is to be determined, and now—there is no reason to believe that the Attorney General will not enforce the Executive Order, whatever it means. But the Governor is a proper party for a far more obvious reason. He was the one who issued the Anti-BDS Executive Order, and he is the one who may unilaterally revoke it. This gives the Governor all the "special relationship" that is necessary to make him a proper party in an *Ex Parte Young* suit. *See AFSCME Council 79 v. Scott*, 278 F.R.D. 664, 670-71 (S.D. Fla. 2011); *Duke Energy Trading & Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1053-54 (9th Cir. 2001); *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 159 (D. Mass. 2011).

The Governor is separately a proper defendant because he directly oversees the affected acquisition policies and practices of the agencies. *Papasan v. Allain*, 478 U.S. 265, 282 n.14 (1986); *see also* Md. Code, State Gov't § 3-302; *see generally* MTD Opp. (Dkt. 11) at 7-8.

### III.    Section C Is Independently Unconstitutional

There is no dispute that, if he wants to bid for a state contract, Ali has to sign the Section C certification. Dkt. 25-1 at 5. Yet Section C is unconstitutional even under the Governor's non-interpretation of Section B.

Even if the Court reads all of Section B out of the Executive Order, it is not true that Section C has no effect other than prohibiting what is already required by the general antidiscrimination provision of Md. Code, State Fin. & Proc. § 19-103(j), and the accompanying certification requirement, Md. Code, State Fin. & Proc. § 19-115. The additional requirements of Section C make that section alone a viewpoint-based punishment of those, like Ali, who engage in the constitutionally-protected right to engage in political boycotts. Dkt. 22 at ¶¶ 4 and 38.

#### A. Section C Prohibits Conduct not Otherwise Prohibited against Israel Only

Section C, unlike Md. Code, State Fin. & Proc. § 19-103(j), prohibits discrimination on the basis of residence and place of incorporation. So a contractor like Ali—even under the Governor's reading of the statute—may discriminate against Americans and businesses incorporated in Germany, or South Africa, or Saudi Arabia, or Palestine, but not against those incorporated against Israel.

Faced with this problem at oral argument, the Governor shrugged it off as a minor discrepancy. But it is not minor. Among other reasons, Ali has good reasons to boycott those who now reside in the occupied portions of the West Bank, in contravention of international law. Dkt. 22 at ¶¶ 4, 13-15. This includes international companies and Americans that Ali could otherwise very well decline to do business with, even in government contracting. Md. Code, State Fin. & Proc. § 19-103(j).

14

As a viewpoint-based anti-discrimination provision, Section C is unconstitutional. Content-neutral antidiscrimination laws may incidentally regulate expressive conduct in most instances because they are narrowly tailored to serve a compelling state interest. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623-24 (1984); *but see Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (even neutral antidiscrimination law may not validly prohibit certain expressive conduct).[4] To be tailored to meet a compelling state interest, the antidiscrimination law must "not aim at the suppression of speech, [must] not distinguish between prohibited and permitted activity on the basis of viewpoint, and [must] not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria." *Jaycees, id.*

Because the content-based Executive Order "distinguish[es] between prohibited and permitted activity on the basis of viewpoint," Section C of the Executive Order alone fails muster under *Jaycees. Accord Invisible Empire of the KKK v. Thurmont*, 700 F. Supp. 281, 288 (D. Md. 1988) (antidiscrimination law that was not "content-neutral" not narrowly-tailored); *Bd. of Ancient Order of Hibernians v. Dinkins*, 814 F. Supp. 358, 368 (S.D.N.Y. 1993) (similar); *see R.A.V. v. City of St. Paul,* 505 U.S. 377, 395 (1992) ("existence of adequate content-neutral alternatives thus 'undercuts significantly' any defense of" a statute as narrowly tailored to meet a compelling government interest) (alteration and citation omitted). So it cannot survive a First Amendment challenge as an antidiscrimination law.

---

[4] Indeed, if Section C did not exist and this was merely an as-applied challenge to Md. Code, State Fin. & Proc. § 19-103, Saqib Ali's First Amendment rights would still trump the antidiscrimination law to the extent his boycott violates Md. Code, State Fin. & Proc. § 19-103 (which it does not), just as South Boston Allied War Veterans Council's First Amendment rights to exclude gays from a parade trumped the Mass. Gen. Laws § 272:98 in *Hurley*. But because Section C is not viewpoint-neutral, the Court need not address such the *Hurley* exception.

