IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SAQIB ALI, | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 1:19-cv-00078-CCB |
| LAWRENCE HOGAN, ET AL., | * | |
| *Defendants*. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

**REPLY IN SUPPORT OF GOVERNOR HOGAN'S
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

In its earlier decision dismissing Mr. Ali's complaint for lack of standing, this Court concluded that Mr. Ali had not demonstrated the injury-in-fact necessary to establish Article III standing because he had not submitted a bid and thus had not suffered a "direct injury," and because he had not otherwise sufficiently alleged a "chilling" theory of standing. ECF 20 at 8-10. The Court thus gave Mr. Ali a choice: if he wants "to proceed on a direct injury theory, he should submit a bid," *id.* at 10, and if he wants pursue a chilling theory, "he must file an amended complaint plausibly alleging that his First Amendment activities have been chilled or that despite the Governor's interpretation of the Order, 'it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights,'" *id.* at 10-11 (citation omitted).

Mr. Ali chose the second option. He did not submit a bid and instead filed an amended complaint in which he attempted to establish standing on the grounds that he could not sign the ¶C certification because he feared that the Governor or a reviewing court

might someday interpret the certification broadly such that the "'other actions' clause"—i.e., that the vendor has not "taken other actions intended to limit commercial relations" on the basis of Israeli national origin—would encompass the boycotting activities that he engages in "in his personal capacity" and be enforced against him, retroactively. ECF 22 at 8-9 (¶¶ 37, 38). As the Governor explained in his memorandum in support of his motion to dismiss the amended complaint, that hypothetical sequence of events is far too speculative to provide the basis for Article III standing, even under the relaxed principles that govern in the First Amendment context. ECF 25-1 at 2, 10-17.

In response to the Governor's motion, Mr. Ali changes tack, spending only one page on his effort to establish standing under a First Amendment "chilling" standard. The analysis that he offers there fails to rebut the many reasons, described in the Governor's motion, as to why Mr. Ali has failed to establish a "credible threat" to support his standing. Instead, Mr. Ali's chilling argument culminates in the assertion that the ¶C certification, read "alone" as a loyalty "oath," is unconstitutional and that *that* "is enough to provide standing." ECF 31 at 8. That argument does not square with the allegations of the amended complaint, which were based only on the potential that ¶B might at some point be enforced against him through an expansive interpretation of what the ¶C certification requires. Nor does it square with this Court's initial decision and its caution that the ¶C certification, because it "largely mirrors" the traditional anti-discrimination clause, "does not likely raise First Amendment concerns." ECF 20 at 6.

But *that* is what Mr. Ali's argument is now: He has staked his case on relitigating the issue of whether the ¶C certification—applied on its own and as written, without

reference to ¶B—is constitutional. Rather than defend his attempt to establish standing based on the "chill" he says he feels from the speculative possibility that the ¶C certification might one day be reinterpreted to prohibit what Mr. Ali does "in his personal capacity," ECF 22 at 9 (¶38), he now takes issue with this Court's earlier conclusion that the ¶C certification "does not likely raise First Amendment concerns," ECF 20 at 6, claiming that the certification not only raises such concerns, but is in fact unconstitutional on its face. Supreme Court precedents upholding the constitutionality of antidiscrimination measures like the ¶C certification say otherwise.

I. **THE ¶C CERTIFICATION, ON ITS FACE AND AS APPLIED, IS CONSTITUTIONAL BECAUSE IT ONLY PROHIBITS ONE FORM OF NATIONAL-ORIGIN DISCRIMINATION.**

It is undisputed that ¶C of the Executive Order is the only certification that would-be vendors must execute when submitting bids for state contracts:

> In preparing its bid on this project, the bidder has considered all proposals submitted from qualified, potential subcontractors and suppliers, and has not, in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier, refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories. The bidder also has not retaliated against any person or other entity for reporting such refusal, termination, or commercially limiting actions. Without limiting any other provision of the solicitation for bids for this project, it is understood and agreed that, if this certification is false, such false certification will constitute grounds for the State to reject the bid submitted by the bidder on this project, and terminate any contract awarded based on the bid.

