IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SAQIB ALI | * | |
| | * | Civil Action No. CCB-19-78 |
| v. | * | |
| | * | |
| LAWRENCE HOGAN, *et al.* | * | |

**MEMORANDUM**

In this action, the plaintiff, Saqib Ali, raises a First and Fourteenth Amendment challenge to Maryland Governor Lawrence Hogan's Executive Order Prohibiting Discriminatory Boycotts of Israel in State Procurement. Before the court is Governor Hogan's motion to dismiss (ECF 25) and Attorney General Brian Frosh's motion to dismiss (ECF 26). The matter has been fully briefed, and no further oral argument is necessary.[1] For the reasons stated herein, the motions will be granted.

**FACTS & PROCEDURAL HISTORY**

Mr. Ali is a computer software engineer and has "experience designing, developing, testing, deploying and maintaining complex software systems for government contracts for the US Department of Defense." (ECF 22, Am. Compl., ¶¶ 4, 44). He has also "dedicated himself to education and advocacy regarding the plight of the Palestinian people" and he "works to enlist as many members of the public as possible in joining him in non-violent opposition to Israel's maltreatment of Palestinians." (*Id.* ¶ 47). To that end, he is involved with the "Boycott, Divestment, and Sanctions" ("BDS") movement, which "seeks the peaceful end of Israeli discrimination against and maltreatment of Palestinians" by "impos[ing] economic pressure on Israel to cease its settlement activity in Palestinian Territory." (*Id.* ¶ 15). For example, he

---

[1] Oral argument was heard regarding the defendants' motions to dismiss (ECF 9, 10) Ali's original complaint (ECF 1) on August 1, 2019.

1

"refuses to purchase Sabra hummus or SodaStream products, which have ties to Israel and its occupation of Palestine," he advocates for others to join the BDS movement, and, in 2014, he "organized 'Freedom2Boycott in Maryland,' a coalition of statewide grassroots activists opposed to Maryland's legislative proposals targeting the BDS movement" which "helped to defeat Maryland's anti-BDS legislative proposals." (*Id.* ¶¶ 48, 50).

On October 23, 2017, Governor Hogan issued Executive Order 01.01.2017.25, titled "Prohibiting Discriminatory Boycotts of Israel in State Procurement." The preamble refers to the Declaration of Cooperation between Maryland and Israel, and notes that "[b]oycotts of people or entities because of their Israeli national origin, or residence or incorporation in Israel and its territories, undermines the Declaration of Cooperation." (ECF 25, Ex. A, Executive Order ("EO"), preamble). Section A of the Executive Order defines "Boycott of Israel" as "the termination of or refusal to transact business activities, or other actions intended to limit commercial relations, with a person or entity because of its Israeli national origin, or residence or incorporation in Israel and its territories." (EO § (A)(1)). But "Boycott of Israel" does not include actions that are (1) not commercial in nature, (2) for business or economic reasons, (3) because of the specific conduct of the party, (4) against a public or governmental entity, or (5) forbidden by the United States pursuant to 50 U.S.C. § 4607.[2] Section B of the Executive Order states that:

> Executive agencies may not execute a procurement contract with a business entity unless it certifies, in writing when the bid is submitted or the contract is renewed, that:
> 1. it is not engaging in a boycott of Israel; and
> 2. it will, for the duration of its contractual obligations, refrain from a boycott of Israel.

---

[2] 50 U.S.C. § 4607 concerns foreign boycotts.

2

Section C of the Executive Order provides that all requests for bids or proposals issued for contracts with executive agencies shall include the following certification to be signed by the bidder:

> The undersigned bidder hereby certifies and agrees that the following information is correct: In preparing its bid on this project, the bidder has considered all proposals submitted from qualified, potential subcontractors and suppliers, and has not, in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier, refused to transact or terminated business activities, or taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin, or residence or incorporation in Israel and its territories. The bidder also has not retaliated against any person or other entity for reporting such refusal, termination, or commercially limiting actions.