### B. Section C Applies to a Different Range of Conduct than Otherwise Prohibited

Md. Code, State Fin. & Proc. § 19-103(j) only prohibits "any disadvantage, difference, distinction, or preference in the solicitation, selection, hiring, or commercial treatment of a vendor, supplier, subcontractor, or commercial customer" for improper discriminatory reasons. In contrast, Section C prohibits the "refus[al]" to transact or terminate business activities or tak[e] other actions intended to limit commercial relations" with a (broader, but Israel-only) protected group. As explained below in Section IV(B), what "other actions intended to limit commercial relations" means is unconstitutionally vague. But, whatever it means, it means something different than "the solicitation, selection, hiring, or commercial treatment" of a particular "vendor, supplier, subcontractor, or commercial customer." The prohibition against "actions intended to limit commercial relations" also applies to all "person[s]" and "entit[ies]" that reside, are incorporated, or are from Israel, and not just a "vendor, supplier, subcontractor, or commercial customer." Because the Executive Order provides additional protections to Israeli-based persons and entities than persons and entities based in other countries, it is not viewpoint-neutral, and Section C is separately unconstitutional for the same reasons as explained in Section A, *above.*

### C. Section C's Politically Oriented Oath is Unconstitutional

The additional Certification required by Section C is an unconstitutional loyalty test to the Governor's preferred policies because it names Israel and not any other country. Ali is a citizen and former legislator and has no problem complying with those laws of this country and state that are constitutionally proper. *See* Dkt. 22 at ¶ 6. But—aside from being too vague to permit Ali to sign the provision without fear that doing so violates both the law and Ali's sincerely-held religious beliefs against lying, *see* § IV, below—the Certification language of

Section C is designed to humiliate, embarrass, and deter Ali and all others who oppose Israel and its occupation from seeking government contracts. *See* Dkt. 22 at 38.

The First Amendment tolerates only oaths of basic constitutional duties, such as not committing treason. *Cole*, 405 U.S. at 680. Other oaths, and in particular oaths "relating to political beliefs," are unconstitutional. *Id.* Oaths may not be used "to penalize political beliefs" *Konigsberg v. State Bar of Cal.,* 366 U.S. 36, 54 (1961); *see also Baird,* 401 U.S. at 6 (government may not "exclude[e] a person from a profession or punishing him solely because he is a member of a particular political organization or because he holds certain beliefs").

So as the district court in *Amawi* explained, a certification requirement such as the one required by Section C is not a mere generic request that the signer verify that they will follow the law. 373 F. Supp. 3d at 754-55. Rather, it is an invasive attempt "to make inquiries about a person's beliefs or associations," *id.* at 754 (quoting *Baird,* 401 U.S. 1 at 6), "solely for the purpose of withholding a right or benefit because of what he believes," 373 F. Supp. at 755 (quoting *Baird*, 401 U.S. at 7). It is separately and independently unconstitutional even if the Executive Order can otherwise be read to do nothing at all.

## IV.   The Executive Order Is Unconstitutionally Void for Vagueness Even under the Governor's Interpretation

### A. Even if Section B is Ultimately Given no Meaning, the Executive Order is Unconstitutionally Vague

Even if ultimately given no meaning by a Court, Section B is unconstitutionally vague. "While 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity,' [the] 'government may regulate in the area' of First Amendment freedoms 'only with narrow specificity.'" *Brown v. Ent't Merchants Ass'n*, 564 U.S. 786, 807

(2011) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989), and *NAACP v. Button,* 371 U.S. 415, 433 (1963)) (other citation omitted).

The Executive Order cannot meet this standard. This Court has essentially found as much. "The vagueness of what the Order actually prohibits, and the First Amendment territory in which it resides, have prompted the parties to take markedly different stances as to its effect." Dkt. 20 at 6. "The degree of interpretive gymnastics performed by the parties to digest (and litigate) this executive order provokes certain justiciability concerns." *Id.* at 7. The interpretation of the statute is "a moving target, especially if there is a saving construction to be found in the Governor's interpretation of his executive order that the language of Section C is not broadened in any way by Section B or the transposition of any clause from the Boycott of Israel definition into the certification text itself." *Id.* at 8. At most, the Order is simply "limited enough to be susceptible to an interpretation that does not prohibit Mr. Ali's proffered BDS activism." *Id.* at 9.

As *Johnson v. United States*, 135 S. Ct. 2551, 2559 (2015), explained, when courts have "trouble making sense" of a regulation, that indicates the regulation is likely void for vagueness. "[P]ervasive disagreement about the nature of the inquiry" does not mean that a case is non-justiciable, but rather that the regulation is void. *Id* at 2560.