E.O. at 3 (¶C). As the Court observed in its earlier decision, the plain language of ¶C "largely mirrors the general prohibition against national-origin discrimination already

contained in the required Maryland Bid/Proposal Affidavit." ECF 20 at 6. That more general prohibition, in relevant part, reads as follows:

> In preparing its Bid/proposal on this project, the Bidder/Offeror has considered all Bid/proposals submitted from qualified, potential subcontractors and suppliers, and has not engaged in "discrimination" as defined in § 19-103 of the State Finance and Procurement Article of the Annotated Code of Maryland. "Discrimination" means any disadvantage, difference, distinction, or preference in the solicitation, selection, hiring, or commercial treatment of a vendor, subcontractor, or commercial customer on the basis of race, color, religion, ancestry, or national origin, sex, age, marital status, sexual orientation, sexual identity, genetic information or an individual's refusal to submit to a genetic test or make available the results of a genetic test, disability, or any otherwise unlawful use of characteristics regarding the vendor's, supplier's, or commercial customer's employees or owners. "Discrimination" also includes retaliating against any person or other entity for reporting any incident of "discrimination." Without limiting any other provision of the solicitation on this project, it is understood that, if the certification is false, such false certification constitutes grounds for the State to reject the Bid/proposal submitted by the Bidder/Offeror on this project, and terminate any contract awarded based on the Bid/proposal.

ECF 25-1 (Exhibit B at ¶B). The introductory passages of the two provisions, and those passages involving retaliation and bid-disqualification, are almost verbatim identical. The only differences appear in how the two provisions define discrimination:

> *Executive Order*: "refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories."

> *Standard Commercial Nondiscrimination Provision*: "Discrimination" means any disadvantage, difference, distinction, or preference in the solicitation, selection, hiring, or commercial treatment of a vendor, subcontractor, or commercial customer on the basis of race, color, religion, ancestry, or national origin, sex, age, marital status, sexual orientation, sexual identity, genetic information or an individual's refusal to submit to a genetic test or make available the results of a genetic test, disability, or any otherwise unlawful use of characteristics regarding the vendor's, supplier's, or commercial customer's employees or owners.

4

In the earlier briefing, Mr. Ali conceded that ¶C was only a more specific version of the general commercial nondiscrimination provision, characterizing it as targeting "one form of national-origin discrimination." ECF 11 at 15.  Faced with the reality that the more general nondiscrimination provision is indisputably constitutional, *see, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 615, 623 (1984); *Norwood v. Harrison*, 413 U.S. 455, 470 (1973); *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984), Mr. Ali now argues that ¶C actually is different in three ways, but none holds up under scrutiny.

First, Mr. Ali argues that, by identifying Israelis and no other nationality, the ¶C certification is "viewpoint-based" and amounts to an "unconstitutional loyalty test." ECF 31 at 15, 16.  This, of course, is the same argument that Mr. Ali made in the earlier briefing, ECF 11 at 15, and it provides no basis on which revisit the Court's earlier conclusion that ¶C "does not likely raise First Amendment concerns," ECF 20 at 6.  But putting that aside—and also putting aside the fact, discussed in the Governor's earlier filings, that the provision only addresses conduct (i.e., commercial contracting decisions) and not speech—¶C does not discriminate on the basis of viewpoint.  It prohibits discrimination against Israelis for *whatever* the reason, just as the general nondiscrimination provision prohibits discrimination against, say, German, South African, Saudi Arabian, or Palestinian contractors regardless of the reason for the discrimination.  The two provisions are identical in that respect.  Neither provision is viewpoint-based because the types of discrimination they target "cause unique evils that government has a compelling interest to prevent—wholly apart from the point of view such conduct may transmit." *Jaycees*, 468 U.S. at 628; *see also Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993) (federal and state anti-

5

discrimination laws constitute "permissible content-neutral regulation of conduct"); *Board of Directors of Rotary Intern. v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (Unruh Act's prohibition of gender discrimination "makes no distinctions on the basis of the organization's viewpoint").

That ¶C singles out "one form of national-origin discrimination," ECF 11 at 15, does not make it viewpoint-based, as the Supreme Court has rejected the notion that a measure's focus on one aspect of a larger problem renders it content-based. *See McCullen v. Coakley*, 573 U.S. 464, 480 (2014) (upholding the constitutionality of measure creating buffer zones around abortion clinics even though the measure had "the 'inevitable effect' of restricting abortion-related speech more than speech on other subjects"). Indeed, in *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*—a case that Mr. Ali heavily, though mistakenly, relies on—the Supreme Court held that group-specific anti-discrimination provisions "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments." 515 U.S. 557, 572 (1995).[1] That "'States adopt laws to address the problems that confront them,'" *McCullen*, 573 U.S. at 481 (citation omitted), does not make those laws unconstitutional.