This certification is included in Maryland's solicitation and invitation for bid documents, with slight changes in wording so it applies to both bids and proposals. (ECF 22 ¶ 34). It appears in the bid/proposal affidavit under the header "Prohibiting Discriminatory Boycotts of Israel." (ECF 25, Ex. B, Bid/Proposal Affidavit, § M).

Mr. Ali alleges that, although he "only boycotts Israel in his personal capacity, signing this certification would be intimidating." (ECF 22 ¶ 38). For example, it is not clear to Mr. Ali if the "other actions" clause is limited to the "in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier" clause, especially to the extent that Section C may cover what is more broadly prohibited by Section B. (*Id.*). Additionally, he "cannot sign the oath because it requires Ali to support a political position he opposes." (*Id.* ¶ 56). According to Mr. Ali, he has not bid on at least six government contracts because he cannot sign the Section C certification. (*Id.* ¶¶ 53, 57).

Mr. Ali filed his initial complaint on January 9, 2019. (ECF 1). The defendants filed motions to dismiss and, as the court noted in its memorandum resolving those motions, the Governor asserted in his briefing and through counsel at oral argument that the language of

Section B should be read as limited by the Section C certification, so the Executive Order "is but an Israel-specific reiteration of the general prohibition against national origin discrimination." (ECF 20, Memorandum, at 6). On October 1, 2019, the court dismissed Mr. Ali's complaint without prejudice, noting that "[g]iven the current allegations and the Governor's express disavowal of any prohibitive effect beyond national origin discrimination in the preparation of the bid, the court finds that there is not sufficient controversy to go forward on the basis of a direct injury." (*Id.* at 8). The court stated that if Mr. Ali wished to proceed on the basis of a direct injury, he should submit a bid. (*Id.* at 8–9). If Mr. Ali sought "to challenge Section C on the basis of what he alleged to be a content specific restriction, he must allege an injury in order to have standing to sue." (*Id.* at 9 n.4). Finally, if Mr. Ali wished to rely on the relaxed standing requirements applicable in First Amendment challenges, he must "file an amended complaint plausibly alleging that his First Amendment activities have been chilled or that despite the Governor's interpretation of the Order, 'it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights.'" (*Id.* at 10–11 (quoting *Cooksey v. Futrell*, 721 F.3d 226, 236 (4th Cir. 2013)).

Mr. Ali filed an amended complaint on October 29, 2019, asserting two counts. (ECF 22). First, he claims that the Executive Order abridges his freedom of speech and assembly, in violation of the First and Fourteenth Amendments. (*Id.* at 12). Specifically, he argues that the Executive Order and the mandated "No Boycott of Israel" certification in Maryland bids and contracts each constitute viewpoint discrimination; are void for vagueness; and are each a prior restraint on speech, an unconstitutional condition on contractors, and an ideological litmus test and compelled speech. (*Id.* ¶¶ 67, 70–72, 74). Mr. Ali also contests the Governor's "purported interpretation" of the Executive Order as being "inconsistent with its text." (*Id.* ¶ 29). Second,

he claims that the Executive Order and the "No Boycott of Israel" certification are unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment. (*Id.* ¶ 86).

## STANDARD OF REVIEW

Issues of standing are analyzed under the rubric of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. *See Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480–81 (4th Cir. 2003) (affirming district court's dismissal of complaint for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1)). Plaintiffs bear the burden of proving that subject matter jurisdiction exists. *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). A plaintiff must prove standing "in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Ordinarily, "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see also Pac. Legal Found. v. Goyan*, 664 F.2d 1221, 1223 (4th Cir. 1981). When a defendant challenges subject matter jurisdiction pursuant to Rule 12(b)(1), "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)). A Rule 12(b)(1) motion should be granted "only if the material jurisdictional facts are not in

dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co.*, 945 F.2d at 768.