The Governor is left with arguing that if Section B and Section C mean literally nothing, but instead simply reiterate what the non-discrimination law already is, then the Executive Order is constitutional. But the canon of constitutional avoidance does not apply in vagueness cases. *United States v. Simms*, 914 F.3d 229, 251 (4th Cir. 2019), *cert. denied*, No. 18-1338, 2019 WL 4923463 (U.S. Oct. 7, 2019). If it did, the canon would defeat the vagueness rule, as the canon would require some particular interpretation of the statute, and

then, assuming that interpretation, the statute would no longer be vague. "Due process requires [the government] to speak in definite terms, particularly where the consequences for individual liberties are steep." *Simms*, 229 F.3d at 251. "For similar reasons, although courts must interpret statutes under the presumption that [their enactors] do not intend to violate the Constitution, judges cannot revise invalid [laws]." *Id.* "[W]hile the grave remedy of striking down a statute as unconstitutional lies within the judicial province, rewriting it is a task solely for the elected legislature." *Id.* Substitute executive orders for statutes, and Governors for legislatures, and the result is no different. In fact, given the far lower barriers of re-enacting an Executive Order vis-à-vis a statute, the purposes of the canon of constitutional avoidance is even less served here.

This Court separately noted that the "Governor likely has the prerogative to issue the authoritative construction of his own executive order." Dkt. 20 at 8.  Respectfully, Plaintiff disagrees, but even if true, the Court's observation is not determinative in this case for the reasons discussed in this Section and in Section II, *above*. The Court also notes that "counsel for the Governor and Attorney General has expressly disavowed enforcement of Section B against Mr. Ali." Dkt. 20 at 9. But such a disavowal does not impact Ali's case as the Governor cannot disavow the police power of the state. *Baltimore & Ohio R. Co. v. Kuchta*, 76 Md. App. 1, 6, 543 A.2d 371, 374 (1988); *United States v. Winstar Corp.*, 518 U.S. 839, 875 n.20 (1996) (citing *Stone v. Mississippi*, 101 U.S. 814 (1880)) (other citations omitted). The Governor's voluntary cessation as an attempt to moot this case is invalid for the reasons explained in Section II(C), *above*. In any event, neither the Governor nor the Attorney General has disavowed enforcement of Section C against Ali and opposing counsel's in-court presentation offers no protection against enforcement.

The Governor's speech-chilling arguments do not help, either. *See* § IV, *below*. Instead, the vagueness of the executive order independently provides standing. *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 303 (1979) (vague statute itself provides standing for vagueness challenge for any individual who might come under the provision's regulation).

### B.  Section C is Independently Unconstitutionally Vague

Even read in isolation Section C, is unconstitutionally vague. This is the Certification required by Section C:

> In preparing its bid/proposal on this project, the Bidder/Offeror has considered all bid/proposals submitted from qualified, potential subcontractors and suppliers, and has not, in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier, refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories. The Bidder/Offeror also has not retaliated against any person or other entity for reporting such refusal, termination, or commercially limiting actions. Without limiting any other provision of the solicitation for bid/proposals for this project, it is understood and agreed that, if this certification is false, such false certification will constitute grounds for the State to reject the bid/proposal submitted by the Bidder/Offeror on this project, and terminate any contract awarded based on the bid/proposal.

Executive Order 01.01.2017.25(C).

This language is vague and confusing. Section C prohibits the "refus[al] to transact" or the "terminat[ion of] business activities" done "in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier." It also prohibits an individual from "tak[ing] other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories." But it is unclear whether this provision is limited by the condition that the "other actions" be

performed "in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier."

The confusion caused by this language is heightened by the fact that Section B is not included in current government contract requests for bids. *See* Memorandum Opinion (Dkt. 20) at 5. The Governor has asserted in this case that he does not require a certification under Section B because that certification should be read in harmony with the one required by Section C. *See id.* at 6; Dkt. 25-1 at 12. Yet while an "in harmony" interpretation, requiring reading the certification required by Section C as covering what is prohibited by Section B, might narrow the meaning of Section B, it would also require an expansive interpretation of Section C to make it consistent with Section B. Such an interpretation would not limit "tak[ing] other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories" to be limited to those actions performed "in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier."