---

[1] Mr. Ali suggests that the Supreme Court's decision in *Hurley* somehow leads to the conclusion that Mr. Ali's right to discriminate against Israelis "trump[s]" the operation of content-neutral anti-discrimination provisions. ECF 31 at 15 n.4. To the contrary, *Hurley* underscored that an anti-discrimination provision like that required under § 19-115 of the State Finance and Procurement Article does not "target speech or discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services," 515 U.S. at 572, or, here, in the provision of contracted-for services to the

Second, Mr. Ali points out that ¶C prohibits discrimination "on the basis of Israeli national origin, *or residence or incorporation* in Israel and its territories" whereas the general nondiscrimination provision only targets discrimination based on national origin. *See* ECF 31 at 14. This too is not a new argument; as Mr. Ali acknowledges, the Court, at the earlier oral argument, inquired about this aspect of the ¶C certification, *id.*, before concluding that it "does not likely raise First Amendment concerns," ECF 20 at 6.

That a supplier resides in Israel or a company is incorporated in Israel overlaps substantially with Israeli national-origin, such that even the "discrepancy" that Mr. Ali seizes upon is more semantic than real. Courts have pointed out that distinctions between ancestry, national origin, and residency are often hard to make. "Clearly, 'the line between discrimination based on ancestry or ethnic characteristics, and discrimination based on place or nation of origin, is not a bright one. Often, the two are identical as a factual matter.'" *Magana v. Commonwealth*, 107 F.3d 1436, 1446 (9th Cir. 1997) (ellipses omitted; quoting *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 614 (1987)). That is

---

State. The constitutional problem in *Hurley* was not with the laws themselves, but with the state court having treated the *parade* as a "public accommodation" subject to the anti-discrimination law. *Id.* at 573. Because of the parade's "expressive character," the requirement that the organizers include voices with which they disagreed undermined their "autonomy to choose the content of [their] own message." *Id.* Even if one were to accept Mr. Ali's premise that his purchasing decisions incidentally convey some speech, it would still be a far cry from a parade, which the Supreme Court has held is inherently expressive. *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 693 (2000) (pointing out that a "St. Patrick's Day parade—like most every parade—is an inherently expressive undertaking"); *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 64 (2006) ("Unlike a parade organizer's choice of parade contingents, a law school's decision to allow recruiters on campus is not inherently expressive.").

particularly true for Israel, where there is significant overlap between Israel as a nation and as a Jewish homeland. *See Sinai v. New England Tel. & Tel. Co.*, 3 F.3d 471, 474 (1st Cir. 1993) (observing that it "well established" that Israel, though "not composed exclusively of Jews," is nevertheless "a Jewish state" and that "the jury could find that Israel is one of those countries in which the populace is composed primarily of a particular race").

And while the general non-discrimination provision does not expressly include "residence" or place of "incorporation," it is broader in other respects that covers the same or similar ground. For example, the general nondiscrimination provision prohibits not only discrimination based on the supplier's national origin, but also discrimination based on the characteristics of the supplier's "employees or owners." ECF 25-1, Exhibit B at ¶B. As a result, the only conceivable daylight between the two provisions would emerge if, for example, an American company were to decide to relocate to Israel—or, as Mr. Ali would have it, "in the occupied portions of the West Bank," ECF 31 at 14—but without any Israeli owners and without hiring any Israeli workers. And even then the discrimination would fall outside of the Executive Order's reach if Mr. Ali or any other would-be vendor chose not to do business with the company *because* of its decision to relocate to Israel or the West Bank. *See* E.O. at 2 (¶A.1.iii) (excepting discriminatory actions taken "because of the specific conduct of the person or entity").

Finally, Mr. Ali focuses on the phrase "other actions intended to limit commercial relations" in ¶C, contending that it is broader than the standard nondiscrimination provision, which does not contain that phrase. ECF 31 at 16. But in fact the standard provision is the broader of the two; it prohibits "any disadvantage, difference, distinction,

8

or preference" in the hiring of a subcontractor, and not just the "refus[al] to transact or terminate[] business activities, or tak[ing of] other actions intended to limit commercial relations" with that subcontractor. *Compare* ECF 25-1, Exhibit B, ¶B *with id.* ¶M. Nor is there grounds on which to draw the conclusion, as Mr. Ali does, that the phrase "other actions intended to limit commercial relations" in ¶C "means something different [from] 'the solicitation, selection, hiring, or commercial treatment' of a particular 'vendor, supplier, subcontractor, or commercial customer,'" ECF 31 at 16, when *all* of ¶C is subject to a prefatory clause—emphasized by the Court in its earlier decision—limiting its application to "*the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier.*" ECF 20 at 5-6 (emphasis provided by Court).