## DISCUSSION

Before reaching the merits of Mr. Ali's First and Fourteenth Amendment claims, the court must first resolve the threshold issue of standing, that "irreducible constitutional minimum." *Lujan*, 504 U.S. at 560. The "presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Diamond v. Charles*, 476 U.S. 54, 62 (1986). This is because "standing is not to be placed in the hands of concerned bystanders," as they may "use it simply as a vehicle for the vindication of value interests." *Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) (internal quotations omitted). To have standing, then, "[a] claimant must demonstrate (1) an 'injury in fact'; (2) a 'causal connection between the injury and the conduct complained of,' such that the injury is 'fairly traceable' to the defendant's actions; and (3) a likelihood that the injury 'will be redressed by a favorable decision.'" *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 134 (4th Cir. 2011) (quoting *Lujan*, 504 U.S. at 560–61).

To satisfy the injury in fact requirement, the plaintiff must demonstrate that he has "suffered an invasion of a legally protected interest," *id.* at 135 (quoting *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460 (4th Cir. 2005)), which is "concrete and particularized" and "actual or imminent," rather than "conjectural or hypothetical," *id.* (quoting *Lujan*, 504 U.S. at 560). *See also Clapper v. Amnesty Int'l*, 568 U.S. 398, 401 (2013) (noting the "well-established requirement that threatened injury must be 'certainly impending'"). "[T]he assertion of a facial challenge to an ordinance based on the First Amendment may warrant some relaxation of the prudential rule that a claimant may assert her own rights only," although "the claimant must

nevertheless satisfy the injury-in-fact requirement grounded in Article III." *Benham*, 635 F.3d at 135.

In this case, the Governor argues that Mr. Ali fails to satisfy even the relaxed standing requirements that apply in First Amendment cases because there is no credible threat Mr. Ali would be prosecuted for submitting a bid and because Mr. Ali has not had his speech chilled. (ECF 25 at 9).³ In response, Mr. Ali argues that he does have standing, first because he has sustained a direct injury in being prohibited from bidding on state contracts, and second because his inability to bid on such contracts is a burden on his free speech rights under the relaxed standards applicable in First Amendment challenges. (ECF 31, Combined Opp., at 11, 12). Thus, because the parties primarily dispute whether Mr. Ali can satisfy the injury in fact requirement, the court will address in turn each of Mr. Ali's theories for establishing an injury.

## I. Direct Injury

Mr. Ali asserts that he has sustained a direct, concrete injury from the Governor's Executive Order. Specifically, he argues that "he has been punished by an executive order that declares him"—as a person who intends to continue to engage in BDS activity—"ineligible for government contracts." (ECF 31 at 11). Further, he contends, he need not submit a bid in order to establish standing, as he has already been injured and as the Constitution does not require a person to submit a futile bid to establish standing.⁴ (*Id.* at 10–11). In response, the Governor asserts that Mr. Ali cannot satisfy the traditional standing requirements under *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), let alone the more relaxed requirements that apply in a First

---

³ Both the Governor and Attorney General Frosh also argue that Mr. Ali's claims are barred by the state sovereign immunity doctrine. (ECF 25 at 9; ECF 26 at 8–10). Because the court concludes that Mr. Ali lacks standing to raise this challenge, the court does not reach the issue of state sovereign immunity.

⁴ The court finds that this latter argument lacks merit. This case is not like *Hamilton v. Palozzi*, 848 F.3d 614, 620–21 (4th Cir. 2017), *cert. denied*, 186 S. Ct. 500 (2017), in which the court held that a plaintiff "need not go through the futile exercise of applying for a permit when he has been told already that it will be rejected." Here, the Governor has not stated that Mr. Ali's bid would be rejected.

Amendment challenge. (ECF 25 at 13). The Governor also argues that Mr. Ali's interpretation of the Executive Order is overbroad, as the Executive Order does not actually cover the activity that Mr. Ali alleges he is engaged in. (*Id.* at 16–19).