Even if "[t]aken other actions intended to limit commercial relations" only applies to actions taken "in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier," it is still unconstitutionally vague. Ali boycotts Israel in his personal capacity. He has also broadcast that boycott. Such a boycott would make Israeli subcontractors, venders, and suppliers unlikely to be willing to do business with Ali in government contracting. Does that mean Ali has taken an "other action intended to limit commercial relations" with Israeli persons and entities? It certainly would seem so. After all, the Executive Order's Sixth WHEREAS clause specifically notes that it is "the public policy of the United States" to oppose boycotts of Israel, and other WHEREAS clauses assert that

21

such boycotts are bad even when not undertaken as part of government contracting. *See* Fifth, Seventh, Eighth, Ninth, and Eleventh WHEREAS Clauses.

Vagueness in oaths create a particularized constitutional concern. "With such vagaries in mind, it is not unrealistic to suggest that the compulsion of this oath provision might weigh most heavily upon those whose conscientious scruples were the most sensitive." *Cramp v. Bd. of Pub. Instruction of Orange Cty., Fla.*, 368 U.S. 278, 286 (1961). When an oath is vague, and particularly a politically-oriented oath such as Section C's, "it requires no strain of the imagination to envision the possibility of prosecution for … guiltless knowing behavior." *Id.* Even if the oath required by Section C ultimately only covered activity already illegal under general discrimination laws—which it does not—it is specifically designed to give pause to individuals like Ali and make them choose between their constitutional right to boycott and their constitutional right to compete for government contracts on equal terms. The vagueness does not create a constitutional standing defense for the Governor. It makes the Executive Order unconstitutional.

If boycotting Israel in Ali's personal capacity (even outside the preparation of a particular bid) violates Section C, then it is unconstitutional for the same reasons Section B is unconstitutional, as explained in Section VI, *below*. Even if it does not, "other action intended to limit commercial relations," whatever it means, is unconstitutionally void. *See Amawi*, 373 F. Supp. 3d at 756 ("otherwise taking any action that is intended to penalize, inflict harm on, or limit commercial relations specifically with Israel" unconstitutionally void for vagueness).

### C. Neither Provision Is "Readily Susceptible" to a Constitutionally-Appropriate Limiting

Quoting *American Booksellers*, 484 U.S. at 397, the Governor,  claims that the Executive Order can be saved because it is "'readily susceptible' to a narrowing construction that would

make it constitutional." Dkt. 25-1 at 26. The Governor then proceeds to rewrite the Executive Order to render it superfluous of the already existing "national-origin discrimination that would-be venders have always had to certify compliance with." *Id.* at 28.

In *American Booksellers*, the Supreme Court did not directly address the vagueness challenge and instead certified the meaning of the statute to the Virginia Supreme Court. 484 U.S. at 396-97. But the U.S. Supreme Court did not give the Virginia Supreme Court license to rewrite the statute. Instead, the U.S. Supreme Court required a specific ambiguous phrase ("harmful to juveniles") to be interpreted to have a relatively discrete meaning. *American Booksellers,* 484 U.S. at 398. The Supreme Court has explained that "narrowing constructions are only appropriate when 'the text or other source of congressional intent' identifies a clear line that a court could draw." *PSINet, Inc. v. Chapman*, 362 F.3d 227, 236 (4th Cir. 2004) (citing *Reno v. ACLU*, 521 U.S. 844, 884 (1997)).

In other words, *American Booksellers* just recites the canon of constitutional avoidance. That canon does not apply in vagueness cases. *Simms*, 914 F.3d at 251.

Even if the canon did, the discrete terms in Section B discussed in Section II(A), *above,* cannot logically be interpreted to make Section B merely duplicative of both Section C and Md. Code, State Fin. & Proc. § 19-103(j). There is no readily susceptible meaning of "for business or economic reasons" that is sufficiently definite to avoid the vagueness problem with that phrase. *See* § VII, *below*; *see also Amawi*, 373 F. Supp. 3d at 756-57. And there is no readily susceptible meaning of the future tense "will" or the defined term "business entity" to render them the same as the past tense "has" or to apply to all "bidders."

Likewise, there is no readily susceptible meaning in Section C for "residence or incorporation" to render those terms nugatory. Nor is there any readily susceptible meaning

of "other actions intended to limit commercial relations" that would be sufficiently definite to avoid the vagueness problem with that phrase.

## V.     Ali's Claim Is Not Barred by the 11th Amendment to the Constitution

The Governor next claims that "the Eleventh Amendment bars this suit … because it does not fit within the narrow exception recognized in *Ex Parte Young*." Dkt. 25-1 at 22-23. But, as explained above in Section II(C) and in Ali's original Opposition, Dkt. 11 at 7-8, this case fits squarely within the *Ex Parte Young* exception. The Governor's Eleventh Amendment argument should thus fail.