The arguments that Mr. Ali offers in his response simply rehash those that he made in the earlier briefing and at oral argument, and they provide no basis for the Court to revisit its earlier conclusion that the ¶C certification "does not likely raise First Amendment concerns." ECF 20 at 6. And because Mr. Ali confirms that he only boycotts Israel "in his personal capacity," ECF 31 at 3, 21, he offers no good reason why he cannot truthfully sign the ¶C certification as it is written. The fact of the matter is that Mr. Ali *can* truthfully sign it, but he has made the strategic decision not to submit a bid, most likely because, as the Court noted, he "may well get the state contract." ECF 20 at 9. Instead, Mr. Ali chooses to relitigate the Court's earlier decision that he "should submit a bid" to seek standing based on direct injury, ECF 20 at 10, arguing that he "does not need to" do so, ECF 31 at 4, because he has already established standing based on "direct harm," *id.* at 6. But he offers nothing new in support of that already-rejected position, other than to reassert—sincerely

9

and vehemently—his disagreement with the Governor's decision to issue the Executive Order. But that disagreement, by itself,

> is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms. It is evident that [Mr. Ali is] firmly committed to the constitutional principle of [free speech], but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy. "[T]hat concrete adverseness which sharpens the presentation of issues," is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself.

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485-86 (1982) (citation omitted); *see also Moss v. Spartanburg County Sch. Dist. Seven*, 683 F.3d 599, 604 (4th Cir. 2012) ("Plaintiffs may not establish their standing to bring suit merely because they disagree with a government policy[.]").

Ultimately, whether Mr. Ali has established standing must be determined not by rhetoric, but by the allegations of the amended complaint, several of which establish that Mr. Ali has not suffered an injury, either directly or through a "chilling" theory. Instead, those allegations establish that Mr. Ali "refuses to purchase Sabra hummus or SodaStream products, which have ties to Israel and its occupation of Palestine," and that he does so "personally" and not in a commercial capacity or in the preparation of bids. ECF 22 at 10 (¶48); *see also id.* at 9 (¶38) (alleging that "Ali only boycotts Israel in his personal capacity"); ECF 31 at 3, 21, 22 (same). Those allegations do not suffice to establish a case or controversy over the application of ¶C to Mr. Ali's ability to bid on state contracts. For the reasons discussed here and in the Governor's opening memorandum, the Court should dismiss the amended complaint for lack of standing, this time with prejudice.

## II.   THE ¶C CERTIFICATION IS NOT VOID FOR VAGUENESS.

As the Governor explained in his opening memorandum, *see* ECF 25-1 at 25-28, a state enactment is unconstitutionally vague only if it "'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).  Mr. Ali does not argue that the ¶C certification is "standardless"; its language contains none of the subjective terms that courts have found problematic under this aspect of the due process test. *See, e.g.*, *Williams*, 553 U.S. at 306 ("[W]e have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings."). Instead, Mr. Ali makes three overlapping arguments, presumably that a "person of ordinary intelligence" would not understand what ¶C prohibits, but none holds up.

Mr. Ali begins by returning to ¶B and arguing that its interaction with ¶C renders the entire order unconstitutionally vague. ECF 31 at 17-20. This is a counterfactual argument, as Mr. Ali concedes that the ¶C certification is the only one that would-be state vendors must execute, ECF 22 at 8 (¶¶ 34, 36), and, as the Governor has explained, there are no plans to change that. Because of the Governor's "prerogative to issue the authoritative construction of his own executive order," ECF 20 at 8, the Court properly concluded that the order is "susceptible to an interpretation that does not prohibit Mr. Ali's proffered BDS activism," *id.* at 8-9.  And having found that the language of the order is

11

susceptible to that limiting construction, Fourth Circuit precedent provides that the Court "must" consider it "when assessing [Mr. Ali's] void-for-vagueness claim," *Martin*, 700 F.3d at 136, just as it did when evaluating his initial standing claim, ECF 20 at 9.