A few courts recently have found that plaintiffs had standing to challenge laws requiring certifications similar to the one at issue in the Governor's Executive Order. First, *Arkansas Times LP v. Waldrip* concerned Act 710, an Arkansas statute prohibiting state entities from contracting with companies unless the companies certified that they are not and would not for the duration of their contracts engage in a boycott of Israel.[5] 362 F. Supp. 3d 617, 617 (E.D. Ark. 2019). When the Arkansas Times, a weekly newspaper that had for years contracted with a state college to publish advertisements, was entering into a new advertising contract, it was informed it would have to sign the certification. *Id*. at 620. The Times refused to do so and lost the contract. *Id*. The court held that the Times had standing "because it suffered an injury in fact when it lost a government contract." *Id*. at 621. The court reasoned that the Times did not need to rely on a theory that there was "a risk of future injury" as it had "*already* sustained an injury from Act 710," namely the loss of a contract—which was a "concrete and quantifiable economic loss." *Id*. at 622 (emphasis in original).

Next, *Jordahl v. Brnovich* concerned Arizona Revised Statute § 35-393.01, a law substantially similar to the one at issue in *Arkansas Times*. 336 F. Supp. 3d 1016, 1028–29 (D. Ariz. 2018), *vacated as moot*, 789 F. App'x 589 (9th Cir. 2020). Jordahl, an attorney and the sole owner of a law firm that for twelve years had contracted with a county jail to provide legal services to incarcerated people, personally participated in boycotts of Israel and wished to have

---

[5] The term "Boycott of Israel" was defined in the Arkansas statute as "engaging in refusals to deal, terminating business activities, or other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories, in a discriminatory manner." Ark. Code Ann. § 25-1-502(1)(A)(i).

his law firm do the same in its consumer decisions. *Id*. Though Jordahl refused to sign the required certification, he continued to provide services at the jail under a pre-existing contract, and the jail ultimately refused payment. *Id*. at 1029. In adjudicating a challenge to Jordahl's standing to sue, the court held that the firm had been injured in a few ways, among them the direct injury of "not getting paid for services rendered due to its refusal to sign the certification."[6] *Id*. at 1032–33. "In this regard," the court stated, "the firm has not only experienced a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement, it has actually sustained injury." *Id*. at 1033 (internal quotations omitted).

Notably, both *Jordahl* and *Arkansas Times* featured plaintiffs who had a long history of contractual dealings with the state, and who had already negotiated a new contract and—but for the imposition of the certification requirement—would have executed it. As a result of their refusal to sign, the plaintiffs in those cases either lost a contract that otherwise would have been theirs, or were refused payment on a contract under which they had already rendered performance. Therefore, those plaintiffs could point to direct, concrete injuries on which to base their standing.

Unlike those plaintiffs, Mr. Ali cannot satisfy the injury in fact requirement by pointing to a contract lost for failure to sign a certification, because he has not yet bid on a contract. Instead, Mr. Ali's theory of a direct injury rests upon his interpretation of the Executive Order as prohibiting him from even submitting a bid on a contract in the first place. This interpretation is contrary to the interpretation advanced by the Governor, who "has disavowed the applicability of the Executive Order to people like Mr. Ali who choose to boycott Israeli goods and services as a

---

[6] The court also found that Jordahl alleged a sufficient risk of future injury because the county "conditioned the Firm's contracts on a promise to refrain from engaging in [a] protected course of conduct and the Firm refrained from engaging in such actions for fear of breaching the contract," thereby chilling Jordahl's speech. 336 F. Supp. 3d at 1033.

personal matter outside the context of State procurement." (ECF 25 at 21). Ordinarily, a district court is to accept as true all allegations in a plaintiff's complaint. *Warth v. Seldin*, 422 U.S. at 501. But "[p]articular weight must be given to the Government disavowal of any intention to prosecute on the basis of the Government's own interpretation of [a] statute and its rejection of [a plaintiff's] interpretation as unreasonable." *Blum v. Holder*, 744 F.3d 790, 798 (1st Cir. 2014).