## VI.    Section B Violates the First Amendment

Section B's prohibition on boycotts of Israel, given its actual and plain meaning, *see* §§ II(A)-(B), *above*, violates the First Amendment for the reasons explained in Ali's initial Opposition, as well as *Jordahl*, 336 F. Supp. 3d 1016, *Koontz*, 283 F. Supp. 3d 1007, and the since decided *Amawi*, 373 F. Supp. 3d 717. In quick summary:

- *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), and *not Rumsfeld v. FAIR*, 547 U.S. 47 (2006), or *Int'l Longshoremen's Association, AFL-CIO v. Allied International, Inc.*, 456 U.S. 212 (1982) applies. *See* Dkt. 11 at 10-17 and 19-23; *Koontz*, 283 F. Supp. 3d at 1021-24; *Amawi*, 373 F. Supp. 3d at 743-45; *Jordahl*, 336 F. Supp. 3d at 1040-44.

- Even if *FAIR* applied, the required certification(s) constitute compelled speech, Dkt. 11 at 25.

- The regulation of Ali's boycotting is not incidental and so the Executive Order would fail *O'Brien* test anyway, Dkt. 11 at 17 and 21.

- The Executive Order cannot pass compelling interest test, Dkt. 15-16 and 24; ; *Koontz*, 283 F. Supp. 3d at 1023; *Amawi*, 373 F. Supp. 3d at 747-52.

- Government contracts are not subsidies, Dkt. 11 at 17-18; *Amawi*, 373 F. Supp. 3d at 753-54; *Jordahl*, 336 F. Supp. 3d at 1046 n.9 and 1049.

## VII.    Section B is Void for Vagueness

Section B, and the entire Executive Order, is void for vagueness for the reasons explained in Ali's original Opposition (at 26) and above in Section IV. As explained in Section IV, this is true whether or not Section B is given any meaning.

And if Section B is given meaning, it then it must incorporate the carve-outs from the definition of "Boycott of Israel." Executive Order 01.01.2017.25(A). This includes carve-out (ii), "for business or economic reasons." Such a phrase is no less vague than Texas's carve-out for "ordinary business purposes," which the Court in *Amawi* found unconstitutionally vague. 373 F. Supp. 3d at 756.

The application of the "business or economic reasons" safe harbor is not some mere hypothetical. Texas has applied its Anti-BDS Law to Airbnb, who refused to list properties in certain Israeli-controlled territories in the West Bank.[5] Airbnb may have been doing so for a variety of "ordinary business purposes," as that term is commonly understood, such as to comply with another government entity's legal requirements, because the refusal is part of a broader anti-discrimination policy, or in order to avoid international commercial boycotts of Airbnb by third parties.[6] Indeed, in announcing its refusal to list properties, Airbnb stated "Airbnb does not support the BDS movement, any boycott of Israel, or any boycott of Israeli companies."[7] So Texas found Airbnb's decision not to be for "ordinary business purposes." Whether Maryland would equally punish Airbnb's decisions to be for "business or economic

---

[5] *See* Elizabeth Findell, *In pro-Israel move, Texas books boycott of Airbnb*, AUSTIN-AMERICAN STATESMAN (Mar. 11, 2019), *available at* https://www.statesman.com/news/20190311/in-pro-israel-move-texas-books-boycott-of-airbnb.

[6] *See* Amanda McCaffrey, Airbnb's Listings in Disputed Territories: A Tortured Compromise, Just Security (July 29, 2019), *available at* https://www.justsecurity.org/65114/airbnbs-listings-in-disputed-territories-a-tortured-compromise/.

[7] *Id.*

reasons" is completely unclear and cannot be resolved by any readily apparent definition of the term "business or economic reasons." The term is thus unconstitutionally vague.

## VIII.   The Attorney General Is a Proper Defendant

For the reasons explained in Ali's Brief, Dkt. 11 at 8-10, the Attorney General is also a proper defendant. The Court should thus also deny the Attorney General's separate motion to dismiss.

## CONCLUSION

The Court should deny both the Governor's and the Attorney General's Motion to Dismiss.

Respectfully submitted,

January 30, 2020                             CAIR LEGAL DEFENSE FUND

                                            BY:    */s/ Lena F. Masri*
                                            LENA F. MASRI (20251)
                                            GADEIR I. ABBAS (20257) *
                                            JUSTIN SADOWSKY (20128)
                                            453 New Jersey Ave, SE
                                            Washington, DC 20003
                                            Phone: (202) 488-8787

                                            *Attorneys for Plaintiff Saqib Ali*

                                            *Mr. Abbas is licensed in VA, not in D.C.
                                            Practice limited to federal matters.