In response, as he does with respect to standing, Mr. Ali takes issue with the Court's earlier conclusions. He "disagrees" with the Court's conclusions that the "Governor likely has the prerogative to issue the authoritative construction of his own executive order," ECF 31 at 19, and that the Governor and the Attorney General had "disavowed enforcement of Section B," *id.*, but the only authorities he cites to support his disagreement are plainly inapposite. Both cases address the question whether a legislature may contract away its responsibility to legislate in the public interest, not whether a government official can announce how he or she interprets or applies a prior enactment. *See Baltimore & Ohio R. Co. v. Kuchta*, 76 Md. App. 1, 6-8 (1988) (county governing body could not contract away its "police power" to "protect the safety of the public who used the roads in Baltimore County"); *United States v. Winstar Corp.*, 518 U.S. 839 (1996) (upholding federal government's contractual commitment to allow banks to consider goodwill and capital credits, despite subsequent legislative changes barring the same).

Mr. Ali's repeated reliance on the Fourth Circuit's decision in *United States v. Simms*, 914 F.3d 229 (4th Cir. 2019), *cert. denied*, 2019 WL 4923463, is also seriously misplaced. *See* ECF 31 at 18, 23. Mr. Ali cites *Simms* for the proposition that "the canon of constitutional avoidance does not apply in vagueness cases," *e.g.*, ECF 31 at 18, but it says no such thing. Instead, what *Simms* stands for is that a reviewing court may not invoke the canon of constitutional avoidance *if* the statute's plain language admits of only "one

12

plausible construction." 914 F.3d at 251. In that situation, "given the clear language" of the statute at issue, the court "lack[ed] the power to avoid its constitutional infirmity" through an alternative construction, for doing so would arrogate to itself the power "'to rewrite a statute as it pleases.'" *Id.* (quoting *Jennings v. Rodriguez*, 138 U.S. 830, 843 (2018)). The court made clear, however, that where other constructions are "'fairly possible'"—as this Court found is the case here—courts remain "'obligated to construe [a] statute to avoid [constitutional] problems.'" *Id.* (citations omitted). The doctrine of constitutional avoidance "is thus 'a means of giving effect to congressional intent, not of subverting it.'" *Id.* (quoting *Clark v. Martinez*, 543 U.S. 371, 382 (2005)).[2]

In other respects too Mr. Ali's argument reduces to the notion that courts do not employ the usual canons of statutory construction when evaluating vagueness challenges. For example, he insists on isolating the phrase "other actions intended to limit commercial relations" from its larger context, when it is inescapable that the phrase refers to *commercial* behavior. Read in context, this portion of ¶C applies only where the bidder, in preparing his bid, has "refused to transact or terminated business activities, or taken other actions intended to limit commercial relations" with a supplier on the basis of its

---

[2] *Simms*—and *Johnson v. United States*, 135 S. Ct. 2551 (2015), on which Mr. Ali also relies, ECF 31 at 18—involved a notoriously vague criminal "residual clause" of the sort that has generated no fewer than seven Supreme Court sentence-enhancement decisions over the past decade or so. *See United States v. Davis*, 139 S. Ct. 2319, 2325-26 (2019); *Johnson*, 135 S. Ct. at 2556. Those clauses are vague in two ways, as they require trial courts to determine whether the crime—not as actually committed, but in the "idealized 'ordinary case'"—involves conduct that presents a "serious potential risk" of physical injury. *Davis*, 139 S. Ct. at 2326. The "residual clause" bears no resemblance to the Executive Order.

Israeli national origin, residence, or incorporation.  A "person of ordinary intelligence," *Martin*, 700 F.3d at 135, simply could not understand this larger contextual phrase as applying to Mr. Ali's refusal to buy Sabra hummus, SodaStream products, or any of the other boycotting activities that Mr. Ali might pursue in his personal capacity.

For similar reasons, *Amawi v. Pflugerville Independent School District*, 373 F. Supp. 3d 717 (W.D. Tex. 2019), *appeal filed*, No. 19-50384 (5th Cir.), does not control here.[3]  Although the district court there held that the Texas anti-Israel boycott measure was vague, the provision it construed was significantly broader than ¶C.  The Texas measure covered "'*refusing to deal with*, terminating business activities with, or otherwise taking any action that is intended to *penalize, inflict harm on,* or limit commercial relations with Israel.'" 373 F. Supp. 3d at 730-31 (quoting Tex. Gov. Code § 2270.802; emphasis added).  The district court in *Amawi* found the phrase "refusing to deal"—which the Executive Order here does not contain—involved "inherently *expressive* conduct," 373 F. Supp. 3d at 756, and the terms "penalize" and "inflict harm on" would seem to encompass more than the purely commercial conduct covered by ¶C of the Executive Order.  More importantly, the Texas measure was not in any way limited to discrimination in the bid-preparation