The court finds that the Governor's interpretation is the most reasonable and that his disavowal is consistent with the plain text of the Executive Order. Section B of the Executive Order prohibits state agencies from contracting with anyone engaging in a boycott of Israel, but defines boycott of Israel as "the termination of or refusal to transact business activities, or other actions intended to limit commercial relations, with a person or entity because of its Israeli national origin." (EO § A(1)). "Commercial relations," in turn, is defined as "a business entity's conduct of business, and the terms and conditions by which business is transacted . . . ." (EO § A(3)). With the definitional language integrated into Section B, it reads:

> Executive agencies may not execute a procurement contract with a business entity unless it certifies, in writing when the bid is submitted or the contract is renewed, that:
> 1. it is not engaging in [the termination of or refusal to transact business activities, or other actions intended to limit [a business entity's conduct of business, and the terms and conditions by which business is transacted . . .], with a person or entity because of its Israeli national origin, or residence or incorporation in Israel and its territories]; and
> 2. it will, for the duration of its contractual obligations, refrain from [the same].

Notably, state agencies are prohibited from executing contracts with "business entit[ies]" which terminate or refuse "to transact business activities." Therefore, a boycott of Israel requires a boycott in one's business decisions.

Section C, which contains the language that Mr. Ali would have to sign to submit a bid, does require that bidders affirm they would not take "other actions intended to limit commercial

10

relations" with "a person or entity on the basis of Israeli national origin." (EO § C). But this clause is limited by its prefatory clauses—"[i]n preparing its bid on this project" and "in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier." (EO § C). The portion of Section C that Mr. Ali finds most problematic should be read thus:

> "*In preparing its bid on this project*, the bidder . . . has not, *in the solicitation, selection, or commercial treatment of any subcontractor, vendor, or supplier*, . . . taken other actions intended to limit commercial relations, with a person or entity on the basis of Israeli national origin." (*Id*. (emphasis added)).

Read in light of its relevant adverbial clauses, Section C is effectively limited to an affirmation that the bidder has not discriminated in the bid formation process.

In sum, Section B prohibits state agencies from contracting with an entity engaging in a boycott of Israel in its business decisions, and Section C requires any bidder to affirm that he or she has not discriminated in the bid formation process. Significantly, Mr. Ali states that he only boycotts Israel in his personal capacity, by "refus[ing] to purchase Sabra hummus or SodaStream products, which have ties to Israel and its occupation of Palestine," and by advocating for the BDS movement. (ECF 22 ¶¶ 38, 48). He does not allege that he boycotts Israel in his business capacity, except possibly for one sentence in his opposition stating that he "will continue to refuse to do business with, for instance, American citizens who operate in the West Bank." (ECF 31 at 10). Other than this, Mr. Ali does not allege that he intends to participate in any activities that would be covered under the Executive Order, and it is not clear from Mr. Ali's amended complaint that any of his potential work for the state—were he to bid on and obtain a contract—would require him to work with other businesses. As a result, the court cannot conclude that Mr. Ali is prohibited from bidding on a contract.

Accordingly, Mr. Ali has not sufficiently alleged a direct injury that would provide him with standing to challenge the Executive Order. If Mr. Ali is to have standing to challenge the

11

Executive Order, it must flow from an injury caused by the certification requirement under the more relaxed standards of a First Amendment pre-enforcement challenge.[7]

## II. Pre-Enforcement Injury

There are two common ways of demonstrating an injury in fact in a pre-enforcement First Amendment challenge. First, the plaintiff may allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" such that he risks prosecution or some other penalty. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see also Cooksey v. Futrell*, 721 F.3d 226, 237 (4th Cir. 2013). Second, a plaintiff may allege "self-censorship, which occurs when a claimant 'is chilled from exercising her right to free expression.'" *Cooksey*, 721 F.3d at 235 (citing *Benham*, 635 F.3d at 135). Either way, a "plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt*, 442 U.S. at 298. And the Supreme Court has emphasized that "[o]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of . . . Government was unconstitutional." *Clapper*, 568 U.S. at 408 (quoting *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997)).

In this case, Mr. Ali argues that (1) he would face a credible threat of prosecution if he submitted a bid with a signed certification, as his intention to "continue to refuse to do business with U.S. citizens operating in the West Bank" runs afoul of the certification requirement; and (2) the certification requirement operates to "chill the exercise of constitutionally protected speech and associations." (ECF 22 ¶ 75; ECF 31 at 10). The Governor counters that the threat

---

[7] Indeed, the court said as much in its previous memorandum opinion: "If Mr. Ali seeks to proceed on a direct injury theory, he should submit a bid." (ECF 20 at 10). As Mr. Ali has not submitted a bid, it is presumed he primarily "wishes to argue that First Amendment justiciability rules save his claims." (*Id.*).