---

[3] *Amawi* is one of two cases in which anti-Israel boycott measures are currently on appeal.  *Amawi* is scheduled to be argued on March 31, 2020, while *Arkansas Times LP v. Waldrip*, 362 F. Supp. 3d 617 (E.D. Ark. 2019), *appeal filed*, No. 19-1378 (8th Cir.), was argued on January 15, 2020.  A district court decision in a third case was vacated and dismissed on appeal after the Arizona legislature amended the law at issue such that it no longer applied to the plaintiffs in the litigation.  *See Jordahl v. Brnovich*, 789 F. App'x 589, 591 (9th Cir. 2020) (describing amendments as limiting law to "companies with ten or more full-time employees" and "contracts valued at $100,000 or more").

process, as is ¶C. Instead, it barred would-be vendors from state contracts if they participated in anti-Israel boycotts in any way and at any time "during the term of the contract." *Id*. at 730. Even if *Amawi* were to be upheld on appeal, it would still have no bearing on the constitutionality of the far narrower provisions of ¶C.[4]

Ultimately, much of Mr. Ali's vagueness argument hinges on hypothetical scenarios that have no basis either in the language of the Executive Order or, more importantly, his amended complaint. For example, Mr. Ali argues that, even if he does not discriminate against Israeli subcontractors, venders, and suppliers in the formation of his bid, the boycotting that he carries out in his personal capacity means that those Israeli subcontractors would be "unlikely to be willing to do business with Ali in government contracting" and that *that* would might constitute "other action intended to limit commercial relations" with Israelis. ECF 31 at 21. It goes without saying that no "person of ordinary intelligence," *Martin*, 700 F.3d at 135, would understand that that contrived scenario would fall within the reach of ¶C. Nor does the theoretical possibility that Mr. Ali might have "good reasons to boycott those who now reside in the occupied portions of the West Bank" or decline to do business with "international companies and Americans" operating there, ECF 31 at 14, suffice, when those possibilities are not supported by

---

[4] Even the Texas measure's "carve-out" for refusals to contract with Israelis "for *ordinary* business purposes"—which the *Amawi* court also found to be vague, 373 F. Supp. 3d at 756-57 (emphasis added)—is distinguishable from the Executive Order's exceptions, which, among other things, exclude actions taken "for business or economic reasons," E.O. at 2 (¶A.1.ii), without requiring bidders to speculate about what an "ordinary" business purpose might be. *Cf. Davis*, 139 S. Ct. at 2326.

allegations that Mr. Ali actually participates in such boycotts, that he participates in anything other than his "personal capacity," or that he discriminates against those companies in the bid-preparation process. Whether seen through the lens of standing principles or vagueness jurisprudence, the speculative allegations of Mr. Ali's amended complaint simply do not establish that he falls within the range of conducted covered by ¶C. *See Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012) ("We are mindful that our task is not to dream scenarios in which a regulation might be subject to a successful vagueness challenge."); *Hill v. Colorado*, 530 U.S. 703, 733 (2000) ("[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications[.]'" (citation omitted)).

\* \* \*

The Governor does not take issue with Mr. Ali for testing the Executive Order's constitutionality; the First Amendment concerns he raises are obviously important and merit careful consideration, as the litigation over other states' measures addressing anti-Israel boycotts demonstrates. But that is precisely why the Governor has crafted and applied the Executive Order more narrowly than those other measures, focusing not on the speech-related boycotting activities that a would-be vendor might pursue in their personal capacity, but on discrimination in the bid-formulation process itself—discrimination that artificially reduces competition, "impair[s] commercial viability," and poses "undue risks" to the State as a contracting partner. *See* E.O. at 1-2. That commercial focus places it

squarely within the type of nondiscrimination measures that have long been deemed constitutional.[5]

## CONCLUSION

The First Amended Complaint should be dismissed.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Adam D. Snyder
ADAM D. SNYDER
Assistant Attorney General
Bar No. 25723
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
asnyder@oag.state.md.us
(410) 576-6398
(410) 576-6955 (facsimile)

Attorneys for Defendant Lawrence
Hogan, Governor of Maryland

---

[5] Because Mr. Ali does not meaningfully rebut the Defendants' entitlement to Eleventh Amendment immunity, that principle too bars Mr. Ali's amended complaint, for the reasons provided in the initial briefing.  *See* ECF 25-1 at 22-23; ECF 26-1 at 3-11; *see also* ECF 9-1 at 13-15; ECF 10-1 at 2-9; ECF 12 at 8-10; ECF 13.