12

of prosecution is wholly speculative and that Mr. Ali's speech has not been chilled.  (ECF 25 at 16, 23).  The court will address each theory for establishing a pre-enforcement injury in turn.

### A. Threat of Prosecution

When a party brings a pre-enforcement challenge to a statute or regulation on the basis of a threat of prosecution, he or she must allege (1) an intention to engage in a course of conduct arguably affected with a constitutional interest and (2) that there exists a credible threat of prosecution under the statute or regulation.  *Babbitt*, 442 U.S. at 298; *see also Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018).  It is not necessary that a plaintiff expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights.  *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).  There is a presumption that a "non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs" presents a credible threat.  *Kenny*, 885 F.3d at 288 (quoting *North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)).  Still, the threat of prosecution cannot be imaginary, chimerical, or wholly speculative, *Babbitt*, 442 U.S. at 298, and even a "sincere fear" that a statute might be applied to a plaintiff's conduct does not satisfy Article III's requirements when the plaintiff's conduct is not actually targeted by that statute, *Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009).  Supreme Court decisions reveal several factors used to determine whether the threat of enforcement is credible: past enforcement or official threats made against the plaintiff; a failure to disavow future enforcement; and the frequency of enforcement against similarly situated persons.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163–64 (2014); *Humanitarian Law Project v. Holder*, 561 U.S. 1, 16 (2010); *Steffel*, 415 U.S. at 455–56.

*Cooksey v. Futrell* provides an illustrative example of a credible threat of prosecution. 721 F.3d 226 (4th Cir. 2013). In that case, Cooksey was investigated for potential violations of North Carolina's Dietetics/Nutrition Practice Act, which prohibits the unlicensed practice of dietetics/nutrition, when state authorities learned he maintained a website advocating a paleolithic diet as treatment for diabetes. *Id*. at 230. At the conclusion of the investigation, he was provided with a "red-pen review" of "areas of concern" on his website. *Id*. Fearing civil and criminal action, he altered his website as suggested by the state, taking down his advice columns. *Id*. at 232. The court held that Cooksey had standing based on a credible threat of prosecution because (1) he received a phone call from a high-ranking state official warning him she could seek an injunction; (2) he received a red-pen mark-up of his website accompanied by a request to make changes to the site; and (3) he was told that the state would continue to monitor him. *Id*. at 236–37. This, the court reasoned, would "surely" cause a person of ordinary firmness to feel a chilling effect. *Id*. at 237. Therefore, Cooksey had sufficiently shown that he "experienced a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the State." *Id*. at 236.

Other cases decided by the Fourth Circuit Court of Appeals teach that a credible threat of prosecution exists where an organization inquires with a state agency whether its conduct would violate a statute and the agency responds in the affirmative, *see North Carolina Right to Life*, 168 F.3d at 708–10, and—more clearly—where a plaintiff has actually been prosecuted in the past, *see Kenny*, 885 F.3d at 285.

In this case, Mr. Ali cites Maryland's debarment and perjury statutes and states that if he were to sign the certification he may "be subject to damages, disbarment, and even imprisonment." (ECF 22 ¶¶ 32, 38 (citing Md. Code Ann., State Fin. & Proc. § 16-203(a)(12);

14

Md. Code Ann., Crim. Law § 9-101(a)(4))).[8]  The Governor counters that given his disavowal of future enforcement and the lack of a history of prior enforcement, "Ali has in no way established" a credible threat that might cause a person of ordinary firmness to feel a chilling effect from the Executive Order.  (ECF 25 at 21).  Further, the Attorney General argues that since he has not enforced, threatened to enforce, or advised other agencies to enforce the Executive Order against Mr. Ali, there is no reasonable basis on which to feel a chilling effect.  (ECF 26 at 16).

The court finds that Mr. Ali has not sufficiently alleged a credible threat of prosecution.  As explained above, the plain text of the Executive Order is in accord with the Governor's interpretation and the Governor has disavowed the interpretation of the Executive Order advanced by Mr. Ali.  Additionally, Mr. Ali has failed to identify any person who was prosecuted or threatened with prosecution under this Executive Order.  Mr. Ali himself has not been prosecuted in the past—as the plaintiff in *Kenny* was—nor has he been threatened with prosecution in the future.  Further, Mr. Ali has not inquired with the state as to whether his proposed conduct would violate the Executive Order, as the plaintiff in *North Carolina Right to Life* did.  Finally, unlike the plaintiff in *Cooksey*, whose conduct was reviewed and found by a state agency to be illegal, the Governor in this case has represented just the opposite to this court, stating that Mr. Ali will not be subjected to prosecution for engaging in any of the activities listed in his amended complaint.  In sum, barring any unanticipated changes to this status quo, Mr. Ali is and should feel free to continue boycotting Israel in his personal capacity so long as he

---

[8] Section 9-101(a)(4) of the Criminal Law Article makes it a misdemeanor to "willfully and falsely make an oath or affirmation as to a material fact . . . in an affidavit required by any state . . . government . . . with legal authority to require the issuance of an affidavit."  Section 16-203(a)(12) of the State Finance and Procurement Article states a person "may be debarred from entering into a contract with the State if the person . . . has . . . been found in a final adjudicated decision to have violated" the state's general Commercial Nondiscrimination Policy, codified in Title 19 of the State Finance and Procurement Article.

does not do so in the context of bid formation. In this case, the threat of prosecution is too speculative to make out an injury even under the relaxed standards of a First Amendment challenge; there is no concrete allegation that would substantiate Mr. Ali's fears, which "rest on mere conjecture about possible governmental actions." *Clapper*, 568 U.S. at 420.

### B. Chilled Speech

A party may also bring a pre-enforcement challenge to a statute or regulation by showing self-censorship. *Cooksey*, 721 F.3d at 235. This occurs "when a claimant is chilled from exercising her right to free expression." *Benham*, 635 F.3d at 135. The chilling effect must be objectively reasonable and not speculative. *Cooksey*, 721 F.3d. at 236. But the plaintiff need not show that he ceased his First Amendment activities, as government action is sufficiently chilling when it is "likely [to] deter a person of ordinary firmness from the exercise of First Amendment rights."[9] *Id.* Further, the Fourth Circuit has not "rule[d] out the possibility that a person hardy enough to withstand a chilling effect could assert an injury on account of the burden she faced in carrying out the desired activity." *Benham*, 635 F.3d at 139 n.7.

In the recent case of *Amawi v. Pflugerville Independent School District*, for example, the court held that five sole proprietors who had contracts with various state agencies had standing to challenge the inclusion of no-boycott clauses in their contracts because the plaintiffs "made a clear showing" that "the inclusion of the no-boycott clauses in their contracts chilled their First Amendment right to free expression." 373 F. Supp. 3d 717, 737 (W.D. Tex. 2019), *vacated as*

---

[9] The Governor's contention that Mr. Ali must have actually been chilled in his speech to show an injury in fact is contrary to Fourth Circuit precedent. (*See* ECF 25 at 23). Rather, the question is whether the government's "conduct would tend to chill a reasonable person's exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500–01 (4th Cir. 2005). The Supreme Court's language in *Laird v. Tatum* is not to the contrary: "if respondents themselves are not chilled, but seek *only* to represent those 'millions' whom they believe are so chilled, respondents clearly lack that 'personal stake in the outcome of the controversy' essential to standing." 408 U.S. 1, 13 n.7 (1972) (emphasis added) (citations omitted). Mr. Ali does not seek merely to advocate for the rights of others. Were Mr. Ali's speech chilled, that would serve as evidence of a chilling effect, but its absence is not dispositive.

16

*moot*, *Amawi v. Paxton*, 956 F.3d 816 (5th Cir. 2020). The Texas statute at issue, H.B. 89, required any entity contracting with a state agency to certify that it "does not boycott Israel" and "will not boycott Israel during the term of the contract." *Id.* at 730. "Boycott Israel" was defined as "refusing to deal with, terminating business activities with, or otherwise taking any action that is intended to penalize, inflict harm on, or limit commercial relations specifically with Israel, or with a person or entity doing business in Israel or in an Israeli-controlled territory." *Id.* at 730–31. Because each of the plaintiffs was engaged in and intended to continue to engage in conduct that could fairly be construed as inflicting harm on or limiting commercial relations with Israel—including "refusing to buy the Sabra brand of hummus"—the broad certification requirement of the Texas law chilled their expression. *Id.* at 732, 737.

On the issue of chilled speech, *Jordahl v. Brnovich* is again illustrative. As previously noted, in *Jordahl*, the court held that the plaintiff was injured in a few ways and not just by being refused payment. 336 F. Supp. 3d at 1032. Specifically, the firm was injured when it was required to promise to refrain from engaging in arguably constitutionally protected activity in exchange for receiving a government contract. *Id.* Jordahl wished to, but for fear of losing his contract could not, extend his personal boycott of Israeli products to his law firm's consumer choices, and Jordahl personally was chilled from his ongoing boycott of Hewlett-Packard, Airbnb, and SodaStream for fear that, as the sole owner of a firm that bears his name, "these political activities . . . may be confused with those of his Firm's." *Id*. at 1033. The court noted that "[w]here a plaintiff has refrained from engaging in expressive activity for fear of prosecution under the challenged statute, such self-censorship is a constitutionally sufficient injury as long as it is based on an actual and well-founded fear that the challenged statute will be enforced." *Id*. (internal quotations omitted).

In this case, Mr. Ali has not sufficiently alleged that his speech has been chilled. While Mr. Ali alleges, albeit in general and conclusory terms, that the certification requirement would deter "an individual of ordinary firmness" from boycotting Israel as signing even the Section C certification "would be intimidating," Mr. Ali's amended complaint does not adequately allege that this is so. (ECF 22 ¶¶ 38–39). Unlike the plaintiffs in *Amawi*, who had to sign a certification with language similar to the language in Section B of Governor Hogan's Executive Order, Mr. Ali would only have to sign Section C of the Executive Order and therefore he is not confronted with such a broad certification requirement. To submit a bid, Mr. Ali would need to certify that he had not discriminated against Israelis in the context of bid formation, but—unlike the *Amawi* plaintiffs—he would be free to continue his personal boycotts against Sabra and SodaStream. Nor is Mr. Ali like the plaintiff in *Jordahl*, who presented allegations that he had ceased boycotting for fear his activities would be confused with those of his firm; Mr. Ali has not presented any allegations that he has ceased any boycotting activities that would be covered by the Executive Order, or that but for the certification he would have expanded his boycotting activities. Even if Section C is read as incorporating the broader language of Section B, Mr. Ali does not allege an intention to engage in any activity that could be construed to fall within the purview of the Executive Order; indeed, he does not state that he intends to do any boycotting in his business decisions. Nor does he appear to have engaged in any self-censorship. And even if his amended complaint could be construed to allege that he had engaged in self-censorship, it could not be said—in light of the plain language of the Executive Order—to be based on an "actual and well-founded fear" that the Order would be enforced in the manner he believes it will. *Jordahl*, 336 F. Supp. 3d at 1033. Consequently, Mr. Ali cannot claim standing by way of self-censorship.

18

## CONCLUSION

Because Mr. Ali has not submitted a bid, he cannot proceed on the basis of a direct injury.  And because Mr. Ali has not sufficiently alleged a credible threat of prosecution or a chilling effect, he cannot proceed under the more relaxed standards applicable in a First Amendment challenge.  For these reasons, the court will grant Governor Hogan's motion to dismiss (ECF 25) and Attorney General Frosh's motion to dismiss (ECF 26).  A separate order follows.


  10/26/20                                                              /S/
Date                                                            Catherine C. Blake
                                                                United States District Judge